**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LAUREN DE CAMARA, SASHA KACHRU,<br>HOPE RICHARDS-CORDELL,<br>SAULE AOKI, KYRA KUELGEN, and<br>ESÉNIA BAÑUELOS<br><br>*Plaintiffs*,<br><br>v.<br><br>BRYN MAWR COLLEGE, and<br>THE BOARD OF TRUSTEES<br>OF BRYN MAWR COLLEGE,<br><br>*Defendants*. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Civil Action No. 2:25-cv-02287<br><br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiffs Lauren De Camera ("De Camara"), Sasha Kachru ("Kachru"), Hope Richards Cordell ("Richards-Cordell"), Saule Aoki ("Aoki"), Kyra H. Kuelgen ("Kuelgen"), Esenia Bañuelos ("Bañuelos"), by and through its undersigned counsel, for themselves and on behalf of all others similarly situated, as and for their complaint against Bryn Mawr College ("Bryn Mawr" or the "College"), the Board of Trustees of Bryn Mawr College (the "Bryn Mawr Board" and, collectively with the College, the "Defendants"), allege and state as follows:

**INTRODUCTION**

1.      This is an individual and class action for damages resulting from Defendants' deliberate indifference to the needs of students with disabilities, in particular "invisible" disabilities, as evidenced by (a) the gross understaffing of the College's "Access Services", a two-person program offered by a highly profitable "non-profit" College that generated net income of $46,871,571 and investment income of $56,477,122 in 2023 alone; (b) the College's arbitrary and capricious responses to the needs of its disabled students and (c) Bryn Mawr's disregard for the

emotional health and well-being of disabled students, who have contemplated suicide, abandoned their studies, transferred to other colleges and universities, or suffered painfully through their time at the College. Plaintiffs seek injunctive relief under Title III of the Americans with Disabilities Act and monetary damages for negligent infliction of emotional distress and breach of contract, as remedies for Bryn Mawr's flagrant disregard of the needs and well-being of its neurodivergent students.

## THE PARTIES

2.      Plaintiff Lauren De Camara is a former Bryn Mawr student who has been diagnosed with Central Sensitization Syndrome and suffered from Post-Concussive Syndrome while she was at Bryn Mawr. De Camara suffered from the arbitrary decisions of the Director of Access services, Deborah Alder ("Alder"), and the College's callous indifference to her needs as divergent student. She continued to be denied an accommodation until she was forced to leave Bryn Mawr on or about May 6, 2024.

3.      Plaintiff Sasha Kachru ("Kachru") is a current Bryn Mawr student who has been diagnosed with Autism, Generalized Anxiety Disorder, and Attention Deficit Hyperactivity Disorder, and suffered from the arbitrary decisions of the Director of Access services and the College's callous indifference to her needs as divergent student.

4.      Plaintiff Hope Richards Cordell suffers from a severe food allergy that requires adherence to a strict gluten-free diet. Cordell suffered from the arbitrary decisions of the Director of Access services and the College's callous indifference to her needs as divergent student.

5.      Plaintiff Kyra Kuelgen ("Kuelgen") has been diagnosed with Hypermobility Syndrome Disorder, which causes her joints to be more susceptible to injuries. Before the 2023

academic year began, Kuelgen underwent hip surgeries for a labral repair and femoroacetabular impingement. Kuelgen suffered from the arbitrary decisions of the Director of Access Services and the College's callous indifference to her needs as divergent student.

6.      Plaintiff Esenia Bañuelos ("Bañuelos") suffers from ADHD, C-PTSD (complex PTSD), major Depression, and Asthma. She was one of the student leaders of the campus fighting for better treatment and reasonable accommodations for students with disabilities and mental health needs, and has faced retaliation from Defendants for her efforts.

<u>**JURISDICTION AND VENUE**</u>

7.      This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338 in that this case arises under Title III of the Americans with Disabilities Act, 42 U.S.C. § 1201 *et. seq*.

8.      This Court has supplemental jurisdiction over all state law causes of action asserted herein pursuant to 28 U.S.C. § 1367, because Plaintiffs' state law claims are part of the same case or controversy.

9.      This Court has personal jurisdiction over Defendants because they conduct business in Pennsylvania and because they have committed torts in the State of Pennsylvania and in this district.

10.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events, acts, omissions, and injuries giving rise to the claims occurred in this judicial district and because Defendants are subject to personal jurisdiction in this judicial district at the time this action has commenced.

## FACTUAL BACKGROUND

### Bryn Mawr College

11.     Bryn Mawr College is a well-known, private liberal arts college, primarily for women, identified as one of the "Seven Sisters" college, a group of prestigious women's colleges that also includes Vassar College, Smith College, and Mt. Holyoke College.

12.     Bryn Mawr was founded as a Quaker institution in 1885 and has since grown into a highly successful business enterprise. According to the most recently available financial data, in 2023 Bryn Mawr generated a total of $241,836,662 in revenue against expenses of $194,965,091 for net income of $46,871,571. Tuition amounts to $59,300 per year not including an additional $20,050 students are required to pay for room and board, books and other expenses. Bryn Mawr's endowment amounts to more than $1.1 billion dollars and generated investment income of $56,477,122.

### Bryn Mawr's Treatment of Disabled Students

13.     Each Bryn Mawr class numbers approximately 360 students, resulting in a total undergraduate student body of approximately 1440 students. Plaintiffs estimate that between 10-20% of the student body suffers from some form of disability or neurodivergence requiring an accommodation.

14.     The needs of the College's divergent student body are met almost exclusively by Bryn Mawr's "Access Services" department, a two-person outfit with an operating budget Plaintiffs believe to be less than $250,000 per year, with the lion's share of the budget, which amounts to slightly more than 0.1% of Bryn Mawr's 2023 operating revenues, going to the salaries of its Director and Assistant Director of Access Services. This department is falsely presented by the College as welcoming, understanding, and accommodating set against the serene background

of the Eastern Pennsylvania hills, as shown below:



At Access Services, we work with students and visitors to campus who self-identify with a disability to ensure equal access to Bryn Mawr's programs, activities and services. The Access Services office, located in Guild Hall, provides support, and may arrange accommodations related to access for eligible students and visitors to campus.  Individuals who think they may need accommodations because of the effects of a learning, physical, or psychological diagnosis and/or a chronic medical condition are encouraged to contact Access Services as early as possible to discuss their situation.

15.     However, in reality, the Access Services program consists of arbitrary and inscrutable decisions made by its director. Despite the College's promotional materials, the department lacks the resources necessary to provide required accommodations, leading to

unwarranted denials of accommodations driven by lack of funding or the director's personal whims.

16.      Access Services nominally reports to the President of the College and through the President to the Board of Trustees, but the Board exercises virtually no oversight on its abuse of power, thus adopting and ratifying the violations of students' rights. The needs of 10-20% of the student body are given less attention than the performance of a few stocks and bonds in the College's billion-dollar endowment. On information and belief, the chief investment officer of the College earns well in excess of $1 million per year, more than four times the budget of the entire Access Services department, underscoring the unimportance of the needs of divergent students to the Board of Trustees.

