**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LAUREN DE CAMARA, SASHA** | : | **CIVIL ACTION** |
| **KACHRU, and ESÉNIA BAÑUELOS,** | : | |
| | : | |
| **v.** | : | **NO. 25-2287** |
| | : | |
| **BRYN MAWR COLLEGE, THE** | : | |
| **BOARD OF TRUSTEES OF BRYN** | : | |
| **MAWR COLLEGE** | : | |

## MEMORANDUM

**KEARNEY, J.**                                                                   **September 26, 2025**

Three former students along with three current students of Bryn Mawr College sue to compel the College to change a variety of policies and practices relating to certain defined accommodations for varied disabilities. They also seek damages for breach of contract and negligent infliction of emotional distress. But the students before us concede many of their pleaded concerns do not affect them. We remind the students of our separation of powers and limited jurisdiction over live cases and controversies. Federal courts generally do not opine on issues other than those concretely harming the persons suing for relief; we do not express views on policies either in Congress or in the College which do not affect the rights of persons before us. Their remedy for rewriting College policies not affecting them directly may be available through College processes or seeking change through the persons we elect to Congress.

The students' pleaded challenges, unlike blindless, deafness, or mobility-challenged, may not be readily visible. We do not discount the veracity of the students' challenges. But the question before us today is whether Congress requires colleges provide the requested assistance. The College and its Trustees move to dismiss all claims based on a "shotgun" pleading theory. We disagree. They then move to dismiss limited claims. We agree many of the claims cannot proceed

into discovery as presently pleaded. Three of the six students lack standing to assert their claims. The students cannot proceed on a deliberative indifference theory as a matter of law. We dismiss a novel theory an iPad and Apple Pencil are necessary auxiliary aids under the Americans with Disabilities Act for two students with attention deficit hyperactivity disorder without prejudice. We also grant leave to amend other disability claims along with the presently insufficiently pleaded contract and emotional distress claims. We strike claims by persons who wish to proceed without disclosing their names as well as a redundant "class claims" count.

## I.    Alleged Facts

Bryn Mawr College is a long-standing institution of post-secondary school education.[1] It welcomes students who pay almost $60,000 a year in tuition plus approximately $20,000 for room and board, books, and other expenses.[2] It, like many colleges, strives to meet Congress' mandates in Title III of the Americans with Disabilities Act through an "Access Services Department" addressing the needs of its students with disabilities.[3]

Three present and three former Students with various disabilities claim, for different reasons, the College and its Board of Trustees discriminated against them based on their disabilities by understaffing the Access Services Department, responding to their needs arbitrarily and capriciously, and disregarding their emotional health and well-being.[4] The six Students share a common claim but their common claim does not affect them: unidentified students with physical disabilities cannot access Pembroke Hall—a "popular social meeting place[]"—and cannot access student dorms like Merion dorm.[5] They also claim other unidentified students with physical disabilities cannot "ascend[] to the top of Taylor Hall . . . to ring the bell" which is a "well-known" graduation tradition at the College.[6] But the Students before us today do not claim they could not access Pembroke Hall or Taylor Hall or could not access a specific dorm.[7]

### *Claims from former-Students De Camara, Richards-Cordell, and Aoki.*

Three persons formerly enrolled in the College now sue the College to change its disabilities practices and policies, for breach of contract, and for negligent infliction of emotional distress. The three persons share a common reference to an anonymous former student denied accommodations for tendonitis.[8] But they do not face challenges presented by tendonitis.

They differ in their challenges. Lauren De Camara claims the College denied her classroom and housing accommodations she needed because of her central sensitization syndrome, post-concussive syndrome, attention deficit hyperactivity disorder, and dysautonomia.[9] She also alleges the College and its Trustees advised her to purchase an Apple iPad with an Apple Pencil with her own money to help with her attention deficit hyperactivity disorder.[10] Former-Student De Camara alleges she will return to the College if granted her requested accommodations.[11] Hope Richards-Cordell claims the College did not provide her with adequate gluten-free food options to accommodate her autoimmune disorder.[12] Saule Aoki claims the College did not provide her with housing or with on-campus psychiatrists to accommodate her "[attention deficit hyperactivity disorder], anxiety, Raynaud's phenomenon, allergies, and [gastroesophageal reflux disease]."[13] Former-Student Aoki also claims the College refused to remove a rats' nest in her dorm room closet and served her undercooked meat although the Student does not tie these alleged conditions to a disability.[14]

### *Claims from current-Students Kachru, Kuelgen, and Bañuelos.*

Three current Students also seek to change the College's policies along with damages for breach of contract and negligent infliction of emotional distress.[15] Sasha Kachru claims the College did not provide her with a reduced courseload, deadline flexibility, and other accommodations needed because of her autism, generalized anxiety disorder, and attention deficit hyperactivity

disorder.[16] Kyra Kuelgen has hypermobility syndrome disorder and claims the College denied her housing and transportation requests after she underwent two hip surgeries.[17] Esénia Bañuelos claims the College denied her request for extra time on exams needed for her "[attention deficit hyperactivity disorder], [complex post-traumatic stress disorder], major Depression, and Asthma" and could not access several buildings on campus or rely on the College's shuttle service when she twisted her ankle.[18] Current-Student Bañuelos claims Director of Access Services Deborah Alder told her to purchase an Apple iPad with an Apple Pencil with her own money to help with her attention deficit hyperactivity disorder.[19]

## II.    Analysis

The former and current Students sued the College and its Trustees seeking to change the College's policies and practices as applied to them under Title III of the Americans with Disabilities Act.[20] They also seek damages for breach of contract and for negligent infliction of emotional distress under Pennsylvania law.[21]

The College and its Trustees now move to dismiss or to strike the Students' claims. They argue: three former Students and two current Students lack standing to seek injunctive relief under Title III; former-Student De Camara and current-Student Bañuelos do not state a Title III claim because the College did not provide them with iPads or Apple Pencils for their attention deficit hyperactivity disorder; and, no Student pleads a claim for deliberate indifference under Title III.[22] The College and its Trustees also move to dismiss the supplemental Pennsylvania state law breach of contract claims and negligent infliction of emotional distress claims.[23] The College and its Trustees also move to dismiss the Title III and breach of contract claims as shotgun pleadings, move to dismiss an anonymous former student's allegations, and move to strike the class allegations.[24]

We agree with several of the College and its Trustees' arguments. Our analysis requires we dismiss the Title III deliberate indifference claims with prejudice. We also dismiss without prejudice: former-Students Richards-Cordell's and Aoki's Title III claims; current-Students Kuelgen and Bañuelos's Title III claim for "Failure to Provide Transportation and Physical Accessibility Accommodations"; former-Student De Camara and current-Student Bañuelos's Title III claim for "Failure to Provide Needed School Equipment and Supplies"; and, the breach of contract claims and negligent infliction of emotional distress state law claims.

The Students may now proceed on former-Student De Camara's Title III claim relating to virtual attendance accommodations, former-Student De Camara and current-Students Kachru and Bañuelos's Title III claim relating to testing and course assignment accommodations, and, former-Student De Camara and current-Student Kachru's Title III claim relating to priority registration. We decline to dismiss the Title III and breach of contract claims as "shotgun" pleadings. We also decline to weigh in on the Rule 23 class certification analysis until warranted but will not consider a separate "count" for class treatment. Students De Camara, Kachru, and Bañuelos will now proceed on their claims and, if warranted when scheduled, may then move to certify a class (or subclasses) of persons similarly situated to their continuing claims.

**A.  Three Students may proceed on Title III claims to change the College's policies.**

The College and its Trustees move to dismiss the former Students' Title III claims and current-Students Ms. Kuelgen and Bañuelos's Title III claim relating to transportation and physical accessibility accommodations for lacking standing to sue, former-Student De Camara and current-Student Bañuelos's Title III claim relating to school equipment for failing to state a claim, and the claims for deliberate indifference under Title III for failing to state a claim. We grant the College and its Trustees' motion and dismiss these Title III claims other than former-Student De Camara's

claim relating to virtual attendance accommodations, former-Student De Camara and current-Students Kachru and Bañuelos's claims relating to testing and course assignment accommodations, and former-Student De Camara and current-Student Kachru's claims relating to priority registration.

>1. **Former-Students Richards-Cordell and Aoki lack standing to proceed on both their Title III claims and current-Students Kuelgen and Bañuelos lack standing to proceed on their Title III claim relating to transportation and physical accessibility accommodations.**

The former and current Students seek injunctive relief to remedy the College and its Trustees' alleged violations of Title III of the Americans with Disabilities Act.[25] We face a threshold issue as to whether five of the six Students have standing to proceed on their challenged Title III claims. The College and its Trustees ask us to dismiss former-Students De Camara, Richards-Cordell, and Aoki's Title III claims for lacking standing to sue because they no longer attend the College.[26] The College and its Trustees also ask us to dismiss current-Students Kuelgen and Bañuelos's Title III claims for lack of standing to sue because they do not claim lack of physical access to buildings on campus.[27] Former-Students De Camara, Richards-Cordell, and Aoki do not dispute they no longer attend the College.[28] But they claim standing to sue because the College and its Trustees' alleged discrimination deterred them from attending school there.[29] Current-Students Kuelgen and Bañuelos argue they do allege the College and its Trustees denied them access to certain buildings on campus.[30]

We must find a party invoking our limited jurisdiction on a claim-by-claim basis enjoys standing to do so. We enjoy jurisdiction over actual cases and controversies.[31] There is no actual case or controversy—and we lack jurisdiction—when a person does not have standing to sue in federal court.[32] A person suing in federal court bears the burden to establish she has standing to sue.[33] A person has standing to sue for a particular type of relief if she "(1) suffered an injury in

fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."[34] A person satisfies the first requirement—an injury in fact—if she has suffered a (1) concrete, (2) particularized, and (3) actual or imminent injury.[35] "[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought."[36]

We find, as detailed below, former-Student De Camara has standing to sue for injunctive relief even though she no longer attends the College because she alleged an intent to return if she receives her requested relief. But former-Students Richards-Cordell and Aoki lack standing because they no longer attend the College and do not allege an intent to return. Current-Students Kuelgen and Bañuelos also lack standing because they do not allege facts allowing us to plausibly infer a likelihood of future injury.[37]

### a. We dismiss former-Students Richards-Cordell and Aoki's claims for injunctive relief under Title III for lack of standing.