17.      Pembroke Hall, one of the most popular social meeting places for students at Bryn Mawr and Haverford (the traditionally male liberal arts college paired with the historically female Bryn Mawr that shares many classes and programs with the College) is completely inaccessible to disabled students, thus depriving these students of a shared social experience with their able-bodied peers:





18.    The same is true of many student dorms, such as Merion, which is inaccessible to disabled students:



19.    Perhaps nothing is as telling as the total exclusion of disabled students from

participation in one of the college's oldest and most well-known tradition, that of ascending to the top of Taylor Hall – the College's first building, named after its founder and perhaps Bryn Mawr's most prominent structure – to ring the bell at the belfry at the top of the building upon graduation. Taylor Hall is completely inaccessible to students in wheelchairs or on crutches and its steep internal stairs are impossible to navigate for students with neurological, balance, vision, and other limitations, as the contrast between the idyllic portrait of the hall in promotional photography and a close-up of the entryway shows:





20.     In keeping with the exclusion of disabled students from campus rituals and campus life, the College does very little to assist disabled students with transportation from dorms to classes on the spread out campus—unlike many other colleges and universities that have a well-established "shuttle" system for students with mobility challenges, Bryn Mawr's shuttle bus service is entirely unknown to the majority of the student body. This is possibly because they do

not promise a safe and timely delivery to class.

21.     Students with dietary restrictions are treated with an indifference bordering on contempt. Gluten free options at the cafeteria are extremely limited, almost parodic, as the junk-food offerings from the "gluten-free" refrigerator show:



22.    The gluten-free options are not only unhealthy, but downright harmful to students' health, as the mold-ridden waffles offered to students with special dietary needs demonstrate:



23.    The structural barriers to full inclusion in a safe and healthy campus life on display for students with "visible" disabilities are also reflected in the experiences of the plaintiffs with "invisible" disabilities described in this complaint. There are no photographs that can capture the discriminatory treatment of students with invisible disabilities, but their stories testify no less

compellingly to Defendants' deliberate indifference to their needs.

24.     The structural barriers to equal treatment and access, and the systematic failure to provide for disabled students' needs are reflected in the common experience of each of the named plaintiffs in this action and the classes of similarly situated students described herein.

**BRYN MAWR STUDENTS' SPECIAL NEEDS**

25.     Plaintiffs estimate that between 10 and 20% of the Bryn Mawr student population suffers from some form of disability. This estimate is based on the named Plaintiffs' experience at the College and national statistics that demonstrate the widespread nature of the problem.

26.     According to the National Institutes for Health (the "NIH") **23.1%** of US adults suffer from mental illnesses of one form or another. https://www.nimh.nih.gov/health/statistics/mental-illness.

27.     The Center for Disease Control (the "CDC") estimates that 2% of the adult population suffers from autism and a further 6% suffer from ADHD. https://www.cdc.gov/autism/publications/adults-living-with-autism-spectrum-disorder.html/ https://www.cdc.gov/adhd/php/adults/index.html.

28.     An estimated 3% of adults are immunocompromised. https://pmc.ncbi.nlm.nih.gov/articles/PMC10401620/, 12.2% face mobility and stamina challenges, www.cdc.gov/disability-and-health/articles-documents/disability-impacts-all-of-us-infographic.html, 1.3% and 20.5%, respectively, suffer from chronic fatigue and chronic pain, https://www.cdc.gov/nchs/data/databriefs/db488.pdf ; https://pubmed.ncbi.nlm.nih.gov/33990113/.

29.     The percentage of Americans with disabilities is on the rise. Between 2020 and 2022, "employment of people with disabilities [went] up nearly 25%, to more than 7.3 million

workers… according to the Bureau of Labor Statistics."

https://www.latimes.com/politics/story/2022-12-15/long-left-out-of-job-market-people-with-disabilities-reap-benefits-of-covid-19s-teleworking-boom.

30.      Disabilities relating to food are particularly acute. 6.2% of the adult population suffers from food allergies.

https://www.cdc.gov/nchs/pressroom/nchs_press_releases/2022/20220126.htm, 14.7% of the adult population has been diagnosed with  diabetes, a condition that requires substantial food accommodations,  https://www.cdc.gov/diabetes/php/data-research/index.html, and a relatively small, but growing, number of US adults have been diagnosed with celiac disease, a potentially life-threatening condition. https://www.ncbi.nlm.nih.gov/books/NBK441900/.

31.      The underlying causes of food disabilities are varied.

32.      36% of the US adult population is lactose-intolerant,

https://worldpopulationreview.com/country-rankings/lactose-intolerance-by-country, 11% of the global population suffers from irritable bowel syndrome,

https://pmc.ncbi.nlm.nih.gov/articles/PMC3921083/ and between 0.4-0.8% struggle with inflammatory bowel syndrome.  https://www.cdc.gov/inflammatory-bowel-disease/php/facts-stats/index.html./

33.      Plaintiffs believe that disability rates among Bryn Mawr students are higher than those in the general population because of Defendants' aggressive marketing of its access services and small class sizes and understanding professors, which would be likely to attract students with special needs.

34.      The experiences of the named Plaintiffs testify to the existence of a systemic problem at Bryn Mawr this lawsuit seeks to address.

## BRYN MAWR'S DISCRIMINATORY PRACTICES

### Lauren De Camara

35.     De Camara matriculated at Bryn Mawr in the fall of 2021. She suffered from ADHD, Dysautonomia, and Post-Concussive Syndrome. The recommended accommodations were priority schedule selection, access to air-conditioned housing, centrally placed housing, housing on the first floor, access to recorded lectures / professors' notes, and extended time on testing and assignments. Notwithstanding the college's promising rhetoric, she quickly found that Bryn Mawr was unable and/or unwilling to provide her with the accommodation needed.

36.     Defendants required that a $4000 neuropsychological battery of tests proving her ADHD be redone and advised that she buy an iPad with an apple pencil for her ADHD.

37.     De Camara's first experience with the college's failure to meet her needs occurred in her first week of school, when, due to her disabilities, she submitted several homework assignments late. She had received neither the doctor's recommended accommodation, nor credit for the assignments. The stress of this inflexibility proved to be a burden on her health throughout the semester.

38.     In February of 2022, De Camara developed further complications to her post-concussive syndrome and required an additional accommodation to be allowed to attend lectures virtually. She sought this basic accommodation directly from her intensive Japanese instructors at Haverford, which offers classes to Bryn Mawr students under a joint program. The instructors were accommodating and allowed De Camara to attend classes remotely when necessary. She was able to maintain an A average in the class, but the Haverford administration refused to acknowledge the accommodation provided by the individual instructors, and insisted she be failed out unless she could obtain a formal accommodation through Bryn Mawr. When she sought to

obtain the accommodation at Bryn Mawr, she was rejected. After an extensive and exhausting series of communications, her Bryn Mawr advisor worked with the Haverford administration, who switched her grade to a D instead of a flat-out failure in a transparently phony informal "accommodation."

39.    This further complication persisted throughout the following two semesters, fall of 2022 and spring of 2023. Because of her vocal advocacy for her rights, De Camara found herself unwelcome in many classrooms. In addition to not being given priority selection, she was asked to drop multiple classes in the first weeks of the semester by teachers who found the idea of opening a zoom recording too burdensome on their busy schedule. Some of the classes she was asked to leave were required for her declared psychology major, such as research methods and statistics and the psychology seminar, as well as classes of personal interest, such as growth and spatial organization of cities. Those who did offer her a seat in the class varied on the delivery of their promise to accommodate, sometimes waiting numerous lectures before sending her any material at all. When she complained of the enormous stress she was under, because of the denial of basic accommodations, her advisor suggested that she seek therapeutic help, and/or transfer schools.

40.    In fact, because of the deliberate actions of Defendants to deny her the needed accommodations, De Camara was obligated to take a medical leave of absence, involving intensive outpatient treatment, after finishing her classes in the spring of 2023. De Camara continues to suffer from Bryn Mawr's failure to provide needed accommodation or even to acknowledge her concerns and main medical requirements.