Former-Students De Camara, Richards-Cordell, and Aoki ask, under Title III, for us to enjoin the College's policies as to providing exam and course accommodations, dietary accommodations, and access to psychiatric and counselling services.[38] The College and its Trustees argue former-Students De Camara, Richards-Cordell, and Aoki lack standing to sue for injunctive relief under Title III absent the injury in fact required for standing.[39] They argue former-Students De Camara, Richards-Cordell, and Aoki have not satisfied the actual or imminent sub-component of an injury in fact because they no longer attend the College.[40] The former Students argue they still have standing because the College and its Trustees' discrimination deterred them from continuing to attend college there.[41] We agree with the College and its Trustees in part.

A person requesting injunctive relief must show she "is likely to suffer future injury from the defendant's illegal conduct" to establish the injury in fact requirement for standing.[42] "[P]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."[43] Persons seeking injunctive relief in Title III cases instead must allege "facts giving rise to an inference that [they] will suffer future discrimination by the defendant."[44] They can show they will suffer future discrimination—and thus have an imminent injury sufficient to establish standing to sue under Title III—with either (1) "the intent to return method" or (2) "the deterrent effect doctrine."[45] Both tests ultimately require a person to show "she has an intent to return to the place of alleged discrimination."[46] The intent to return method requires a person to show: (1) "the defendant engaged in past discriminatory conduct that violates the [Act]," (2) it is reasonable to infer from allegations in the complaint that the discriminatory conduct will continue," and (3) "it is reasonable to infer based on past patronage, proximity of the public accommodation to the plaintiff's home, business, or personal connections to the area, that the plaintiff intends to return to the public accommodation in the future."[47] The deterrent effect doctrine requires a person to show she was "deterred from patronizing a public accommodation because of a defendant's failure to comply with the ADA."[48] She must show "she has actual knowledge of barriers preventing equal access and a reasonable likelihood that [she] would use the facility if not for the barriers."[49] But this test still requires a person to show "she has an intent to return to the place of alleged discrimination."[50]

These tests—which have mainly been applied by our colleagues in the context of Title III claims—align with a decision from our Court of Appeals finding a parent enjoyed standing for injunctive relief against a school even though her child did not enroll there because the parent intended to enroll her child if granted the requested relief.[51]

Former-Students De Camara, Richards-Cordell, and Aoki all assert the deterrent effect doctrine applies to them.[52] But only Ms. De Camara alleges she intends to return to the College if we grant her requested relief.[53] Ms. De Camara pleaded facts showing an imminent injury. She enjoys standing to sue for injunctive relief under Title III.[54]

But Ms. Richards-Cordell and Ms. Aoki agree they are former Students and do not plead they intend to return to the College if we grant their requested relief.[55] They instead rely on the College and its Trustees' alleged past discrimination to establish an imminent injury.[56] Past discrimination alone is insufficient to establish standing to sue under Title III.[57] We find former-Students Richards-Cordell and Aoki have not pleaded an imminent injury required for standing to sue under Title III for injunctive relief. We dismiss their Title III claims with leave to amend.[58]

> **b. We dismiss current-Students Kuelgen and Bañuelos's Title III claims relating to transportation and physical accessibility accommodations absent pleading a likelihood of future injury.**

Current-Students Kuelgen and Bañuelos ask us to order the College and its Trustees "to provide them with access to a shuttle service, ramp access for all buildings at [the College], and push-plate access for entrance doors to buildings and common areas such as dining halls."[59] The College and its Trustees argue current-Students Kuelgen and Bañuelos lack standing to sue under Title III to proceed on this claim because they do not allege a particularized injury.[60] Current-Students Kuelgen and Bañuelos counter they alleged facts showing lack of access by unidentified persons to buildings on campus like Pembroke Hall for socializing or Taylor Hall for a graduation tradition.[61] They also appear to claim they both use wheelchairs in their response.[62] Current-Students Kuelgen and Bañuelos do not plead facts allowing us to find standing to sue for this relief.

An injury is "particularized" if it "affect[s] the plaintiff in a personal and individual way."[63] A person, for example, could satisfy the particularized requirement if she alleges she "personally

9

experienced [the] injury."[64] Neither current-Student Kuelgen nor current-Student Bañuelos allege they tried to access Pembroke Hall or Taylor Hall.[65] They also do not allege they use a wheelchair in their amended Complaint.[66] They allege the College's shuttle service did not support them after Ms. Kuelgen had two hip surgeries and Ms. Bañuelos twisted her ankle.[67] Ms. Kuelgen also alleges she did not receive a requested accommodation for a centrally located first floor dorm room after her hip surgeries.[68] Ms. Bañuelos alleges she could not attend classes after twisting her ankle because "buildings on campus were not equipped for entrance by students unable to go up and down stairs or unable to push open . . . large, heavy doors."[69] They alleged particularized injuries in support of some of their requests for injunctive relief.[70]

But there are other components of an injury-in-fact—like an imminent injury—we must consider *sua sponte*.[71] A person requesting injunctive relief must show she "is likely to suffer future injury from the defendant's illegal conduct."[72] Students Kuelgen and Bañuelos argue the College must provide them with shuttle service around campus and push-plate access for doors.[73] But they do not plead facts suggesting they will continue to require these services to accommodate an ongoing physical disability.[74] They instead plead facts based on past temporary injuries: recoveries from surgery and a twisted ankle.[75] They do not allege facts addressing whether these injuries are likely to repeat themselves again.[76]

Current-Students Kuelgen and Bañuelos did not plead facts showing they are likely to suffer an imminent injury required for standing to sue under Title III.[77] We dismiss Ms. Kuelgen and Ms. Bañuelos's Title III claim for lack of standing without prejudice.[78]

   2.    **We dismiss Students De Camara's and Bañuelos's Title III claim for failure to provide needed school equipment because they cannot allege an iPad and an Apple Pencil are auxiliary aids under the Act.**

Former-Student De Camara and current-Student Bañuelos ask us to order the College and its Trustees to provide them with "specialized school equipment and supplies" like an iPad and Apple Pencil.[79] The College and its Trustees ask us to dismiss their claim and argue they are not required to provide Mses. De Camara and Bañuelos with an iPad or Apple Pencil because they do not qualify as "auxiliary aids" under Title III of the Act.[80] Mses. De Camara and Bañuelos respond an iPad and Apple Pencil are necessary auxiliary aids for students like them with attention deficit hyperactivity disorder because these products would allow them an equal opportunity to participate in the College's academic programs.[81] They also argue whether a particular auxiliary aid is effective is a question of fact.[82] But the Students do not plead how an iPad or Apple Pencil is an aid to them in a classroom.

Mses. De Camara and Bañuelos are correct "the effectiveness of auxiliary aids . . . is a question of fact."[83] But whether a proposed aid or service—like an iPad and an Apple Pencil—falls under the statutory definition of an "auxiliary aid or service" is a question of law for us.[84] We start with Congress' words in Title III. Mses. De Camara and Bañuelos rely on section 12182(b)(2)(A)(iii) to argue the College must provide them with iPads and Apple Pencils.[85]

Congress through section 12182(b)(2)(A)(iii) provides discrimination under Title III includes failing to provide "auxiliary aids and services" to individuals with disabilities.[86] Congress then identifies auxiliary aids and services as including: (1) "qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments," (2) "qualified readers, taped texts, or other effective methods of making visually delivered

materials available to individuals with hearing impairments," (3) "acquisition or modification of equipment or devices," and (4) "other similar services and actions."[87] Congress goes no further.

We are also aware the Department of Justice provides additional guidance through a regulation with examples of auxiliary aids for individuals "who are deaf or hard of hearing" or "who are blind or have low vision."[88]

The parties today present a rather unique issue in the disabilities context. Only a handful of our colleagues have interpreted the meaning of auxiliary aids and services under Title III and its regulations but they do not address whether auxiliary aids and services can include aids for individuals with attention deficit hyperactivity disorder.[89] Other cases involving auxiliary aids focus on aids designed to assist with hearing impairments, vision impairments, or communication disorders.[90] The statutory and regulatory definitions for auxiliary aids and case law suggest auxiliary aids are meant to assist individuals with hearing impairments, vision impairments, or communication disorders rather than individuals with attention deficit hyperactivity disorder.

We can look to guidance from the Department of Justice which appears to expand the use of auxiliary aids and services applicable to postsecondary education courses. The Department of Justice instructs postsecondary education courses should provide "appropriate auxiliary aids and services for persons with impaired sensory, manual, or speaking skills."[91] The Department of Justice offers examples of auxiliary aids for courses including "taped texts, interpreters or other effective methods of making orally delivered materials available to individuals with hearing impairments, Brailled or large print texts or qualified readers for individuals with visual impairments and learning disabilities, classroom equipment adapted for use by individuals with manual impairments, and other similar services and actions."[92] We can find only one of our

colleagues' opinions citing this guidance and our colleague does not interpret what qualifies as an auxiliary aid under it.[93]

We need not reach the legal question today even assuming we accepted the Department of Justice's examples of auxiliary aids. Mses. De Camara and Bañuelos do not allege they have impaired sensory, manual, or speaking skills—or a learning disability—and have not pleaded how an iPad and an Apple Pencil would allow them to access courses at the College.[94] We are not aware of, and the Students have not offered, facts suggesting an iPad and Apple Pencil would somehow assist them in the classroom. The Students offer some statement from a College agent suggesting they buy an iPad. A suggestion to buy an iPad does not mean the device is an auxiliary aid. We need to see some connection between an iPad and an alleged disability (not alleged in this context) in the same way a Braille text, hearing aid, or dictation/recording software may assist a student with a pleaded disability in the classroom. The Students do not plead an iPad and an Apple Pencil qualify as an auxiliary aid under Title III. And we have no basis to decide they are auxiliary aids for Students with attention deficit hyperactivity disorder.[95]

We dismiss Mses. De Camara and Bañuelos' claim for injunctive relief requiring the College and its Trustees provide them with an iPad and Apple Pencil with leave to amend.[96]

> **3.    We dismiss the Students' separate claims for deliberate indifference under Title III because they only seek injunctive relief.**

The Students bring a standalone claim for deliberate indifference under Title III of the Americans with Disabilities Act and ask for injunctive relief.[97] The College and its Trustees ask us to dismiss this claim as not a basis for a claim under Title III.[98] The Students respond their deliberate indifference allegations "demonstrate[e] the profound need for the comprehensive injunctive relief sought."[99] We agree with the College and its Trustees.