41.    De Camara attempted to engage in advocacy during her time at Bryn Mawr. Her advisor informed her the person she should speak with was Jennifer Walters, the undergraduate

dean. Upon hearing De Camara's concerns that not allowing virtual access was discriminatory, Walters coldly suggested that she find a different school. Walters retired shortly thereafter. De Camara repeated her concerns to Cheryl Horsey, the acting dean, who has since become the equal opportunity officer, overseeing the Access Services department. Dean Horsey concurred with Walter's opinion, and equally coldly – and with blatant disregard for De Camara's legitimate need for an accommodation – suggested that De Camara seek education elsewhere.

42.     De Camara finally joined her fellow advocate Bañuelos in securing a meeting with Kimberly Cassidy, president of Bryn Mawr, only to be met with defensiveness and indifference. Despite hearing De Camara's concern over the integrity of the Access Services Director, Cassidy stated that she would not continue the discussion without Alder's presence.

43.      In other joint meetings with Bañuelos, when De Camara requested virtual entry, she was denied access to multiple accessibility meetings, exacerbating the traumatic stress for both girls. When De Camara decided to try to gather her peers for this class-action lawsuit, the school newspaper took an interest in the project. However, when the paper attempted to publish this article, the Bryn Mawr administration refused to allow the paper to publish the article, saying that reporting a lawsuit that is planned, but technically not yet filed, does not count as journalism.

44.     De Camara's health deteriorated vastly over her time at Bryn Mawr: she went from being able to spend five hours a day on productive activities, to barely managing 30 minutes a day while remaining practically bedridden. Her nervous system condition, which was diagnosed after her final semester at Bryn Mawr, reacts strongly to stress.

45.     Bryn Mawr's deliberate and repeated refusal to offer De Camara needed accommodations – driven by a structural lack of resources, trained personnel, knowledge about disability and willingness to take seriously federal anti-discrimination legislation – exacerbated

her condition to the point that she required intensive treatment at the Mayo Clinic for nearly a month and continues to require weekly aftercare appointments for the entirety of the foreseeable future.

46.     As a result of Bryn Mawr's deliberate indifference to her needs, De Camara has been forced to withdraw from Bryn Mawr. She is on indefinite leave until Bryn Mawr has taken the necessary steps to address the structural and specific issues set forth in this Complaint.

### *Hope Richards-Cordell*

47.     Richards-Cordell matriculated at Bryn Mawr in the fall of 2021. She suffered from Celiac disease and notified the school. Her deposit for room and board guaranteed her three square meals a day, in addition to her dorm. She was told she would have access to a specialized "gluten-free room," opened with OneCard ID, for students with gluten intolerances or Celiac. On her very first day on campus, she found that her OneCard had not been granted access to the gluten-free room and was forced to rely on the main hot bar until the situation was remedied, which was rife with cross-contamination. Twenty-two days passed with an extensive, urgent, and exhausting series of emails with the dietician before her OneCard was granted access. Throughout those twenty-two days, she found very few foods that she could tolerate and often feared for where her next meal would come from, and whether it would make her sick.

48.     When Richards-Cordell finally entered the gluten-free room for the first time, she was surprised to find that hot food was not kept there at all. She would have to continue relying on the main hot bar as her food source. To mitigate the onset of food-related anxiety, Richards-Cordell attempted to plan her meals for the week using the available menu. However, she quickly found that this menu was rarely adhered to, and even that stability slipped away.

49.    Richards-Cordell frequently vomited after eating or went hungry to avoid consuming food that was damaging to her health. She became unable to study and missed multiple classes. Richards-Cordell received two failing grades her very first semester and felt incredibly isolated for not being well enough to participate in almost anything. She then took medical leave.

50.    She re-entered Bryn Mawr in the spring semester of 2023. She paid the required expense for room and board and was once again guaranteed three square meals a day. She spoke with Alder about acquiring the accommodations of a first-floor, single dorm, as well as the ability to have a car on campus. She was granted these accommodations, and was happy to find that, this semester, hot food was kept in the gluten-free room.

51.    However, the apparent accommodation for her food disability – which had caused and continued to cause life-threatening consequences – was woefully inadequate. The gluten free room contained hot food only during weekday evening meals. This meant that students with gluten intolerances could not receive hot meals during the day or over the weekend.

52.    Moreover, even though the gluten free room finally carried hot food, the selection of food was essentially limited to plain grilled chicken with rice and a vegetable, vastly inferior to the food provided to "normal" students. Richards-Cordell and others requested that the gluten-free room contain, at a minimum, gluten-free food available in the College's main hot bar, but that had not been properly protected from cross-contaminants, leading to severe, and in some cases, life-threatening reactions if students with gluten allergies ate food from outside the gluten-free room. Defendants refused to provide for equal treatment of students requiring gluten-free accommodation and "normal" students without dietary restrictions.

53.    In response to students demands for dietary accommodations during the day and on weekends, the College administration responded that the kitchen was "short-staffed" and that

the College did not have the resources to ensure that the gluten-free room adequately stocked at all times. The administration's attitude was that students should be happy with a partial accommodation, and that the costs of a full accommodation were too great for a college generating tens of millions of dollars in profits annually.

54.     The short-staffing of the gluten-free room forced Richards-Cordell to eat from the regular hot bar, where items labeled "gluten free" had not been prepared to avoid cross-contamination. Richards-Corden fell ill and frequently vomited in response to food labeled as "gluten-free" but that had not been protected from cross-contamination.

55.     Within the gluten-free room, the short staffing regularly created dangerous situations, such as when hot dishes explicitly labeled as containing wheat were made available, revealing the reckless disregard for proper isolation of gluten-free meals, or when the waffle machine would be uncleaned for weeks at a time.

56.     Richards-Cordell, along with many of her peers, decided it was safer to rely on her own financial assets to obtain safe food than continuing to fight an uncaring administration. She secured a job at a local Starbucks and determined that she needed to work a minimum of 15-20 hours a week to be able to afford the safe meals she should be given by right as a student. That semester, she made $2,439.09 and spent 48% of it ($1,165.79) on essential groceries.

57.     Richards-Cordell's physical, mental, and social health were placed under immense stress once again. At the end of the semester, she withdrew from the college. To this day, she finds herself healing from food insecurity, not caused by poverty, but by the deliberate indifference of the Bryn Mawr administration to her cries.

***Saule Aoki***

58.     Aoki matriculated at Bryn Mawr in the fall of 2020. She suffered from ADHD, anxiety, Raynaud's phenomenon, allergies, and GERD. The only recommended accommodation at that time was 50% extended time on testing.

59.     Despite her extensive neuropsychological test results showing that suffered from ADHD, and a 504 plan in high school allowing 50% extended time on testing, the Director of Access Services, Laure Alder, stated that Aoki's "SAT score [was] too high" to receive the requested accommodation. Aoki's therapist and social worker fought Alder on this point, who eventually granted the recommended accommodation.

60.     Aoki expressly informed the College that she suffered from secondary Raynaud's disease – a condition that causes spasms and pain in response to cold – but Aoki was placed in a dorm room that did not have heating. When it snowed and the temperature dropped, Aoki could not type in her own dorm room because of the shooting pains in her arms and her shivering which prevented her from sleeping.