It is true a person seeking compensatory damages under <u>Title II</u> must show "intentional discrimination under a deliberate indifference standard."[100] But Title II only applies to public entities.[101] Congress intended Title III apply to private universities and Congress does not allow the Students to recover money damages.[102] The Students do not cite law to support their position.

We dismiss the Students' claim for deliberate indifference under Title III as a separate claim with prejudice.[103]

**B.  We decline to dismiss the remaining Title III claims as shotgun pleadings.**

The College and its Trustees ask us to dismiss the Title III claims as shotgun pleadings because they do not have "adequate notice of the grounds upon which each" Title III claim rests.[104] The Students respond they provided the College and its Trustees "with more than fair notice of the claims against them."[105] We agree with the Students.

A complaint is a "shotgun pleading" counter to Federal Rule of Civil Procedure 8(a)(2) when the plaintiff does not include "a short and plain statement of the claim showing that the pleader is entitled to relief."[106] Our Court of Appeals has criticized shotgun pleadings.[107] But the Court of Appeals for the Eleventh Circuit "has articulated the bulk of existing law in this area."[108] The Court of Appeals for the Eleventh Circuit has explained shotgun pleadings can include complaints with "multiple counts where each count adopts the allegations of all preceding counts" and complaints "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action."[109] But the common theme among all types of shotgun pleadings "is that they fail . . . to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests."[110] A complaint with some elements of a shotgun pleading thus will still satisfy Rule 8(a)(2) so long as there are sufficient factual allegations to put defendants on notice of the grounds for the claims against them.[111]

The Students' amended Complaint gives the College and its Trustees adequate notice of the grounds for the Title III claims against them. The College and its Trustees note the amended Complaint has some elements of a shotgun pleading because it incorporates preceding paragraphs in each claim.[112] But the Students identify which allegations in the "Factual Background" portion of the amended Complaint apply to which Students.[113] The Students also identify which specific Student is suing the College and its Trustees for which conduct for each Title III claim.[114] The Students provided the College and its Trustees with adequate notice of the claims against them and the grounds for each claim.[115] We deny the College and its Trustees' motion to dismiss the current and former Students' Title III claims as shotgun pleadings.[116]

**C. We dismiss the breach of contract claims.**

The Students sue the College and its Trustees for breach of contract and request damages.[117] The College and its Trustees move to dismiss the breach of contract claims because the Students do not identify specific promises forming the basis of a contract claim.[118] The Students counter a private college can create a contract with its Students through handbooks and promotional materials.[119] We agree with the College and its Trustees.

A person must plead three elements to establish a breach of contract claim under Pennsylvania law: "(1) the existence of a contract, including its essential terms[;] (2) a breach of the contract; and[] (3) resultant damages."[120] Pennsylvania law acknowledges "the relationship between a private university and a student is contractual."[121] The contract between a private university and its student consists of "the written guidelines, policies, and procedures as contained in the written materials distributed to the student over the course of their enrollment in the institution."[122] But to allege a breach of contract claim against her private college a student must allege "specific and identifiable promise[s] that the school failed to honor."[123] She "must point to

specific undertakings in the [contract] that were not provided."[124] A student's breach of contract claim against her private college will thus fail if she cannot identify specific promises her college made and breached.[125]

The Students bring four claims for breach of contract against the College and its Trustees.[126] They claim the College and its Trustees breached their contracts by failing "to respect [their] academic and intellectual freedom," failing "to provide dietary accommodations," failing "to provide transportation and facility accessibility," and failing "to provide academic accommodations."[127] They only cite to the College's Student Handbook, website, and admission materials generally.[128] They do not cite specific provisions in the Student Handbook—or other materials—giving rise to a contract.[129] The Students do not state a claim because they have not identified specific provisions or materials giving rise to a contract.[130] We dismiss their breach of contract claims with leave to amend.[131]

### D. We dismiss the negligent infliction of emotional distress claims.

The Students sue the College and its Trustees for negligent infliction of emotional distress and ask us to award damages.[132] They allege the College and its Trustees breached their duty to "avoid causing [them] emotional, mental, and psychological harm" by failing to provide them with accommodations, by retaliating against them, by providing facilities unable to meet "minimum standards of health and sanitation," and by serving undercooked food.[133] The College and its Trustees ask us to dismiss these claims because (1) the gist of the action doctrine bars the claims and (2) there is no special relationship between a college and its students.[134] The Students respond the gist of the action doctrine does not apply and there is a special relationship between universities and students with known disabilities.[135] They also ask us to certify a question of a college's duty in tort to its students to the Pennsylvania Supreme Court.[136] We find the gist of the action doctrine

does not apply. But the Students did not plead a claim for negligent infliction of emotional distress. We decline to certify their question to the Pennsylvania Supreme Court.

The gist of the action doctrine bars a tort claim where the duties at issue arise solely from the parties' contract terms.[137] But just because the parties enter a contract does not automatically mean the gist of the action doctrine bars a person's claims relating to their relationship.[138] A person may still sue another person with whom she has a contract under tort law if the duties she claims are breached are drawn from the "broader social dut[ies] owed to all individuals."[139]

We recognize the relationship between a private school like the College and its students is contractual.[140] But Chief Judge Conner in *Dobson* found the gist of the action doctrine did not apply to a student's suit against a private school where a student referenced "[s]chool policies or guidelines" in his claims because the student also alleged the school "negligently or intentionally caused him emotional distress and physical harm."[141] Chief Judge Conner explained the gist of the action doctrine did not bar the student's claim—even though he also referenced school policies— because his claim for emotional distress and physical harm derived from "tort law and the broader social policies implicated thereby, not contract law."[142] Chief Judge Hornak suggests *Dobson* might be limited to its facts because it involved a minor student living at a private school.[143] But Chief Judge Hornak only addresses the portion of the *Dobson* decision where Chief Judge Conner concluded the gist of the action doctrine did not bar the student's negligence claim because there was a duty "based on custodial care and protection of minor children" existing "independent of any contractual obligation."[144] Chief Judge Hornak does not adddress Chief Judge Conner's conclusion the gist of the action doctrine did not bar the student's "infliction of emotional distress claims" because the duty to avoid inflicting "severe emotional distress" does not arise from contractual obligations.[145]

The Students here plead most of the same conduct to show breaches for both their breach of contract and negligent infliction of emotional distress claims.[146] But the Students also claim the College and its Trustees had a duty to "avoid causing [them] emotional, mental, and psychological harm."[147] We agree with Chief Judge Conner: the alleged duty to avoid causing them emotional, mental, and psychological harm arises from "broader social" duties and not just from the parties' contracts.[148] The current and former Students' negligent infliction of emotional distress claims thus in "essence . . . derive[] from tort law" when viewing the allegations in a light most favorable to them.[149] We do not dismiss the Students' negligent infliction of emotional distress claims based on the gist of the action doctrine.

But the Students do not plead a claim for negligent infliction of emotional distress against the College and its Trustees. A person may only bring a negligent infliction of emotional distress claim in "four factual scenarios."[150] One of the scenarios which may give rise to a negligent infliction of emotional distress claim is when a someone owed a contractual or a fiduciary duty toward the person.[151] But a negligent infliction of emotional distress claim can only arise out of a contractual or fiduciary duty where the duty "encompass[es] an implied duty to care for the [person's] emotional well-being."[152] This category of negligent infliction of emotional distress claims will thus only apply to a "narrow set of circumstances."[153] Our colleagues have only recognized this category as applying to certain relationships between doctors and patients and between adoption agencies and adopting parents.[154]

The Students claim they have a special relationship with the College and its Trustees allowing them to sue the College and its Trustees for negligent infliction of emotional distress. But the relationship between a private college and its students is not the type of relationship "hold[ing] the potential of deep emotional harm" necessary for a negligent infliction of emotional distress

claim.[155] The Students do not allege a private college's relationship with its students is so like the doctor-patient or adoption agency relationships so as to create a duty. We decline to extend the concept to private colleges with hundreds of students absent some form of alleged special relationship. We dismiss the Students' negligent infliction of emotional distress claims against the College and its Trustees without prejudice.[156]

We also decline to certify the question of whether the relationship between a private school and student can serve as the basis for a negligent infliction of emotional distress claim. Our Court of Appeals instructs us to consider several factors when deciding whether to certify a question to a state supreme court.[157] One factor—whether the "resolution" of the issue is "unclear"—"will often be dispositive."[158] Here the resolution of the issue is not unclear. The Pennsylvania Supreme Court in *Toney* published a persuasive opinion instructing a special relationship will only arise where there is an implied duty to care for a person's emotional well-being.[159] Our colleagues applying *Toney* consistently conclude the relationship between a private school and its students is not a special relationship because it does not have the potential to inflict deep emotional harm.[160] The cases the current and former Students cite as evidence there is a disagreement in the interpretation of Pennsylvania law are actually both consistent with this approach.[161] We decline to certify the question to the Pennsylvania Supreme Court.

**E. We decline to strike the Students' class action allegations but strike Count XIV as redundant.**

The Students plead the basis for possibly certifying a class of students who are similarly situated to their remaining claims under Title III.[162] But then they add a Count XIV as a presumed catch-all "Class Claim."[163] The College and its Trustees ask us to strike the Students' class action claims.[164] They argue Students have not pleaded facts establishing a prima facie class action under Rule 23 because Students have not satisfied the commonality or typicality requirements for class

actions and because the proposed class definition amounts to an improper fail-safe class.[165] The Students respond striking class allegations is a drastic remedy and any deficiencies at this stage can be addressed by using sub-classes or modifying class definitions.[166] We agree with the Students and decline to strike the allegations in paragraphs ninety-three to ninety-nine of the amended Complaint. But we find the separate Count XIV is redundant without prejudice to incorporate the requested relief in the remaining substantive counts.

We decline to strike the class action allegations at paragraphs ninety-three to ninety-nine of the amended Complaint. The Students plead facts allowing us to plausibly infer a basis to find possible class treatment on the remaining Title III claims. They plead hundreds of potential Class members since February 14, 2022, common questions of law and fact under the remaining Title III claims similarly situated with claims brought by former-Student De Camara and current-Students Kachru and Bañuelos, typicality based on systemic policies, adequacy of representation for Students, and superiority of the class treatment.