61.     Aoki expressly chose Bryn Mawr because of the "robust mental health and psychiatry services" purportedly offered to all students in the College's rosy marketing documents. However, upon her arrival on campus, she found there were no psychiatrists on campus who could prescribe the medication she had been taking for years to address her life-threatening conditions. With some difficulty, Aoki was eventually able to obtain the needed medication off-campus.

62.     Aoki not only suffered herself from the callous indifference of the College, but was also witness to its indifference to other students.  On one occasion, early in the morning, Aoki heard a girl crying outside of her room. When Aoki asked the girl if she was okay, the girl responded she was seriously considering harming herself. Aoki attempted to call the emergency psychiatric team, who responded they would make space for the girl in a little over three hours.

Aoki was forced to choose between missing two important morning classes and taking the risk that this the girl would end her own life during the school's irresponsibly lengthy delay in responding to a mental health crisis. Incidents such as this became so frequent in Aoki's life she considered the sound of students in distress to be the norm.

63.     Aoki attempted to engage in advocacy during her time at Bryn Mawr. She spoke with her professors, some of whom echoed her concerns that many of their students needed counselling, but that none was available. In January 2023, Aoki met with Polly O'Keefe, the head of counselling services. O'Keefe admitted that the counselling department was extremely understaffed but stated that there were no plans to hire or alleviate the situation in the near future.

64.     Aoki then met with Kari Fazio ("Fazio"), Bryn Mawr's then-current CFO. Fazio displayed indifference to Aoki's concerns, even when Aoki stated that the College's deliberate indifference to the mental health needs of its students would eventually lead to a tragedy, such as a preventable suicide. ended the conversation by telling Fazio that if the situation doesn't change, "someone's going to die."

65.     Aoki required morning medications that must be taken with food, and so it was necessary for her to keep sealed food in her dorm. Rats made a nest in her closet, and when she photographed the infestation and asked the school to take action to remove the rats, they told her to discontinue keeping food in her dorm. After months of struggling to sleep, eat, and study with the noise of the rats, and an exhausting series of discussions with the school, not a single rat was removed by Bryn Mawr College. The rat nest was eventually cleaned by Aoki's mother.

66.     During her sophomore year, Aoki developed a stomach ulcer that rapidly drained half the blood from her body. Instead of calling an ambulance, Bryn Mawr campus safety decided to drive her to the hospital themselves.    While she was intensely vomiting blood, they

unnecessarily pulled over and stopped the car partway through the ride. Upon arrival at the hospital, she was admitted to the ICU for emergency surgery.

67.    Thereafter, Aoki became ill frequently from the food at Bryn Mawr's dining halls, as her stomach was more sensitive, and she was vulnerable to illness from undercooked meat. The meat served at the Bryn Mawr dining halls was in fact systematically undercooked, as Aoki learned when she worked in dining hall. Rather than using its substantial wealth to ensure the health and well-being of its students, the College had failed to maintain adequate dining equipment and the old, unrepaired oven in one of the halls was unable to reach a sufficiently high temperature to cook food properly. Throughout her time at Bryn Mawr, Aoki, like many others, became sick as a result of the undercooked food, which caused her physical, emotional, and academic harm.

### *Sasha Kachru*

68.    Kachru first enrolled at Bryn Mawr in the fall of 2022. She suffered from anxiety, depression, and OCD. She requested a single dorm and extended time on assignments, which were both granted following a meeting with Alder, without a letter from a doctor. However, medical circumstances prevented Kachru from completing the semester, and she opted for medical leave.

69.    The following year, fall of 2023, Kachru re-entered Bryn Mawr. Her diagnoses had been changed to autism, generalized anxiety disorder, and ADHD. The accommodations recommended by her psychologist were a reduced courseload, deadline flexibility, 50% extended time on exams with an allowance for breaks, different evaluation for oral presentations tailored to her neurodivergence, access to priority registration, her service dog's presence, and staggered exams.

70.    Despite having gained strength throughout the year of her medical leave, Kachru still required the accommodations recommended by her psychologist, which were summarily

denied. The College refused to grant Kachru priority registration, resulting in a course schedule with back-to-back classes that taxed her physical endurance and caused overstimulation, forcing her to miss class frequently.

71.    The College also rejected her psychologist's recommendation that she be granted flexible deadlines for completing assignments, a critical accommodation for students suffering from autism and ADHD. *See* https://www.adinaaba.com/post/going-to-college-with-autism; https://www.chronicle.com/article/neurodivergent-students-need-flexibility-not-our-frustration. As a result, Kachru could not complete numerous assignments and was unfairly graded.

72.    When Kachru attempted to explain her physical, emotional, social, and academic distress to Alder, and pointed it was because of the denial of accommodation, Alder said, "The recommendations are for your success, and I am not legally obligated to help you succeed … only to even the playing field." When Kachru pointed out that "leveling the playing field" was the purpose of her recommended accommodations, Alder suggested she was asking for special treatment, displaying deliberate indifference to the needs of an autistic student.

73.    By the end of her first year, the stress caused by Bryn Mawr's deliberate indifference to here needs forced her to leave the College and gain admission to an inpatient mental hospital. Kachru has been unable to return to Bryn Mawr.

### *Kyra Kuelgen*

74.    Kuelgen's first contact with the Access Services department occurred in the summer of 2023, after she underwent two hip surgeries. Her doctors cleared her to return to campus, but stressed that she was to minimize physical exertion, and walk on flat surfaces only. She was also instructed to continue her physical therapy routine in her dorm. Kuelgen's doctor

recommended that she be placed in a first floor, centrally located room, that she receive regular shuttle service and that space be provide in her dorm room for therapy.

75.    Bryn Mawr failed to provide the recommended accommodations. The only dorm without stairs to the first floor was not centrally located and the College failed to take the necessary steps to make a centrally located dorm accessible to her. As a result, Kachru was placed in a dorm far from the center of campus, resulting in a denial of one of the needed accommodations. The College's shuttle service is woefully inadequate, and the College has deliberately failed to provide an adequate transportation service for students with physical handicaps. Bryn Mawr's shuttle service does not operate on a regular schedule and reserves the right to arrive half an hour or more late for any shuttle request. As a result, Kuelgen, like other physically handicapped students, could not plan her days on an equal footing with her non-disabled peers and was often late for class, resulting in academic discrimination.  Finally, in keeping with her doctor's recommendations, Kuelgen requested that the wardrobe in her room be removed so that she could have physical therapy in her room. This accommodation requested was denied.

76.    When Kuelgen protested the denial of her needed accommodations, Alder became increasingly aggressive, forcing Kuelgen to attempt to continue her studies without the needed accommodations. Kuelgen became exhausted from walking long distances and going up and down stairs against her doctors' advice, and she was unable to perform her physical therapy as recommended. Kuelge's academic performance suffered, and she experienced emotional harm and suffering, as well as the physical pain from her surgeries and the absence of proper recovery.

### *Esénia Bañuelos*

77.    Bañuelos matriculated at Bryn Mawr in the fall semester of 2022. She suffered from ADHD, C-PTSD (complex PTSD), major depression, and asthma. Her doctor recommended

that she be provided with an accommodation of 50% extra time on exams/timed assignments. When she contacted the Access Services Director to discuss these accommodations, Alder peremptorily denied the requested accommodating, stating: "Extended time on testing does not exist at the collegiate level." Alder also stated that if she allowed her extended time, she was sure Bañuelos would "use it to cheat."

78.     Separately, instead of providing any accommodation for Bañuelos' ADHD, Alder advised Bañuelos to use her own funds to purchase an iPad with an apple pencil and the Notability app installed on the iPad. These devices can cost thousands of dollars – a tiny rounding error in a day's interest on Bryn Mawr's endowment – but a genuine burden for students.