We find no basis to strike these allegations. They are not redundant, immaterial, impertinent, or scandalous.[167] The Students' pleading is consistent with the pleading of class requirements. We will not decide today, on a pleading basis, whether the three Students can show a basis for class certification after our required rigorous analysis of a possible motion for class certification.[168] The College and its Trustees' arguments about fail-safe classes and concerns with subclasses can be reviewed on a class basis if the three Students move for class certification notwithstanding the remaining Title III claims which may, if granted after a non-jury trial, afford the same relief. "The mere existence of a problematic class definition does not automatically mandate denial of class certification."[169] But we agree the inclusion of Count XIV is entirely

redundant. Class treatment is a mechanism to afford relief to unnamed similarly situated persons. It is not a substantive count.

**F.  We dismiss Jane Doe 1 and Student X's allegations because they do not explain why they cannot use their names.**

The College and its Trustees ask us to strike "all . . . references to unnamed plaintiffs" from the amended Complaint under Rule 12(f) for failing to comply with Rule 10(a).[170] The Students do not respond to their arguments.[171] We agree with the College and its Trustees and strike these claims without prejudice.[172]

The Supreme Court through Rule 10(a) requires persons to "name all the parties" in their complaints.[173] A person may only proceed anonymously in "exceptional cases" where she shows (1) she has a "reasonable fear of severe harm" and (2) her reasonable fear "outweighs the public's interest in open litigation."[174] "[E]mbarassment or economic harm" alone is not enough to show a reasonable fear of severe harm.[175] The Students here refer to "Jane Doe 1" and "Student X" in their amended Complaint but do not explain whether they are also suing the College and its Trustees.[176] To the extent Jane Doe 1 and Student X are suing the College and its Trustees we strike their claims under because they have not pleaded facts showing they have a reasonable fear of severe harm if they proceed using their own names—let alone pleaded facts showing their reasonable fear outweighs the public's interest in open litigation.[177] We strike paragraphs eighty-eight to ninety-two with leave to amend for Jane Doe 1 and Student X to identify the claims they are suing the College and its Trustees and to either identify themselves or move to proceed anonymously demonstrating a basis to do so under the law.

**III.    Conclusion**

We grant the College and its Trustees' Motion in part and deny it in part. Several of the Students lack standing to sue for relief under Title III. The Students also did not state a claim for

breach of contract and negligent infliction of emotional distress. We dismiss all claims except for former-Student De Camara's Title III claim for failure to provide virtual attendance accommodations, former-Student De Camara and current-Students Kachru and Bañuelos's Title III claims for failure to provide testing and course assignment accommodations, and former-Student De Camara and current-Student Kachru's Title III claims for failure to permit priority registration.

---

[1] ECF 17 (amended Complaint) at ¶¶ 11–12.

[2] *Id.* at ¶ 12.

[3] *Id.* at ¶ 14.

[4] *Id.* at ¶¶ 1, 15–16.  We refer to the six persons suing as "Students" even though three of the persons no longer attend the College.

[5] *Id.* at ¶¶ 17–18.

[6] *Id.* at ¶ 19.

[7] *Id.* at ¶¶ 17–19 (claiming Merion dorm, Pembroke Hall, and Taylor Hall are inaccessible to students with disabilities without claiming any of the named Students could not access them).

[8] *Id.* at ¶¶ 88–92.

[9] *Id.* at ¶¶ 2, 35–39.

[10] *Id.* at ¶¶ 36, 77.

[11] *Id.* at ¶ 45, ECF 17 at 46(1).

[12] *Id.* at ¶¶ 4, 46–56.

[13] *Id.* at ¶¶ 57, 59–60.

[14] *Id.* at ¶¶ 64, 66.

[15] *Id.* at ¶¶ 3, 73–75, 76–87.

[16] *Id.* at ¶¶ 3, 67–72.

[17] *Id.* at ¶¶ 5, 73–75.

[18] *Id.* at ¶¶ 6, 76–81.

[19] *Id.* at ¶ 77.

[20] *Id.* at ¶¶ 100–38, 171–76.

[21] *Id.* at ¶¶ 147–66–70.

[22] ECF 18-1 at 11–15, 20.

[23] *Id.* at 16–19.

[24] *Id.* at 15–17, 20–25, 20 n.12.

[25] *See* ECF 17 at ¶¶ 104, 106, 112, 118, 127, 132, 138; *id.* at 46–47. They also seek attorneys' fees and costs. *Id.* at 46–47. But attorneys' fees alone are insufficient to save a claim for injunctive relief where a person otherwise lacks standing. *See Thole v. U.S. Bank N.A*, 590 U.S. 538, 541 (2020) ("[A]n 'interest in attorney's fees is, of course, insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim'" (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 480 (1990)).

Former-Student De Camara also appears to request damages for one of her claims under Title III. *See* ECF 17 at ¶ 106. But money damages are not available for claims brought under Title III of the Americans with Disabilities Act. *See* 42 U.S.C. § 12188(a)(1) (allowing "remedies . . . set forth in section 2000a-3(a)"); 42 U.S.C. § 2000a-3(a) (allowing "a civil action for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order . . ."); *see also Giterman v. Pocono Med. Ctr.*, 361 F. Supp. 3d 392, 404 (M.D. Pa. 2019) ("Under Title III of the [Act], private plaintiffs may not obtain monetary damages and therefore only prospective injunctive relief is available" (quotation omitted)).

[26] *See* ECF 18-1 at 11–13 (asking us to dismiss claims one through five); *but see* ECF 17 at 35 (showing neither Ms. De Camara, Ms. Richards-Cordell, nor Ms. Aoki bring claim five). A party may move to dismiss a claim under Federal Rule of Civil Procedure 12(b)(1) if we "lack . . . subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). We evaluate motions to dismiss for lack of

standing under Rule 12(b)(1)'s standards. *See Const. Party of Pa. v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014) ("A motion to dismiss for want of standing is . . . properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter" (quoting *Ballentine v. U.S.*, 486 F.3d 806, 810 (3d Cir. 2007))). The standard we apply under Rule 12(b)(1) depends on whether the party contesting subject matter jurisdiction is making a facial or a factual challenge. *See Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015); *see also Const. Party of Pa.*, 757 F.3d at 357 ("A district court has to first determine . . . whether a Rule 12(b)(1) motion presents a 'facial' attack or a 'factual' attack on the claim at issue, because that distinction determines how the pleading must be reviewed" (quotation omitted)). A facial attack addresses "an alleged pleading deficiency." *See Lincoln Ben. Life Co.*, 800 F.3d at 105 (quoting *CNA v. U.S.*, 535 F.3d 132, 139 (3d Cir. 2008)). We may only consider the complaint, the documents referenced in the complaint, and the documents attached to the complaint "in the light most favorable to the plaintiff" when reviewing a facial attack. *See id.* (quoting *Gould Elecs. Inc. v. U.S.*, 220 F.3d 169, 176 (3d Cir. 2000)). A factual attack claims a person has "actual[ly] fail[ed] . . . to comport [factually] with the jurisdictional prerequisites." *See id.* (quoting *CNA*, 535 F.3d at 139). For a factual attack we "must permit the plaintiff to respond with rebuttal evidence in support of jurisdiction" and then must "decide[] the jurisdictional issue by weighing the evidence." *See id.* (quoting *McCann v. Newman Irrevocable Tr.*, 458 F.3d 281, 290 (3d Cir. 2006)).

The College and its Trustees' arguments here are based on the current and former Students' allegations in their amended Complaint. *See* ECF 18-1 at 11–14 (referencing the former Students' amended Complaint). The College and its Trustees thus bring a facial challenge to subject matter jurisdiction, and we must consider only the amended Complaint "in the light most favorable to the plaintiff[s]." *See Lincoln Ben. Life Co.*, 800 F.3d at 105 (quoting *Gould Elecs. Inc.*, 220 F.3d at 176); *see also Thorne v. Pep Boys Manny Moe & Jack Inc.*, 980 F.3d 879, 885 (3d Cir. 2020) (noting the motion to dismiss relied on "the plaintiff's factual allegations" and thus it was a facial challenge); *Const. Party of Pa.*, 757 F.3d at 358–59 (noting because an attack was facial the panel could "only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff" (quoting *In re Schering Plough Corp. Intron*, 678 F.3d 235, 243 (3d Cir. 2012))).

---

[27] ECF 18-1 at 13–14; ECF 20 at 2–4. The College and its Trustees do not challenge current-Student Kachru's standing to seek Title III injunctive relief.

[28] ECF 19 at 12–14.

[29] *Id.*

[30] *Id.* at 14–15.

[31] U.S. Const. art. III, § 2.

[32] *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) ("For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case—in other words, standing" (quoting *Raines v. Byrd*, 521 U.S. 811, 820 (1997))).

---

[33] *See Spokeo*, 578 U.S. at 338 (noting "[t]he plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing" standing to sue).

[34] *See id.*

[35] *See id.* at 339 ("To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical'" (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992))).

[36] *See Wayne Land & Min. Grp., LLC v. Del. River Basin Comm'n*, 959 F.3d 569, 574 (3d Cir. 2020) (quoting *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017)).

[37] The College and its Trustees also ask us in passing to dismiss former-students De Camara, Richards-Cordell, and Aoki's claims for violations of Title III of the Act as moot under Rule 12(b)(1). *See* ECF 18-1 at 12 ("Such claims . . . similarly are moot . . ."). But the appropriate justiciability argument here is standing because "[s]tanding ensures that each plaintiff has '[t]he requisite personal interest . . . at the commencement of the litigation.'" *See Freedom from Religion Found. Inc. v. New Kensington Arnold Sch. Dist.*, 832 F.3d 469, 476 (3d Cir. 2016) (quoting *Arizonans for Off. Eng. v. Ariz.*, 520 U.S. 43, 68 n.22 (1997)). In contrast "mootness ensures that [the personal] interest 'continue[s] throughout' the duration of the case." *Id.* (quoting *Arizonans for Off. Eng.*, 520 U.S. at 68 n.22); *see also Reading v. N. Hanover Twp.*, 124 F.4th 189, 198 (3d Cir. 2024) (suggesting mootness is applicable where a person "once had standing to seek injunctive relief but lost it during the pendency of litigation" and would not apply where a person never "established a likelihood of future harm").

[38] ECF 17 at ¶¶ 104, 106, 112, 118, 132, 138.

[39] ECF 18-1 at 11–13; ECF 20 at 1–2.