79.     In her first weeks on campus, Bañuelos attempted to engage in advocacy. She conducted a survey about student perception of on-campus accessibility and posted it around the school. Days later, Bañuelos's advisor informed her that Alder had complained that Bañuelos' survey was "slanderous." Rather than attempting to address any of the structural problems in the treatment of students with disabilities, Alder had demanded Bañuelos's advisor and fellowship director investigate her. Bañuelos was cleared of any wrongdoing, and the incident demonstrates the backward-looking "blame the victim" mentality of the Bryn Mawr administration, and its unwillingness to spend even a tiny fraction of the interest of the College's stock portfolio.

80.     Nearing the end of her first semester, Bañuelos requested a follow-up meeting with Alder regarding her needed accommodations, which Alder denied, stating that she was "too busy" to meet with Bañuelos. One of the most important accommodations for Bañuelos, as for many other students struggling with ADHD, was receiving extra time on tests and assignments.

81.    In one course, Bañuelos was unable to finish any exam within the time limit and barely passed. In another, she was forced to take the class credit/no credit because the risk of failing without a test-taking accommodation was too high.

82.    In addition, Bañuelos discovered the College's indifference even to physical disabilities after she twisted her ankle. The College shuttle service was so poorly staffed and advertised that Bañuelos was unaware of its existence. Bañuelos also discovered first-hand that numerous buildings on campus were not equipped for entrance by students unable to go up and down stairs or unable to push open the large, heavy doors in many buildings. As a result, Bañuelos was forced to miss several weeks of classes and her grades declined sharply.

83.    In February of 2023 Bañuelos worked with Alder to make a presentation educating students on the accommodations process. Barely 24 hours after distributing materials for this presentation, Horsey reached out and explained that Alder claimed that Bañuelos had not even mentioned the idea of a presentation, let alone sought Alder's review of the presentation materials. Horsey did not believe Bañuelos until she showed her the email of Alder confirming their meeting, with a subject line clearly indicating the presentation. Horsey ended the meeting immediately, claiming she would follow up with Alder. Bañuelos heard no more from this line of discussion.

84.    Bañuelos decided to take matters above Alder. She met with Nina Bisbee, the Director of Facilities, asking when they could expect fully accessible facilities, with adequate ramps and push plates to open doors. Bisbee informed her that it was not her job to think about accessibility and that Bañuelos concerns raised funding concerns she was unable to address. Bisbee suggested that Bañuelos raise her issues with Alder, which was obviously impossible given Alder's attacks on her for her advocacy work.

85.    Bañuelos then met with Kari Fazio, the CFO and a member of the board of trustees, asking why there wasn't enough funding for basic accessibility architecture. Like Bisbee, Fazio stated that it was not her job to think about accessibility, and that she should raise her concerns with Alder. Bañuelos even met with the President of the College, Kimberly Cassidy, who stated that there were no plans for widespread accessible entrances in the next 20 years.

86.    The ordeal Bañuelos endured in spring of 2023 – in which she was attacked, maligned and ignored in attempting to advocate for others, all while attempting to address her own individual needs which the College was unwilling to address – resulted in the recurrence of chronic illnesses and several hospitalizations.  Bañuelos fell into a major depression so severe she was frequently unable to attend class, and experienced suicidal ideation. That summer, Bañuelos' ankle condition had deteriorated, and she required several surgeries, the recovery from which was complicated by the psychological stress of contemplating returning to such an inhospitable and uncaring place as Bryn Mawr.

87.    When Bañuelos returned to school, she informed her fellow students of her advocacy activity, and the threats Alder had used to attempt to stifle her efforts to improve conditions for disabled students. When the Bryn Mawr administration learned of Bañuelos' comments, two members of the administration met with Bañuelos and attempted to silence her, falsely asserting that Bañuelos was practicing "cancel culture" that was "hurtful" to Alder 's "feelings."

88.    Many of the students who had been following Bañuelos's work over the last two years wanted to meet with Alder themselves. With hesitation, Bañuelos organized a meeting with Alder and Dean Geubauer, who was then in charge of overseeing the department. At the meeting, Alder continued to defame Bañuelos, stating Bañuelos was an "adversarial person" who was trying

to "take her job" as Access Services Director. The upshot of the meeting, characterized by complete denial and gaslighting, was that henceforth all information distributed by the students relating to accessibility issues – every video clip, every flier, every brochure, every pamphlet – would have to be reviewed and approved by Alder and Dean Gebauer.

### ***Other Students***

89.     Other students, who have requested anonymity, have also suffered from Defendants' deliberate indifference of their mental health and neurodivergent needs. Jane Doe 1 matriculated in the fall of 2019, and enjoyed three successful years at Bryn Mawr without any need for accommodation. During her junior year, she was accepted into the AB/MA program for mathematics, with a minor in computer science and another in Spanish.

90.     At the beginning of her fourth year, Jane Doe 1 began having trouble completing coursework as a result of an unusual pain in her hands that made her unable to write or type. Her doctor believed it was tendonitis, and she began treatment, but made no headway. As the situation persisted, Student X reached out to Access Services to obtain an accommodation permitting her record assignments by voice.  The College refused to provide any accommodation, stating that tendonitis is a temporary injury.

91.     Jane Doe's professors initially made efforts to keep the strain on her hands down, but as the semester wore on, they grew frustrated, became less accommodating, and began to doubt Jane Doe 1's suffering. Jane Doe 1 found herself repeatedly having to divulge private medical information, which in and of itself was traumatic, only to be placed under ever more scrutiny, and denied the basic respect to which she was entitled.

92.     As Student X's health worsened, her chronic pain spread. Constant correspondence with the school resulted in no discernible progress and drained her mental health

as well, leading to the development of severe major depression. With no support from the school, she had to drop the prestigious dual BA/MA program she had entered and finish her mathematics classes with the prospect of a BA only.

93.    As the extreme academic stress and depression from constant scrutiny combined with her accelerating chronic pain worsened, Jane Doe 1 was unable to finish even a single class in her final semester at Bryn Mawr. The school still took her entire tuition, along with room and board, and offered her no type of refund for their lack of support, or the unforeseen circumstances through which she endured her final semester on campus. Although she was able to graduate on time, it was at the loss of her Master's degree, as well as her computer science minor, both of which had taken years of hard work. Her final transcript bore the marks of someone who has suffered a major trauma: consistent high grades and a sudden, sharp decline, with a severe negative impact on her overall academic performance, her graduate school opportunities and her career prospects.

## COUNT I

### Violation of Title III of American with Disabilities Act
### (Failure to Provide Virtual Attendance Accommodation)
### De Camara

94.    Plaintiffs repeat and reallege each and every foregoing allegation as if fully set forth herein.

95.    De Camara suffered from a disability and had a federally protected right to accommodation for such disability.

96.    Defendants knew that, in the absence of an accommodation, there was a substantial likelihood of harm to a federally protected right

97.     Notwithstanding their knowledge of the need to provide an accommodation to avoid a substantial likelihood of harm to a federally protected right to Plaintiffs, Defendants failed to provide the needed accommodations.

98.     As a result of Defendants' failures, De Camara has suffered physical emotional and mental harm and is entitled to an injunction ordering Defendant Bryn Mawr to permit De Camara to complete her studies at Bryn Mawr with the ability to attend classes remotely as needed in light of her disabilities.