[40] *Id.*

[41] ECF 19 at 12–14.

[42] *See Doe v. Nat'l Bd. of Med. Exam'rs*, 210 F. App'x 157, 159–60 (3d Cir. 2006) (emphasis removed); *see also Anderson v. Macy's, Inc.*, 943 F. Supp. 2d 531, 538 (W.D. Pa. 2013) ("Because the remedy for a private [Title III] violation is injunctive relief, courts look beyond the alleged past violation and consider the possibility of future violations. Plaintiffs seeking prospective injunctive relief 'must demonstrate a "real and immediate threat" of injury in order to satisfy the "injury in fact" requirement'" (quotations omitted)).

[43] *See Const. Party of Pa.*, 757 F.3d at 361 (quoting *City of L.A. v. Lyons*, 461 U.S. 95, 102 (1983)).

[44] *See Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 561 (3d Cir. 2002) (quoting *Shotz v. Cates*, 256 F.3d 1077, 1081 (11th Cir. 2001)); *Anderson*, 943 F. Supp. 2d at 538. *See also Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 479 (3d Cir. 2018) (without focusing on whether

wheelchair bound persons who experienced physical difficulty in ambulating through allegedly unlawful parking facilities outside of two restaurants would return to those restaurants but finding they still suffered concrete injuries sufficient for standing). We are not persuaded by our Court of Appeals' *Mielo* analysis in reviewing the facts presented today; we do not compare possibly returning to a restaurant chain with over 500 locations with returning to Bryn Mawr College. Students must show they will return with a change in policies as we will not automatically assume they will or can return to the College.

[45] *See Giterman*, 361 F. Supp. 3d at 405 (quoting *Hollinger v. Reading Health Sys.*, No. 15-5249, 2016 WL 3762987, at *10 (E.D. Pa. July 14, 2016)).

[46] *See id.* at 405–06 (quoting *Hollinger v. Reading Health Sys.*, No. 15-5249, 2017 WL 429804, at *4 (E.D. Pa. Jan. 31, 2017)).

[47] *See id.* at 405 (quoting *Hollinger*, 2016 WL 3762987, at *10–11).

[48] *See id.* at 405–06 (quoting *Hollinger*, 2016 WL 3762987, at *11).

[49] *See id.* (quoting *Hollinger*, 2016 WL 3762987, at *11).

[50] *See id.* (quoting *Hollinger*, 2017 WL 429804, at *4).

[51] *See Freedom from Religion Found. Inc.*, 832 F.3d at 481 (finding parent had standing to sue school for injunctive relief through section 1983 for violating First Amendment and her claim was not moot even though her child did not attend school because the child "could return to the high school" if granted relief and the parent "represents that she intends to enroll [child] at the high school" if granted relief).

[52] ECF 19 at 12–14.

[53] ECF 17 at ¶ 45 (alleging she is "on indefinite leave" from school until the College and its Trustees takes "the necessary steps to address the . . . issues set forth in this Complaint"); *id.* at ¶ 104 (requesting an injunction allowing her to "complete her studies at Bryn Mawr with the ability to attend classes remotely as needed in light of her disabilities"); *id.* at 46 (requesting an injunction requiring the College and its Trustees to allow her "to complete her studies at Bryn Mawr with the ability to attend classes remotely . . . together with attorneys' fees and costs").

[54] *See Freedom from Religion Found.*, 832 F.3d at 481; *Giterman*, 361 F. Supp. 3d at 407. The College and its Trustees do not challenge the other components of standing—the remaining requirements for an injury in fact, traceability, and redressability—and at this stage Ms. De Camara has pleaded facts suggesting she had a concrete and particularized injury from an invasion of a legally protected interest, her injuries are "fairly traceable" to the College and its Trustees' conduct, and her injuries are "likely to be redressed by a favorable judicial decision." *See Spokeo*, 578 U.S. at 338–39.

[55] ECF 17 at ¶ 57 (alleging Ms. Aoki started at the College in Fall 2020, which suggests she would have graduated in Spring 2024); *id.* at ¶ 66 (showing Ms. Aoki speaks about her time at the College

in the past tense with phrases like "[t]hroughout her time at Bryn Mawr . . ."); ECF 19 at 12–14 (showing Ms. Aoki does not dispute she is a former student); ECF 17 at ¶ 56 (showing Ms. Richards-Cordell alleges she "withdrew from the [C]ollege"); ECF 19 at 12–14 (showing Ms. Richards-Cordell also does not dispute she is a former student).

[56] ECF 17 at ¶¶ 46–66.

[57] *See Doe v. Friends Cent. Sch. Corp.*, No. 18-3473, 2019 WL 2515977, at *6 (E.D. Pa. June 18, 2019) (dismissing claims under Title III of the Act because "[w]hile the Complaint alleges past discriminatory conduct, it does not allege that the [plaintiffs] intend to enroll [their daughter] at [the school] in the future or that [she] was deterred from patronizing [the school] because of Defendants' failure to comply with the [Act]"); *Mirabella v. William Penn Charter Sch.*, No. 15-1162, 2017 WL 1062460, at *3 (E.D. Pa. Mar. 20, 2017) (granting motion for summary judgment on claims plaintiffs brought under Title III of the Act because "nothing in the record establishes that, at the time the case was initiated, [the student] had any intention to return to [the school], even if the alleged unlawful conduct had been remedied"), *aff'd on other grounds*, 752 F. App'x 131 (3d Cir. 2018); *Giterman*, 361 F. Supp. 3d at 407 (granting summary judgment on claims plaintiff brought under Title III of the Act because plaintiff did not present evidence showing she had a plan to return to the hospital for treatment).

[58] Counts VI–VII.

[59] ECF 17 at ¶ 127.

[60] ECF 18-1 at 13–14; ECF 20 at 2–4.

[61] ECF 19 at 14–15 ("[B]eing barred from a central social hub like Pembroke Hall or from participating in a capstone graduation tradition at Taylor Hall is a tangible and particularized harm").

[62] *Id.* at 15 ("The Amended Complaint makes clear that these students are denied access to these facilities and would use them but for the discriminatory barriers. The law does not require a student in a wheelchair to engage in the futile and dangerous gesture of attempting to climb a flight of stairs to establish an injury").

[63] *See Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560 n.1).

[64] *See Mielo*, 897 F.3d at 480 (emphasis removed); *Cottrell v. Alcon Lab'ys*, 874 F.3d 154, 167 (3d Cir. 2017) (noting plaintiffs must "allege facts establishing he is personally injured by a defendant's conduct" and noting there was "no dispute that [a] harm is particularized" where plaintiffs each claimed they each incurred "financial harm . . . in purchasing medication that was impossible for him or her to use").

[65] ECF 17 at ¶¶ 73–87.

[66] *Id.*

---

[67] *Id.* at ¶ 74 (showing Ms. Kuelgen claims relying on the shuttle services after she underwent hip surgeries caused her to be late for class); *id.* at ¶ 81 (showing Ms. Bañuelos claims she missed class after twisting her ankle in part because the "shuttle service was so poorly staffed and advertised that [she] was unaware of its existence").

[68] *Id.* at ¶ 73.

[69] *Id.* at ¶ 81.

[70] Ms. Kuelgen and Ms. Bañuelos have not alleged a particularized injury regarding their request for "ramp access for all buildings at [the College]" because they do not claim they use wheelchairs or otherwise can only access buildings through ramps. *See* ECF 17 at ¶¶ 73–87, 127.

[71] *See Wayne Land & Min. Grp., LLC*, 959 F.3d at 574 ("[O]ur continuing obligation to assure that we have jurisdiction requires that we raise [the] issue[] of standing . . . sua sponte" (quoting *Seneca Res. Corp. v. Twp. of Highland*, 863 F.3d 245, 252 (3d Cir. 2017)).

[72] *See Nat'l Bd. of Med. Exam'rs*, 210 F. App'x at 159–60 (emphasis removed); *see also Anderson*, 943 F. Supp. 2d at 538 ("Plaintiffs seeking prospective injunctive relief 'must demonstrate a "real and immediate threat" of injury in order to satisfy the "injury in fact" requirement'" (quotations omitted)).

[73] ECF 17 at ¶ 127.

[74] *Id.* at ¶¶ 73–87.

[75] *Id.* at ¶¶ 73, 81.

[76] *Id.* at ¶¶ 73–87.

[77] *See Green v. DGG Props. Co., Inc.*, No. 11-01989, 2013 WL 395484, at *13 (D. Conn. Jan. 31, 2013) (finding person failed to plead facts showing a likelihood of future injury necessary for standing to sue for injunctive relief where he claimed he used a wheelchair only "at the time" he visited a public accommodation because he did not "allege a continuing disability such that it is reasonable to infer that the discriminatory treatment against him will continue").

[78] Count V.

[79] ECF 17 at ¶¶ 113–18.

[80] *Id.* (claiming the College and its Trustees failed to provide them with an iPad and Apple Pencil); ECF 18-1 at 14–15; ECF 20 at 4–5. In determining whether to grant a Rule 12(b)(6) motion, "we accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the plaintiff" but "disregard threadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements." *Robert W. Mauthe, M.D., P.C. v. Spreemo, Inc.*, 806 F. App'x 151, 152 (3d Cir. 2020) (quoting *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 878–79 (3d Cir. 2018)). Our Court of Appeals requires us to apply a three-step analysis to a

12(b)(6) motion: (1) we "tak[e] note of the elements a plaintiff must plead to state a claim"; (2) we "'identify allegations that . . . "are not entitled to the assumption of truth"' because those allegations 'are no more than conclusion[s]'"; and (3) "'[w]hen there are well-pleaded factual allegations,' we 'assume their veracity' . . . in addition to assuming the veracity of 'all reasonable inferences that can be drawn from' those allegations . . . and, construing the allegations and reasonable inferences 'in the light most favorable to the [plaintiff]' . . . , we determine whether they 'plausibly give rise to an entitlement to relief.'" *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 904 (3d Cir. 2021) (quotations omitted); *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016).

[81] ECF 19 at 15–17.

[82] *Id.* at 16.

[83] *See Chisolm v. McManimon*, 275 F.3d 315, 327 (3d Cir. 2001).