## COUNT II
### Violation of Title III of American with Disabilities Act
### (Failure to Provide Testing and Course Assignment Accommodations)
### De Camara, Kashru, Bañuelos v. Defendants

99.     Plaintiffs repeat and reallege each and every foregoing allegation as if fully set forth herein.

100.    De Camara, Kashru and Bañuelos suffered from a disability requiring Bryn Mawr to provide them with additional time to complete tests and assignments and had a federally protected right to accommodation for such disability.

101.    Defendants knew that, in the absence of an accommodation, there was a substantial likelihood of harm to a federally protected right

102.    Notwithstanding their knowledge of the need to provide an accommodation to avoid a substantial likelihood of harm to a federally protected right to Plaintiffs, Defendants failed to provide the needed accommodations.

103.    As a result of Defendants' failures, De Camara, Kashru and Bañuelos have suffered physical, emotional and mental harm and are entitled to an injunction ordering Defendants to provide De Camara, Kashru and Bañuelos up to 50% additional time to complete tests and assignments.

## COUNT III
### Violation of Americans with Disabilities Act
### (Failure to Permit Priority Registration)
### De Camara, Kashru, Bañuelos v. Defendants

104.     Plaintiffs repeat and reallege each and every foregoing allegation as if fully set forth herein.

105.     De Camara, Kashru, and Bañuelos suffered from a disability requiring Bryn Mawr to provide with priority registration for classes and had a federally protected right to accommodation for such disability.

106.     Defendants knew that, in the absence of an accommodation, there was a substantial likelihood of harm to a federally protected right

107.     Notwithstanding their knowledge of the need to provide accommodation to avoid a substantial likelihood of harm to a federally protected right to Plaintiffs, Defendants failed to provide the needed accommodations.

108.     As a result of Defendants' failures, De Camara and Kashru have suffered physical, emotional and mental harm and are entitled to an injunction ordering Defendants to authorize priority registration for De Camara, Kashru and Bañuelos.

## COUNT IV
### Violation of Title III of Americans with Disabilities Act
### (Failure to Provide Needed School Equipment and Supplies)
### De Camara, Kashru v. Defendants

109.     Plaintiffs repeat and reallege each and every foregoing allegation as if fully set forth herein.

110.     De Camara and Kashru suffered from a disability requiring specialized school equipment and supplies that Bryn Mawr failed to provide.

111.    Defendants knew that, in the absence of an accommodation, there was a substantial likelihood of harm to a federally protected right

112.    Notwithstanding their knowledge of the need to provide accommodation to avoid a substantial likelihood of harm to a federally protected right to Plaintiffs, Defendants failed to provide the needed accommodation.

113.    As a result of Defendants' failures, De Camara and Bañuelos have suffered physical, emotional and mental harm and are entitled to an injunction ordering Defendants to provide any specialized school equipment and supplies recommended or required by Bryn Mawr without charge.

**COUNT V**
**Violation of Title III of American with Disabilities Act**
**(Failure to Provide Transportation and Physical Accessibility Accommodations)**
**Kuelgen, Bañuelos v. Defendants**

114.    Plaintiffs repeat and reallege each and every foregoing allegation as if fully set forth herein.

115.    Kuelgen and Bañuelos suffered from a disability requiring access to transportation services, ramp access to buildings, and push-plate door access.

116.    Defendants knew that, in the absence of an accommodation, there was a substantial likelihood of harm to a federally protected right

117.    Notwithstanding their knowledge of the need to provide accommodation to avoid a substantial likelihood of harm to a federally protected right to Plaintiffs, Defendants failed to provide the needed accommodation.

118.    As a result of Defendants' failures, De Camara and Bañuelos have suffered physical, emotional and mental harm and are entitled to an injunction ordering Defendants to

provide them with access to a shuttle service, ramp access for all buildings at Bryn Mawr and push-plate access for entrance doors to buildings and common areas such as dining halls.

**COUNT VI**
**Violation of Title III of American With Disabilities Act**
**(Failure to Provide Dietary Accommodations)**
**Richards-Cordell**

119.    Plaintiffs repeat and reallege each and every foregoing allegation as if fully set forth herein.

120.    Richards-Cordell suffered from a disability requiring a dietary accommodation.

121.    Defendants knew that, in the absence of dietary accommodation, there was a substantial likelihood of harm to a federally protected right

122.    Notwithstanding their knowledge of the need to provide accommodation to avoid a substantial likelihood of harm to a federally protected right to Plaintiffs, Defendants failed to provide the needed accommodation.

123.    As a result of Defendants' failures, Richards-Cordell has suffered physical, emotional and mental harm and are entitled to an injunction ordering Defendants:

    a.    To provide gluten-free food alternatives in a safe, cross-contaminant free environment reasonably comparable to the food provided to students without gluten intolerances.

    b.    To implement a training and oversight program to ensure that gluten-free food alternatives are prepared in a manner that avoids cross-contamination with gluten containing foods.

## COUNT VII
### (Violation of Title III of American With Disabilities Act)
### Access to Psychiatric and Counselling Services
### Aoki

124.    Plaintiffs repeat and reallege each and every foregoing allegation as if fully set forth herein.

125.    Aoki suffered from a disability requiring on-campus access to a prescribing psychiatrist and counselling services.

126.    Defendants knew that, in the absence of an on-campus prescribing psychiatrist and adequate counseling services, there was a substantial likelihood of harm to a federally protected right.

127.    Notwithstanding their knowledge of the need to provide accommodation to avoid a substantial likelihood of harm to a federally protected right to Plaintiffs, Defendants failed to provide the needed accommodation.

128.    As a result of Defendants' failures, Aoki suffered physical, emotional and mental harm and is entitled to an injunction ordering Defendants:

    a.  To ensure the presence of a medication-prescribing psychiatrist on campus.

    b.  To hire additional therapists with experience treating "invisible" disabilities.

## COUNT VIII
### Breach of Contract
### (Failure to Respect Academic and Intellectual Freedom)
### All Plaintiffs

129.    Plaintiffs repeat and reallege each and every foregoing allegation as if fully set forth herein.

130.    As part of the bargained-for exchange of tuition and other payments by students for an education providing certain minimal, baseline services and benefits, such as academic instruction, access to classes and professors, Bryn-Maw promised its students a liberal education in which they would enjoy the intellectual freedom to think, speak, debate, publish and advocate without prior restraints or fear of retaliation.

131.    Bryn Mawr breached its contract with De Camera and Bañuelos by prohibiting the publication of an article in the school newspaper about the present lawsuit and engaging in retaliatory action against De Camara and Bañuelos as described herein for their efforts to secure needed accommodations for themselves and others.

132.    On information and belief, other students have been unable to publish news articles because of the College's policy of reviewing and approving or prohibiting articles on the basis of their content.

133.    On information and belief, other students have faced retaliation for efforts to advocate for themselves and others.

134.    As a result of the foregoing, De Camera and Bañuelos and all other similarly situated students have suffered harm as measured by the diminution in value of their academic experience, the loss of opportunity to attend other colleges that do not engage in the policing and punishing of speech and political advocacy, the waste of resources in paying for a Bryn Mawr degree, and other emotional and mental suffering, and are entitled to an award of damages, together with payment of attorney's fees, in an amount to be determined at trial.

**COUNT IX**
**Breach of Contract**
**(Failure to Provide Dietary Accommodations)**
**All Plaintiffs**

135.    Plaintiffs repeat and reallege each and every foregoing allegation as if fully set forth

herein.