[84] *Cf. McGann v. Cinemark USA, Inc.*, 873 F.3d 218, 224–26 (3d Cir. 2017) (analyzing whether an American Sign Language tactile interpreter qualified as an "auxiliary aid or service" and determining a tactile interpreter "'fall[s] comfortably within the scope of th[e] definition' of 'auxiliary aids and services' provided in the text of the [Act] and [Department of Justice] regulations" (quoting *Ariz. ex rel. Goddard v. Harkins Amusement Enters., Inc.*, 603 F.3d 666, 674 (9th Cir. 2010))).

[85] ECF 17 at ¶ 116.

[86] *See* 42 U.S.C. § 12182(b)(2)(A)(iii) ("[A] failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden").

[87] 42 U.S.C. § 12103(1)(A)–(D).

[88] 28 C.F.R. § 36.303(b)(1)–(2). The College and its Trustees base their arguments on regulations applicable to Title II of the Act. *See* ECF 18-1 at 14–15 (citing sections 35.160 and 35.104); ECF 20 at 4–5 (same); *see also* 28 C.F.R. § 35.101(a) ("The purpose of this part is to implement subtitle A of title II of the Americans with Disabilities Act of 1990 . . . which prohibits discrimination on the basis of disability by public entities"). The regulations in Part 36 apply to Title III. *See* 28 C.F.R. § 36.101(a) ("The purpose of this part is to implement subtitle A of title III of the Americans with Disabilities Act of 1990 . . . which prohibits discrimination on the basis of disability by covered public accommodations . . .").

[89] *See McGann*, 873 F.3d at 224–26 (addressing whether interpreter qualified as an auxiliary aid for an individual who was both deaf and blind); *Ariz. ex rel. Goddard*, 603 F.3d at 668, 670

(addressing whether movie captioning and audio descriptions qualified as an auxiliary aid for individual with "hearing loss so severe that he cannot hear or discriminate speech").

[90] *See Le Pape v. Lower Merion Sch. Dist.*, 103 F.4th 966, 971, 981–82 (3d Cir. 2024) (addressing effectiveness of auxiliary aid for non-verbal student with "autism and speech-language impairment"); *Argenyi v. Creighton Univ.*, 703 F.3d 441, 443, 451 (8th Cir. 2013) (reversing summary judgment entered against a medical student with "a serious hearing impairment" because there was "a genuine issue of material fact as to whether [medical school] denied [plaintiff] an equal opportunity to gain the same benefit from medical school as his nondisabled peers by refusing to provide him his requested accommodations"); *Crane v. Lifemark Hosps., Inc.*, 898 F.3d 1130, 1132, 1134–35 (11th Cir. 2018) (addressing "profoundly deaf" person's claim hospital discriminated against him by failing to provide an auxiliary aid); *Robles v. Domino's Pizza*, 913 F.3d 898, 902, 904–05 (9th Cir. 2019) (discussing auxiliary aids when discussing a blind man's claim against Domino's); *Murphy v. Spongelle LLC*, 716 F. Supp. 3d 358, 361–62 (W.D. Pa. Feb. 9, 2024) (addressing blind man's claim for denying him an auxiliary aid); *Dalton v. Saint Barnabas Med. Ctr.*, No. 21-5354, 2023 WL 7298464, *1–2, *5 (D.N.J. Nov. 6, 2023) (referencing auxiliary aids in response to person with a traumatic brain injury claiming need for support with communication).

[91] *See* 28 C.F.R. § 36.309(c)(3) ("A private entity that offers a course covered by this section shall provide appropriate auxiliary aids and services for persons with impaired sensory, manual, or speaking skills, unless the private entity can demonstrate that offering a particular auxiliary aid or service would fundamentally alter the course or would result in an undue burden").

[92] *Id.*

[93] *See Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1163 (9th Cir. 2011) (citing 28 C.F.R. § 36.309(c)(3)).

[94] ECF 17.

[95] We do not reach the College and its Trustees' alternative theory an iPad and an Apple Pencil are "personal devices" they are not required to provide. *See* ECF 18-1 at 14–15; ECF 20 at 4–5; 28 C.F.R. § 36.306 ("This part does not require a public accommodation to provide its customers, clients, or participants with personal devices, such as wheelchairs; individually prescribed devices, such as prescription eyeglasses or hearing aids; or services of a personal nature including assistance in eating, toileting, or dressing"). But based on the examples the Department of Justice provides—which include wheelchairs, prescription eyeglasses, and prescription hearing aids—personal devices seem to be devices a health care professional would prescribe. *See* 28 C.F.R. § 36.306. Few of our colleagues have interpreted what devices beyond the provided examples qualify as personal devices. But Judge Katz also relied on the Department of Justice's regulation to conclude the Act "does not require public facilities . . . to supply individuals with medical prescriptions" like oxygen "under the guise of auxiliary aids." *See Dryer v. Flower Hosp.*, 383 F. Supp. 2d 934, 941 (N.D. Ohio 2005) (citing 28 C.F.R. § 36.306) (finding a hospital was not required to provide a non-patient—who a doctor had prescribed oxygen to assist with her breathing—with oxygen from the hospital). The College and its Trustees have not argued a medical professional prescribed Mses. De Camara and Bañuelos an iPad and an Apple Pencil. ECF 18-1 at

¶¶ 14–15. We decline to go beyond our holding on "auxiliary aids" to find an iPad and an Apple Pencil are personal devices a college would never be required to provide for a student. *See Dryer*, 383 F. Supp. 3d at 941 (noting "public accommodations are not required to provide 'personal devices . . .'" (quoting 28 C.F.R. § 36.306)).

96 Count IV.

97 ECF 17 at ¶¶ 171–76.

98 ECF 18-1 at 20; ECF 20 at 5 n.1.

99 ECF 19 at 19.

100 *See Durham v. Kelley*, 82 F.4th 217, 226 (3d Cir. 2023) (noting deliberate indifference requires "(1) knowledge that a federally protected right is substantially likely to be violated . . . and (2) failure to act despite that knowledge" (quoting *Haberle v. Troxell*, 885 F.3d 170, 181 (3d Cir. 2018)).

101 *See* 42 U.S.C. §§ 12131–32 ("[N]o qualified individual with a disability shall . . . be subjected to discrimination by [a public entity]").

102 *See* 42 U.S.C. § 12182(a) (prohibiting public accommodations from discriminating "on the basis of disability"); 42 U.S.C. § 12181(7)(J) (defining public accommodations to include private schools "if the operations of such entities affect commerce"); 42 U.S.C. § 12188(a)(1) (allowing "remedies . . . set forth in section 2000a-3(a)"); 42 U.S.C. § 2000a-3(a) (allowing "a civil action for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order . . .").

103 Count XIII.

104 ECF 18-1 at 16.

105 ECF 19 at 11.

106 *See Bartol v. Barrowclough*, 251 F. Supp. 3d 855, 859 (E.D. Pa. 2017) (first quoting *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015); and then quoting Fed. R. Civ. P. 8(a)(2)).

107 *See id.* ("The Third Circuit has criticized 'the all too common shotgun pleading approach' to complaints" (quoting *Hynson v. City of Chester Legal Dep't*, 864 F.2d 1026, 1031 n.13 (3d Cir. 1988))).

108 *See id.* ( explaining "[a]s a result, district courts within the Third Circuit often cite to the Eleventh Circuit for this law").

109 *See id.* (quoting *Weiland*, 792 F.3d at 1321–23) (explaining the Court of Appeals for the Eleventh Circuit has identified four types of shotgun pleadings: (1) "a complaint containing

multiple counts where each count adopts the allegations of all preceding counts," (2) "a complaint that is 'replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action,'" (3) "a complaint that does 'not separat[e] into a different count each cause of action or claim for relief,'" and (4) "a complaint that 'assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against'" (quoting *Weiland*, 792 F.3d at 1321–23)).

[110] *See id.* (quoting *Weiland*, 792 F.3d at 1323)

[111] *See Fike v. Glob. Pharma Healthcare Priv., Ltd.*, 741 F. Supp. 3d 265, 274 (E.D. Pa. 2024) (concluding complaint was not a shotgun pleading—even though it had "some of the hallmarks of a shotgun pleading"—because (1) the complaint "clearly separates the claims into nine different counts . . . against all four Defendants," (2) none of the counts rely "solely on the allegations in the previous paragraphs," and (3) the "factual allegations specific to each claim under the related count and in the [complaint] as a whole . . . put [Defendants generally] on notice of their alleged wrongdoing"); *M.B. v. Schuylkill Cnty.*, 375 F. Supp. 3d 574, 586–87 (E.D. Pa. 2019) (concluding complaint was not a shotgun pleading—even though it had some characteristics of one—because it included "specific allegations against the respective defendants" and thus gave them notice of the grounds for the claims against them); *Bartol*, 251 F. Supp. 3d at 860 (finding complaint was a shotgun pleading where it failed to identify which of the thirteen claims pertained to which of the seven defendants because it failed to give defendants notice of the claims against them and the grounds for each claim).

[112] *See* ECF 18-1 at 15–16 (arguing the amended Complaint is shotgun pleading); ECF 17 at ¶¶ 100, 100, 107, 113, 119, 128, 133, 147, 153, 158, 163. One Hundred is included twice because the allegations for both claim one and claim two begin with it. *See* ECF 17 at 31, 32.

[113] *See* ECF 17 at ¶¶ 35–87.

[114] *See id.* at ¶¶ 100–38.

[115] *See Fike*, 741 F. Supp. 3d at 274; *M.B.*, 375 F. Supp. 3d at 586–87.

[116] The College and its Trustees also move to dismiss the contract claims as shotgun pleadings. We separately address why we dismiss the contract claims without needing to explain why the contract claims also are not shotgun pleadings.

[117] ECF 17 at ¶¶ 147–66.

[118] ECF 18-1 at 16–18; ECF 20 at 5–6.

[119] ECF 19 at 22–23.

[120] *See Doe v. Univ. of Sciences*, 961 F.3d 203, 211 (3d Cir. 2020) (quoting *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016)).

[121] *See David v. Neumann Univ.*, 177 F. Supp. 3d 920, 925 (E.D. Pa. 2016) (citing *Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa. Super. Ct. 1999)).

[122] *See id.* (quoting *Swartley*, 734 A.2d at 919).

[123] *See id.* (quoting *Vurimindi v. Fuqua Sch. of Bus.*, 435 F. App'x 129, 133 (3d Cir. 2011)).

[124] *See id.* (quoting *Miller v. Thomas Jefferson Univ. Hosp.*, 908 F. Supp. 2d 639, 655 (E.D. Pa. 2012)).