136.    As part of the bargained-for exchange of tuition and other payments by students in exchange for an education providing certain minimal, baseline services and benefits, such academic instruction, access to classes and professors, and a diet meeting students' basic nutritional and health requirements, Bryn Mawr promised its students with special dietary needs, such as access to gluten-free or allergen-free meals of a comparable variety and nutritional value to the food offered to students without such dietary needs.

137.    Bryn Mawr breached its contract with Richards-Cordell and other similarly situated students by failing to provide gluten-free and allergen-free food of a quality, variety and safety comparable to the food provided to students without such dietary restrictions.

138.    As a result of the foregoing, Richards-Cordell and all other similarly situated students have suffered harm as measured by the diminution in value of their academic experience, the loss of opportunity to attend other colleges that provide adequate nutrition, the waste of resources in paying for a Bryn Mawr education that failed to provide adequate nutrition, emotional and medical harm, including hospitalizations, doctor's bills, mental anguish, pain and suffering, and are entitled to an award of damages, together with payment of attorneys' fees, in an amount to be determined at trial, and such other relief as set forth below.

**COUNT X**
**Breach of Contract**
**(Failure to Provide Transportation and Facility Accessibility)**
**All Plaintiffs**

139.    Plaintiffs repeat and reallege each and every foregoing allegation as if fully set forth herein.

140.    As part of the bargained-for exchange of tuition and other payments by students in exchange for an education providing certain minimal, baseline services and benefits, such

academic instruction, access to classes and professors, buildings and facilities, Bryn-Maw promised its students they would have access to buildings and facilities on a non-discriminatory basis, and that they would be provided with transportation services sufficient to maintain a continuity of education in the event of temporary or permanent disability affecting the students' transportation needs. with special dietary needs, such as access to gluten-free or allergen-free meals of a comparable variety and nutritional value to the food offered to students without such dietary needs.

141.    Bryn Mawr breached its contract with Kuelgen and Bañuelos and other similarly situated students by failing to provide ramp access to Bryn-Mawr dorms and other buildings, failing to provide push-plate access to entrance doors to buildings and large common areas, failing to provide an adequate transportation system, and to publicize the minimal services available, to students suffering from permanent or temporary mobility disabilities.

142.    As a result of the foregoing, Kuelgen and Bañuelos and all other similarly situated students have suffered harm as measured by the diminution in value of their academic experience, the loss of opportunity to attend other colleges that provide adequate transportation and facility access, the waste of resources in paying for a Bryn Mawr education that failed to provide adequate transportation and facility access, aggravation of their physical disabilities, medical harm, including hospitalizations and doctor's bills, mental anguish, pain and suffering, and are entitled to an award of damages, together with payment of attorneys' fees, in an amount to be determined at trial, and such other relief as set forth below.

**COUNT XI**
**Breach of Contract**
**(Failure to Provide Academic Accommodations)**
**All Plaintiffs**

143.    Plaintiffs repeat and reallege each and every foregoing allegation as if fully set forth

herein.

144.    As part of the bargained-for exchange of tuition and other payments by students in exchange for an education providing certain minimal, baseline services and benefits, such academic instruction, access to classes and professors, buildings and facilities, Bryn-Maw promised its students with disabilities they would that they would be provided academic accommodations sufficient to receive an education comparable to that of students without such disabilities.

145.    Bryn Mawr breached its contract with De Camara, Kashru and Bañuelos and other similarly situated students by failing to provide additional time for testing and completing assignments despite the documented need for such accommodations.

146.    As a result of the foregoing, De Camara, Kashru and Bañuelos and all other similarly situated students have suffered harm as measured by the diminution in value of their academic experience, the loss of opportunity to attend other colleges that provide adequate transportation and facility access, the waste of resources in paying for a Bryn Mawr education that failed to provide adequate transportation and facility access, aggravation of their physical disabilities, medical harm, mental anguish, pain and suffering, and are entitled to an award of damages, together with payment of attorneys' fees, in an amount to be determined at trial, and such other relief as set forth below.

## COUNT XII
### Negligent Infliction of Emotional Distress
### All Plaintiffs

147.    Plaintiffs repeat and reallege each and every foregoing allegation as if fully set forth herein.

148.    Because of the contractual relationship between Bryn Mawr and its students, as

well as the special relationship of trust students place in Bryn Mawr, Bryn Mawr owed its students a duty of care to avoid causing these students emotional, mental and psychological harm.

149.    Bryn Mawr breached its duty to Plaintiffs named herein by failing to provide the accommodations described herein, the absence of which caused and was reasonably foreseeable to cause, emotional, mental and physical suffering and anguish; by engaging in retaliatory actions that caused and were reasonably foreseeable to cause, emotional, mental and physical harm; by failing to provide facilities that met minimum standards of health and sanitation, such as being free from infestation by rats; by serving undercooked meat with a known risk of physical danger.

150.    As a result of Defendants' breach of their duty to the plaintiff, Plaintiffs and all other similarly situated students have suffered emotional suffering and anguish in an amount to be determined at trial and such other relief as set forth below.

**COUNT XIII**
**Violation of Title III of Americans with Disabilities Act**
**(Deliberate Indifference)**
**All Plaintiffs**

151.    Plaintiffs repeat and reallege each and every foregoing allegation as if fully set forth herein.

Class Allegations

152.    Each of the Plaintiffs herein suffered from a disability and had a federally protected right to accommodation for such disability.

153.    The Plaintiffs' claims are typical of other similarly situated students to be certified as a class.

154.    Defendants knew that, in the absence of an accommodation, there was a substantial likelihood of harm to a federally protected right

155.    Notwithstanding their knowledge of the need to provide an accommodation to avoid a substantial likelihood of harm to a federally protected right to Plaintiffs and other similarly situated students, Defendants failed to provide the needed accommodations.

156.    As a result of Defendants' failures, Plaintiffs and other similarly situated students, have suffered physical, emotional and mental harm and are entitled to an injunction ordering Defendants:

(a) To provide extra time for tests and completion of assignments upon presentation of a doctor's note recommending this accommodation;

(b) To make available a virtual option for all classes, accessible to students who present a doctor's note or objective medical evidence of their disability;

(c) To fund the cost of school equipment or supplies needed for all students with disabilities, such as an iPad with an Apple pen and Notability functionality;

(d) Upgrade the dining hall kitchen facilities so that the ovens can reach a sufficient temperature to safely cook meat;

(e) Provide gluten-free food alternatives in a safe, cross-contaminant free environment reasonably comparable to the food provided to students without gluten intolerances;

(f) Implement a training and oversight program to ensure that gluten-free food alternatives are prepared in a manner that avoids cross-contamination with gluten containing foods;

(g) Ensure the presence of a medication-prescribing psychiatrist on campus;

(h) Hire additional therapists with experience treating "invisible" disabilities;

(i) Provide priority registration to students with a documented autism or ADHD diagnosis;

(j)  Ensure that all buildings have ramp access and that doors are equipped with push plates;

(k) Provide a campus shuttle service with app access for disabled students, sufficient vehicles to respond to requests for service within fifteen minutes, and well-publicized guidelines for eligibility, use and inquiries.

**COUNT XIV**
**Violation of Title III of Americans with Disabilities Act**
**(Failure to Provide Needed Accommodations)**
**Class Claim**

157.    Plaintiffs repeat and reallege each and every foregoing allegation as if fully set forth herein.

Class Allegations

158.    The Class Members are so numerous that their individual joinder herein is impracticable. On information and belief, the Class Members number in the hundreds. Members of the class include Bryn Mawr students who attended the College at any time from February 14, 2022 to the present. The precise number of Class Members and their identities are unknown at this time but may be determined through discovery. Class Members may be notified of the pendency of this action by mail and/or publication through the records of Defendants.