[125] *See Vurimindi*, 435 F. App'x at 132–33 (affirming decision to dismiss breach of contract claim where student cited university's "mission statement," "diversity statement," and "general statements against harassment" as the basis for a contract because student "did not point to any specific and definite terms that were violated"); *David*, 177 F. Supp. 3d at 925 (dismissing breach of contract claim for failure to state a claim with leave to amend where student made "only general references to the handbook, syllabi, and protocols" because from the complaint it was "not at all clear which polic[ies] or procedure[s]" the University breached (quoting *Harris v. Saint Joseph's Univ.*, No. 13-3937, 2014 WL 1910242, at *3 (E.D. Pa. May 13, 2014)); *Harris*, 2014 WL 1910242, at *3 (dismissing breach of contract claim even though student claimed university breached contract by failing to comply with handbook provisions related to the "investigation and adjudication of complaints" because student still did not allege which specific promises in the handbook the university violated).

[126] *See* ECF 17.

[127] *See id.* at ¶¶ 147–66.

[128] *See id.* at ¶ 148 (alleging the College and its Trustees "promised its students, through its Student Handbook (e.g., sections on academic freedom and non-discrimination), website (e.g., statements promoting an inclusive community), and admissions materials (e.g., representations of support for student advocacy), a liberal education in which they would enjoy the intellectual freedom to think, speak, debate, publish, and advocate without prior restraints or fear of retaliation" without identifying any specific materials supporting these promises); *id.* at ¶ 154 (alleging the College and its Trustees "promised its students with special dietary needs access to gluten-free or allergen-free meals of a comparable variety and nutritional value to the food offered to students without such dietary needs" without identifying any specific materials supporting this promise); *id.* at ¶ 159 (alleging the College and its Trustees "promised its students they would have access to buildings and facilities on a non-discriminatory basis, and that they would be provided with transportation services sufficient to maintain a continuity of education in the event of temporary or permanent disability affecting the students' transportation needs" without identifying any specific materials supporting these promises); *id.* at ¶ 164 (alleging the College and its Trustees "promised its students an educational experience allowing the intellectual freedom to think, speak,

debate, publish, and advocate unhindered by restraints or fear of retaliation through its Student Handbook, website, and admission materials" without identifying any specific materials supporting these promises).

[129] *See id.* at ¶¶ 148, 154, 159, 164.

[130] *See Vurimindi*, 435 F. App'x at 132–33; *David*, 177 F. Supp. 3d at 925; *Harris*, 2014 WL 1910242, at *3.

[131] Counts VIII–XI. The College and its Trustees also ask us to dismiss the Students' request for "monetary damages for mental anguish, pain, and suffering" arising from their breach of contract claims. *See* ECF 18-1 at 18; ECF 17 at ¶¶ 157 (claiming damages for "mental anguish, pain and suffering"), 162 (same), 166 (same). We find the Students do not plead a specific promise giving rise to a contract claim.

We dismiss the contract claim without prejudice. We offer the Students a reminder damages for mental suffering are only available for a breach of contract where the "breach is wanton or reckless and caused bodily harm and where the contract is to render a performance of such a character that the defendant had reason to know when the contract was made that the breach would cause mental suffering for reasons other than mere pecuniary loss." *See MDB v. Punxsutawney Christian Sch.*, 386 F. Supp. 3d 565, 591 (W.D. Pa. 2019) (quoting *Emerman v. Baldwin*, 142 A.2d 440, 447 (Pa. Super. Ct. 1958)); *Campitelli v. Plymouth Rock Assurance Corp.*, No. 22-4422, 2023 WL 5111971, at *4 (E.D. Pa. Aug. 8, 2023) (noting "common examples of the types of contracts whose breach is particularly likely to result in serious emotional disturbance" include "contracts of carriers and innkeepers with passengers and guests, contracts for the carriage or proper disposition of dead bodies, and contracts for the delivery of messages concerning death" (quoting *Rittenhouse Regency Affiliates v. Passen*, 482 A.2d 1042, 1043 (Pa. Super Ct. 1984)). The breaching party's conduct must be "so outrageous as to be actionable as the tort of intentional infliction of emotional distress." *See Campitelli*, 2023 WL 5111971, at *4 (quoting *DeHart v. HomEq Servicing Corp.*, 47 F. Supp. 3d 246, 254 n.7 (E.D. Pa. 2014), *aff'd* 679 F. App'x 184 (3d Cir. 2017)). We remind the Students they must plead facts supporting their request for damages for mental suffering if they choose to pursue contract claims.

[132] ECF 17 at ¶¶ 167–70.

[133] *Id.* at ¶¶ 168–69.

[134] ECF 18-1 at 18–19; ECF 20 at 6–7.

[135] ECF 19 at 20–21.

[136] *Id.* at 21–22.

[137] *See Bruno v. Erie Ins. Co.*, 106 A.3d 48, 68 (Pa. 2014) ("[T]he nature of the duty alleged to have been breached . . . [is] the critical determinative factor in determining whether the claim is truly one in tort, or for breach of contract . . . . If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract . . . then the claim is to be

viewed as one for breach of contract . . . . If, however, the facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals . . . it must be regarded as a tort"); *see also Reardon v. Allegheny Coll.*, 926 A.2d 477, 486 (Pa. Super. Ct. 2007) (explaining the gist of the action doctrine applies where (1) the claim arises "solely from the contractual relationship between the parties," (2) the duties defendant allegedly breached "were grounded in the contract itself," (3) "any liability stems from the contract," and (4) the claim "essentially duplicates the breach of contract claim or where the success of the tort claim is dependent on the success of the breach of contract claim").

[138] *See Bruno*, 106 A.3d at 70–71 (concluding the gist of action doctrine did not apply—even though the parties shared a contract—because "the substance of the [plaintiffs'] allegations is not that [defendant] failed to meet these [contractual] obligations; rather, it is that [defendant], during the course of fulfilling these obligations through the actions of its agents, acted in a negligent manner . . ."); *Dobson v. Milton Hershey Sch.*, 356 F. Supp. 3d 428, 437 (M.D. Pa. 2018) (noting the contract between a private school and its students "does not exclusively define the relationship . . . there may be *other* legal duties owed by private institutions to their students defined by different sources of law, including tort law").

[139] *See Bruno*, 106 A.3d at 68.

[140] *See Dobson*, 356 F. Supp. 3d at 436 (citing *McCabe v. Marywood Univ.*, 166 A.3d 1257, 1262 (Pa. Super. Ct. 2017); *MDB*, 386 F. Supp. 3d at 591.

[141] *See Dobson*, 356 F. Supp. 3d at 437–38.

[142] *See id.*

[143] *See MDB*, 386 F. Supp. 3d at 592 ("[I]n *Dobson*, the Middle District of Pennsylvania concluded that the plaintiff's claims were not barred by the gist of the action doctrine [because] he alleged that the Milton Hershey School, at which he was a private resident student housed in a group home and supervised by school 'houseparents,' 'exercised year-round custody, care, and control over him and functioned as a primary caregiver—providing education, housing, food, clothing, and medical, dental, and psychological care" (citing *Dobson*, 256 F. Supp. 3d 432, 437)).

[144] *See Dobson*, 356 F. Supp. 3d at 437.

[145] *See id.* at 438.

[146] *Compare* ECF 17 at ¶¶ 168–69 (claiming the College and its Trustees breached "a duty of care to avoid causing [them] emotional, mental, and psychological harm" by "failing to provide the accommodations described," "engaging in retaliatory actions," "failing to provide facilities that met minimum standards of health and sanitation," and "serving undercooked meat"), *with id.* at ¶¶ 148–53 (claiming the College and its Trustees breached a contract with the current and former Students by "engaging in retaliatory actions"); *id.* at ¶¶ 154–57 (claiming the College and its Trustees breached a contract with the current and former Students by "failing to provide gluten-free and allergen-free food of a quality, variety, and safety comparable to the food provided to students without such dietary restrictions"); *id.* at ¶¶ 164–66 (claiming the College and its Trustees

breached a contract with the current and former Students by "failing to provide additional time for testing and completing assignments despite the documented need for such accommodations").

[147] *Id.* at ¶ 168.

[148] *See Dobson*, 356 F. Supp. 3d at 437–38 (finding gist of action doctrine did not bar tort claim—even though plaintiff referenced "School policies or guidelines" in his claims—because plaintiff also claimed the School "negligently or intentionally caused him emotional distress and physical harm" which is a claim deriving from "tort law and broader social policies implicated thereby, not contract law").

[149] *See id.*

[150] *See Toney v. Chester Cnty. Hosp.*, 961 A.2d 192, 197–98 (Pa. Super. Ct. 2008), *aff'd*, 36 A.3d 83 (Pa. 2011). The four scenarios are "(1) situations where the defendant had a contractual or fiduciary duty toward the plaintiff; (2) the plaintiff was subjected to a physical impact; (3) the plaintiff was in a zone of danger, thereby reasonably experiencing a fear of impending physical injury; or (4) the plaintiff observed a tortious injury to a close relative." *Id.*

[151] *See id.* There is a difference "between duty-creating special relationships under negligence law and special relationships in a[] [negligent infliction of emotional distress] claim . . . . The standard for the latter is far more stringent." *See Humphries v. Pa. State. Univ.*, No. 20-00064, 2021 WL 4355352, at *21 (M.D. Pa. Sept. 24, 2021), *appeal filed*, No. 25-2122 (3d Cir. 2025)

[152] *See Toney*, 36 A.3d at 95 ("[W]e find it prudent to limit the reach of this [negligent infliction of emotional distress] claim to preexisting relationships involving duties that obviously and objectively hold the potential of deep emotional harm in the event of breach . . . . we would hold that some relationships, including some doctor-patient relationships, will involve an implied duty to care for the plaintiff's emotional well-being that, if breached, has the potential to cause emotional distress resulting in physical harm"). The Pennsylvania Supreme Court's *Toney* opinion is not precedential. *See Weiley v. Albert Einstein Med. Ctr.*, 51 A.3d 202, 217 n.16 (explaining *Toney* "does not have precedential value" because the Pennsylvania Supreme Court "was divided evenly"). But we still may look to it for its persuasive value. *See id.* (explaining *Toney* still "has persuasive value" and affirmed the Pennsylvania Superior Court's earlier decision); *MDB*, 386 F. Supp. 3d at 593 (considering *Toney* as "persuasive . . . as to how the Pennsylvania Supreme Court would . . . recognize a[] [negligent infliction of emotional distress] claim based on the breach of a contractual or fiduciary duty"); *Hershman v. Muhlenberg Coll.*, 17 F. Supp. 3d 454, 459 (E.D. Pa. 2014) (same).