159.    Common questions of law and fact exist as to all Class Members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to, the extent to which the College and its representatives owed a contractual or other special common law duty to provide an intellectual environment free from prior restraint and retaliation for the expression of ideas; to provide adequate transportation and access to school facilities for students suffering from temporary or permanent physical disabilities; to make available gluten and allergen-free meals unharmed by cross-contamination and of

comparable quality and variety to the food provided to students who are not subject to dietary restrictions; to ensure that kitchen facilities are in adequate working condition to cook and prepare food safely; to make available prescribing psychiatrists on campus and counsellors and therapists trained with respect to "invisible" disabilities; to ensure students salubrious living conditions free from, among other things, infestations of rats; and to prevent discrimination of students who need special school equipment and supplies;

160.     The claims of the named Plaintiffs are typical of the claims of the Class Members in that, to the extent that a contract and/or special duty exists with respect to the matters set forth in paragraph 121 above, the named he named Plaintiffs have suffered from the breach of the special duty and/or violation of the contractual obligations of Defendants.

161.     The named Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class Members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously.

162.     The interests of Class Members will be fairly and adequately protected by the named Plaintiffs and their counsel.

163.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability, particularly against an entity such as Bryn Mawr, that generates tens of millions of dollars in annual profit. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system

presented by the complex legal and factual issues of this case. Individualized litigation also presents the potential for inconsistent or contradictory judgments.

Class Member Allegations

164.    Each of the Plaintiffs herein suffered from a disability and had a federally protected right to accommodation for such disability.

165.    Each of the Plaintiffs was denied a federally protected right to an accommodation.

166.    The Plaintiffs' claims are typical of other similarly situated students to be certified as a class.

167.    All members of the proposed class have an interest in the relief sought by Plaintiffs.

168.    As a result of the foregoing, the proposed class is entitled to an injunction ordering Defendants:

(a)  To provide extra time for tests and completion of assignments upon presentation of a doctor's note recommending this accommodation;

(b)  To make available a virtual option for all classes, accessible to students who present a doctor's note or objective medical evidence of their disability;

(c)  To fund the cost of school equipment or supplies needed for all students with disabilities, such as an iPad with an Apple pen and Notability functionality;

(d)  Upgrade the dining hall kitchen facilities so that the ovens can reach a sufficient temperature to safely cook meat;

(e)  Provide gluten-free food alternatives in a safe, cross-contaminant free environment reasonably comparable to the food provided to students without gluten intolerances;

(f) Implement a training and oversight program to ensure that gluten-free food alternatives are prepared in a manner that avoids cross-contamination with gluten containing foods;

(g) Ensure the presence of a medication-prescribing psychiatrist on campus;

(h) Hire additional therapists with experience treating "invisible" disabilities;

(i) Provide priority registration to students with a documented autism or ADHD diagnosis;

(j) Ensure that all buildings have ramp access and that doors are equipped with push plates;

(k) Provide a campus shuttle service with app access for disabled students, sufficient vehicles to respond to requests for service within fifteen minutes, and well-publicized guidelines for eligibility, use and inquiries.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the entry of judgment as follows:

(1)     Under Count I, for an injunction ordering Defendants to permit De Camara to complete her studies at Bryn Mawr with the ability to attend classes remotely as needed in light of her disabilities, together with attorneys' fees and costs.

(2)     Under Count II, for an injunction ordering Defendants to provide De Camara, Kashru and Bañuelos up to 50% additional time to complete tests and assignments, together with attorneys' fees and costs.

(3)     Under Count III, for an injunction ordering Defendants to authorize priority registration for De Camara and Kashru, together with attorneys' fees and costs.

(4)     Under Count IV, for an injunction ordering Defendants to provide any specialized

school equipment and supplies recommended or required by Bryn Mawr without charge to De Camara and Kashru, together with attorneys' fees and costs.

(5)     Under Count V, for an injunction ordering Defendants to provide Kuelgen and Bañuelos with access to a shuttle service, ramp access for all buildings at Bryn Mawr and push-plate access for entrance doors to buildings and common areas such as dining halls, together with attorneys' fees and costs.

(6)     Under Count VI, for an injunction ordering Defendants to provide Richards-Cordell gluten-free food alternatives in a safe, cross-contaminant free environment reasonably comparable to the food provided to students without gluten intolerances, and to implement a training and oversight program to ensure that gluten-free food alternatives are prepared in a manner that avoids cross-contamination with gluten containing foods, together with attorneys' fees and costs.

(7)     Under Count VII, for an injunction ordering Defendants to make available an on-campus medication-prescribing psychiatrist and a therapist or counselor specialized in treating "invisible" disabilities, together with attorneys' fees and costs.

(8)     Under Count VIII, for damages resulting from Defendants' breach of contract in an amount to be determined at trial, together with attorneys' fees and costs.

(9)     Under Count IX, for damages resulting from Defendants' breach of contract in an amount to be determined at trial, together with attorneys' fees and costs.

(10)     Under Count X, for damages resulting from Defendants' breach of contract in an amount to be determined at trial, together with attorneys' fees and costs.

(11)     Under Count XI, for damages resulting from Defendants' breach of contract in an amount to be determined at trial, together with attorneys' fees and costs.

(12)    Under Count XII, for compensatory and punitive damages resulting from Defendants' negligent infliction of emotional distress in an amount to be determined at trial, together with attorneys' fees and costs.

(13)    Under Counts XIII and XIV, for an injunction ordering Defendants to:

(a) To provide extra time for tests and completion of assignments upon presentation of a doctor's note recommending this accommodation.

(b) To make available a virtual option for all classes, accessible to students who present a doctor's note or objective medical evidence of their disability.

(c) To fund the cost of school equipment or supplies needed for all students with disabilities, such as an iPad with an Apple pen and Notability functionality.

(d) Upgrade the dining hall kitchen facilities so that the ovens can reach a sufficient temperature to safely cook meat.

(e) Provide gluten-free food alternatives in a safe, cross-contaminant free environment reasonably comparable to the food provided to students without gluten intolerances.

(f)  Implement a training and oversight program to ensure that gluten-free food alternatives are prepared in a manner that avoids cross-contamination with gluten containing foods.

(g) Ensure the presence of a medication-prescribing psychiatrist on campus.

(h) Hire additional therapists with experience treating "invisible" disabilities.

(i)  Provide priority registration to students with a documented autism or ADHD diagnosis.

(j)  Ensure that all buildings have ramp access and that doors are equipped with push plates.

(14)    Certifying Counts VIII-XIII as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure Rule and appointing Plaintiffs as class representatives.

(15)    Awarding Plaintiffs a reasonable fee as class representative.

(16)    Such other relief as this Court deems just and proper.


**<u>DEMAND FOR JURY TRIAL</u>**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury in this action of all issues so triable.


Respectfully submitted,

*/s/ Samantha F. Green*
Samantha F. Green, Esquire
PA Bar No. 316157
**SIDKOFF, PINCUS & GREEN, P.C.**
1101 Market Street, Suite 2700
Philadelphia, PA 19107
(215) 574-0600
(215) 574-0310 (fax)
sgreen@sidkoffpincusgreen.com


*/s/ Eden P. Quainton*
Eden P. Quainton, pro hac vice forthcoming
QUAINTON LAW, PLLC
2 Park Ave., 20th Fl.
New York, New York, 10016
Dated: May 5, 2025    (212) 419-0575
*Attorneys for Plaintiffs*

47