[153] *See Doe v. Abington Friends Sch.*, No. 22-0014, 2022 WL 16722322, at *6 (E.D. Pa. Nov. 4, 2022).

[154] *See Abington Friends Sch.*, 2022 WL 16722322, at *6 ("Since *Toney*, Pennsylvania's lower courts have limited the kinds of contractual and fiduciary relationships that could give rise to a[] [negligent infliction of emotional distress] claim to a narrow set of circumstances involving doctor-patient relationships and adoptions"); *MDB*, 386 F. Supp. 3d at 593 ("Since *Toney*, Pennsylvania

courts have only found certain doctor/patient relationships . . . and one between an adoption agency and adoptive parents to support such a claim, declining to extend liability any further"); *Hershman*, 17 F. Supp. 3d at 460 ("If the [Pennsylvania] Supreme Court were to permit special relationship [negligent infliction of emotional distress] claims, I predict it would do so by adopting the narrow grounds announced by the lead justices in *Toney* . . . . [Pennsylvania's] intermediate appellate and trial courts since *Toney* . . . . have allowed special relationship [negligent infliction of emotional distress] claims only between doctors and patients and an adoption agency and adoptee parents").

[155] *See Hershman*, 17 F. Supp. 3d at 460 (finding "the relationship between a college and its students does not obviously hold the potential of deep emotional harm" necessary for a negligent infliction of emotional distress claim based on a contractual or fiduciary duty); *MDB*, 386 F. Supp. 3d at 594 ("[A]bsent special circumstances . . . the Pennsylvania courts would not extend liability for the [negligent infliction of emotional distress] tort to a case involving a relationship between a school and its student . . . . The relationship between [the school] and [the student] was simply not of the intensely emotionally charged sort where courts have recognized a 'special relationship' giving rise to a duty not to negligently inflict emotional distress").

[156] Count XII.

[157] *See U.S. v. Defreitas*, 29 F.4th 135, 141–42 (3d Cir. 2022) (listing factors for us to consider when deciding whether to certify a question including whether the question's resolution is "unclear and control[s] an issue in the case," the "importance" of the question, and "judicial economy").

[158] *See id.* at 141.

[159] *See Toney*, 36 A.3d at 95.

[160] *See Hershman*, 17 F. Supp. 3d at 460; *MDB*, 386 F. Supp. 3d at 594.

[161] *See* ECF 19 at 21–22 (citing *Humphries* and *Kling*); *Humphries*, 2021 WL 4355352, at *22–23 (concluding student's relationship with Pennsylvania State University "is not the sort that would give rise to liability"); *Kling v. Univ. of Pittsburgh Med. Ctr.*, No. 18-01368, 2020 WL 4218004, at *2 (W.D. Pa. July 23, 2020) ("[U]nder Pennsylvania law, Plaintiff and Defendants did not maintain a special contractual or fiduciary relationship to establish any duty to support liability for Plaintiff's [negligent infliction of emotional distress] claim").

[162] ECF 17 at ¶¶ 93–99. We are not certain as to how class treatment would assist the Students. Their remaining claims seek prospective injunctions to change the College's policies. The injunction under Title III would have the same effect. But they may have a different view and we defer this analysis until presented under Rule 23 based on the issues then before us.

[163] ECF 17, Count XIV.

[164] ECF 18-1 at 20–21; ECF 20 at 7–9. Under Rule 23 "the proponent of the class bears the burden of proof to show by a preponderance of the evidence that the four requirements of Rule 23(a) are satisfied and that the class fits in one of the three categories listed in Rule 23(b)(1)–(3)." *See In re Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464, 497 (W.D. Pa. 2019) (citing *In re*

*Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 305, 309 n.6 (3d Cir. 2008)). Before discovery begins this means a person must make "a prima facie showing that the class action requirements of [Rule 23] are satisfied or that discovery is likely to produce substantiation of the class allegations." *See id.* at 498 (quoting *Trunzo v. Citi Mortg.*, No. 11-1124, 2018 WL 741422, at *4 (W.D. Pa. Feb. 7, 2018)). At this stage we accept all of the current and former Students' "factual allegations in the complaint" as true and "view all reasonable inferences in the light most favorable to" them when determining whether they have satisfied Rule 23's requirements. *See Dieter v. Aldi, Inc.*, No. 18-00846, 2018 WL 6191586, at *3 (W.D. Pa. Nov. 28, 2018) (quoting *Durso v. Samsung Elecs. Am., Inc.*, No. 12-05352, 2013 WL 5947005, at *3 (D.N.J. Nov. 6, 2013)).

A motion to strike class allegations is "for all practical purposes, identical to an opposition to a motion for class certification." *See Almond v. Janssen Pharms., Inc.*, 337 F.R.D. 90, 99 (E.D. Pa. 2020) (quoting *Korman v. Walking Co.*, 503 F. Supp. 2d 755, 762 (E.D. Pa. 2007)). We consider motions to strike class allegations under Rule 23. *See In re Ry. Indus.*, 395 F. Supp. 3d at 496 ("[A] court's consideration of a motion to strike class allegations should not be analyzed under Rule 12(f) . . . rather, a court should consider a motion to strike class allegations under the pertinent provisions of Rule 23, which governs class certification"); Fed. R. Civ. P. 23(c)(1)(A) ("At an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action"); *id.* at 23(d)(1)(D) ("In conducting an action under this rule, the court may issue orders that . . . require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly . . ."). Because plaintiffs "may generally conduct discovery relevant to the Rule 23 class certification requirements" we may "only grant a motion to strike class allegations if class treatment is evidently inappropriate from the face of the complaint." *See Almond*, 337 F.R.D. at 99 (quoting *Zarichny v. Complete Payment Recovery Servs., Inc.*, 80 F. Supp. 3d 610, 615 (E.D. Pa. 2015)).

[165] ECF 18-1 at 20–25.

[166] ECF 19 at 23–26.

[167] *See* Fed. R. Civ. P. 12(f); *see also In re Ry. Indus.*, 395 F. Supp. 3d at 496 (concluding "a court should consider a motion to strike class allegations under the pertinent provisions of Rule 23" rather than under Rule 12(f) because (1) "[i]t is unlikely that a defendant can show the class allegations constitute 'an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter'" and (2) a motion to strike class allegations is "tantamount to a denial of class certification" (quotations omitted).

[168] *See e.g. Meilo*, 897 F.3d at 482 (noting Rule 23(a) requires "a rigorous analysis that usually requires courts to make factual finding and legal conclusions that overlap the underlying merits of the suit").

[169] *See Jackson v. Se. Pa. Transp. Auth.*, 260 F.R.D. 168, 182–84 (E.D. Pa. 2009) (finding courts should "tailor the class definition to make it workable" because "the mere existence of a problematic class definition does not automatically mandate denial of class certification"); *Pelletier v. Endo Int'l PLC*, 338 F.R.D. 446, 479 (E.D. Pa. 2021) (removing "and were damaged

thereby" language from class definition "to ensure that there are no ongoing concerns" about whether the class was a fail-safe class);

[170] ECF 18-1 at 20 n.12. Rule 12(f) allows us to strike "any redundant, immaterial, impertinent, or scandalous matter" from a pleading. Fed. R. Civ. P. 12(f).

[171] ECF 19. We could grant the College and its Trustees' requested relief on this ground alone. *See* L. Civ. R. 7.1(c) ("In the absence of a timely response, the motion may be granted as uncontested except as provided under Federal Rule of Civil Procedure 56, or otherwise prohibited by law"); *Hilton v. Home Depot, Inc.*, No. 20-5145, 2022 WL 837207, at \*2 (E.D. Pa. Mar. 21, 2022) (dismissing claim because plaintiff did not oppose defendant's motion to dismiss it). But we also address the merits.

[172] *See Pro. Orthopedic Assocs., PA v. CareFirst BlueCross BlueShield*, No. 14-4486, 2015 WL 4025399, at \*5 (D.N.J. June 30, 2015) (dismissing anonymous plaintiff's claims without prejudice under Rule 10(a) because plaintiff "did not seek leave to proceed anonymously" and none "of the allegations in the complaint establish that [he] could be in fear of severe harm had he proceeded using his own name").

[173] *See* Fed. R. Civ. P. 10(a); *Doe v. Megless*, 654 F.3d 404, 408 (3d Cir. 2011) ("Rule 10(a) requires parties to a lawsuit to identify themselves in their respective pleadings").

[174] *See Megless*, 654 F.3d at 408–09.

[175] *See id.* at 408.

[176] ECF 17 at ¶¶ 88–92 (stating they only "requested anonymity" without providing a reason). Jane Doe 1 and Student X also appear to be the same student. *See id.* at ¶ 89 (using Jane Doe 1 and Student X to refer to the same student).

[177] *See Pro. Orthopedic Assocs.*, 2015 WL 4025399, at \*5. Our Court of Appeals directs us to balance several factors to determine whether a reasonable fear outweighs the public's interest should we need to consider the issue in the future. *See Megless*, 654 F.3d at 409 ((noting "[t]he factors in favor of anonymity include[] '(1) the extent to which the identity of the litigant has been kept confidential; (2) the bases upon which disclosure is feared or sought to be avoided, and the substantiality of these bases; (3) the magnitude of the public interest in maintaining the confidentiality of the litigant's identity; (4) whether, because of the purely legal nature of the issues presented or otherwise, there is an atypically weak public interest in knowing the litigant's identities; (5) the undesirability of an outcome adverse to the pseudonymous party and attributable to his refusal to pursue the case at the price of being publicly identified; and (6) whether the party seeking to sue pseudonymously has illegitimate ulterior motives'" and the "factors disfavoring anonymity include[] '(1) the universal level of public interest in access to the identities of litigants; (2) whether, because of the subject matter of this litigation, the status of the litigant as a public figure, or otherwise, there is a particularly strong interest in knowing the litigant's identities, beyond the public's interest which is normally obtained; and (3) whether the opposition to

pseudonym by counsel, the public, or the press is illegitimately motivated'" (quoting *Doe v. Provident Life & Acc. Ins. Co.*, 176 F.R.D. 464, 467 (E.D. Pa. 1997)).