|  |  |
|---|---|
| DE CAMARA, *et al.*,<br>Plaintiffs,<br><br>v.<br><br>BRYN MAWR COLLEGE, *et al.*,<br>Defendants. | Civil Action No. 2:25-cv-002287-MAK<br><br>**JURY TRIAL DEMANDED** |

.

## THIRD AMENDED COMPLAINT - CLASS ACTION

Plaintiffs Lauren De Camara ("De Camara"), Hope Richards-Cordell ("Richards-Cordell"), and Esenia Bañuelos ("Bañuelos"), by and through their undersigned counsel, for themselves and on behalf of all others similarly situated, as and for their complaint against Bryn Mawr College ("Bryn Mawr" or the "College"), the Board of Trustees of Bryn Mawr College (the "Bryn Mawr Board" and, collectively with the College, the "Defendants"), allege and state as follows:

## INTRODUCTION

1. This is an individual and class action for damages resulting from Defendants' disregard for the needs of students with disabilities, in particular "invisible" disabilities, as evidenced by (a) the gross understaffing of the College's "Access Services", a two-person program offered by a highly profitable "non-profit" College that generated net income of $46,871,571 and investment income of $56,477,122 in 2023 alone; (b) the College's arbitrary and capricious responses to the needs of its disabled students and (c) Bryn Mawr's disregard for the emotional health and well-being of disabled students, who have contemplated suicide, abandoned their studies, transferred to other colleges and universities, or suffered painfully through their time at the College. Plaintiffs seek injunctive relief under Title III of the Americans with Disabilities Act and

1

monetary damages for breach of contract, as remedies for Bryn Mawr's disregard of the needs and well-being of its neurodivergent students.

## THE PARTIES

2. Plaintiff Lauren De Camara is a former Bryn Mawr student who has been diagnosed with Central Sensitization Syndrome and suffered from Post-Concussive Syndrome while she was at Bryn Mawr. De Camara suffered from the arbitrary decisions of the Director of Access Services, Deborah Alder ("Alder"), and the College's callous indifference to her needs as a divergent student. She continued to be denied an accommodation until she was forced to leave Bryn Mawr on or about May 6, 2024.

3. Plaintiff Hope Richard Cordell suffers from a severe autoimmune disorder that requires adherence to a strict gluten-free diet. Cordell suffered from the arbitrary decisions of the Director of Access Services and the College's callous indifference to her needs as a divergent student.

4. [Intentionally omitted.] femoroacetabular impingement.

5. Plaintiff Esenia Bañuelos ("Bañuelos") suffers from ADHD, C-PTSD (complex PTSD), major Depression, and Asthma. She was one of the student leaders of the campus fighting for better treatment and reasonable accommodations for students with disabilities and mental health needs and has faced retaliation from Defendants for her efforts. Bañuelos was elected student body president of Bryn Mawr College for the 2025–2026 academic year. In that capacity, and as a known campus advocate for disability accommodations, dozens of students have approached her regarding disability accommodation issues, making her uniquely positioned to assess the scope of the proposed classes.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338 in that this case arises under Title III of the Americans with Disabilities Act, 42 U.S.C. § 1201 *et. seq*.

7. This Court has supplemental jurisdiction over all state law causes of action asserted herein pursuant to 28 U.S.C. § 1367, because Plaintiffs' state law claims are part of the same case or controversy.

8. This Court has personal jurisdiction over Defendants because they conduct business in Pennsylvania and because they have committed torts in the State of Pennsylvania and in this district.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events, acts, omissions, and injuries giving rise to the claims occurred in this judicial district and because Defendants are subject to personal jurisdiction in this judicial district at the time this action has commenced.

## FACTUAL BACKGROUND

### *Bryn Mawr College*

10. Bryn Mawr College is a well-known, private liberal arts college, primarily for women, identified as one of the "Seven Sisters" colleges, a group of prestigious women's colleges that also includes Vassar College, Smith College, and Mt. Holyoke College.

11. Bryn Mawr was founded as a Quaker institution in 1885 and has since grown into a highly successful business enterprise. According to the most recently available financial data, in 2023, Bryn Mawr generated a total of $241,836,662 in revenue against expenses of $194,965,091 for net income of $46,871,571. Tuition amounts to $59,300 per year, not including an additional $20,050 students are required to pay for room and board, books, and other expenses. Bryn Mawr's

endowment amounts to more than $1.1 billion and generated investment income of $56,477,122.

***Bryn Mawr's Treatment of Disabled Students***

12.     Each Bryn Mawr class numbers approximately 360 students, resulting in a total undergraduate student body of approximately 1440 students. Plaintiffs estimate that between 10-20% of the student body suffers from some form of disability or neurodivergence requiring an accommodation.

13.     The needs of the College's divergent student body are met almost exclusively by Bryn Mawr's "Access Services" department, a two-person outfit with an operating budget Plaintiffs believe to be less than $250,000 per year, with the lion's share of the budget, which amounts to slightly more than 0.1% of Bryn Mawr's 2023 operating revenues, going to the salaries of its Director and Assistant Director of Access Services. This department is falsely presented by the College as welcoming, understanding, and accommodating, set against the serene background of the Eastern Pennsylvania hills, as shown below:



# Access Services

Bryn Mawr College welcomes the full participation of individuals with disabilities in all aspects of campus life.

At Access Services, we work with students and visitors to campus who self-identify with a disability to ensure equal access to Bryn Mawr's programs, activities and services. The Access Services office, located in Guild Hall, provides support, and may arrange accommodations related to access for eligible students and visitors to campus.  Individuals who think they may need accommodations because of the effects of a learning, physical, or psychological diagnosis and/or a chronic medical condition are encouraged to contact Access Services as early as possible to discuss their situation.

14.     However, in reality, the Access Services program consists of arbitrary and inscrutable decisions made by its director. Despite the College's promotional materials, the department lacks the resources necessary to provide required accommodations, leading to unwarranted denials of accommodations driven by a lack of funding or the director's personal

whims.

15.  Access Services nominally reports to the President of the College and through the President to the Board of Trustees, but the Board exercises no meaningful oversight, thus adopting and ratifying the violations of students' rights. The needs of 10-20% of the student body are given less attention than the performance of a few stocks and bonds in the College's billion-dollar endowment. On information and belief, the chief investment officer of the College earns well in excess of $1 million per year, more than four times the budget of the entire Access Services department, underscoring the unimportance of the needs of divergent students to the Board of Trustees.

16.  Pembroke Hall, one of the most popular social meeting places for students at Bryn Mawr and Haverford (the traditionally male liberal arts college paired with the historically female Bryn Mawr that shares many classes and programs with the College), is completely inaccessible to disabled students, thus depriving these students of a shared social experience with their able-bodied peers:





17. The same is true of many student dorms, such as Merion, which is inaccessible to disabled students:



18. Perhaps nothing is as telling as the total exclusion of disabled students from

participation in one of the college's oldest and most well-known tradition, that of ascending to the top of Taylor Hall – the College's first building, named after its founder and perhaps Bryn Mawr's most prominent structure – to ring the bell at the belfry at the top of the building upon graduation. Taylor Hall is completely inaccessible to students in wheelchairs or on crutches, and its steep internal stairs are impossible to navigate for students with neurological, balance, vision, and other limitations, as the contrast between the idyllic portrait of the hall in promotional photography and a close-up of the entryway shows:





19.     In keeping with the exclusion of disabled students from campus rituals and campus life, the College does very little to assist disabled students with transportation from dorms to classes on the spread-out campus—unlike many other colleges and universities that have a well-established "shuttle" system for students with mobility challenges, Bryn Mawr's shuttle bus service is entirely unknown to the majority of the student body. This is possibly because they do not

promise a safe and timely delivery to class.

20.	Students with dietary restrictions are treated with an indifference bordering on contempt. Gluten-free options at the cafeteria are extremely limited, almost parodic, as the junk-food offerings from the "gluten-free" refrigerator show:



21.     The gluten-free options are not only unhealthy, but downright harmful to students' health, as the mold-ridden waffles offered to students with special dietary needs demonstrate:



22.     The structural barriers to full inclusion in a safe and healthy campus life on display for students with "visible" disabilities are also reflected in the experiences of the plaintiffs with "invisible" disabilities described in this complaint. There are no photographs that can capture the discriminatory treatment of students with invisible disabilities, but their stories testify no less

compellingly to Defendants' deliberate indifference to their needs.

23. The structural barriers to equal treatment and access, and the systematic failure to provide for disabled students' needs are reflected in the common experience of each of the named plaintiffs in this action and the classes of similarly situated students described herein.

## BRYN MAWR STUDENTS' SPECIAL NEEDS

24. Plaintiffs estimate that between 10 and 20% of the Bryn Mawr student population suffers from some form of disability. This estimate is based on the named Plaintiffs' experience at the College and national statistics that demonstrate the widespread nature of the problem.

25. According to the National Institutes of Health (the "NIH") **23.1%** of US adults suffer from mental illnesses of one form or another. https://www.nimh.nih.gov/health/statistics/mental-illness.

26. The Centers for Disease Control (the "CDC") estimates that 2% of the adult population suffers from autism, and a further 6% suffer from ADHD. https://www.cdc.gov/autism/publications/adults-living-with-autism-spectrum-disorder.html/ https://www.cdc.gov/adhd/php/adults/index.html.

27. An estimated 3% of adults are immunocompromised. https://pmc.ncbi.nlm.nih.gov/articles/PMC10401620/, 12.2% face mobility and stamina challenges, www.cdc.gov/disability-and-health/articles-documents/disability-impacts-all-of-us-infographic.html, 1.3% and 20.5%, respectively, suffer from chronic fatigue and chronic pain, https://www.cdc.gov/nchs/data/databriefs/db488.pdf ; https://pubmed.ncbi.nlm.nih.gov/33990113/.

28. The percentage of Americans with disabilities is on the rise. Between 2020 and 2022, "employment of people with disabilities [went] up nearly 25%, to more than 7.3 million

workers… according to the Bureau of Labor Statistics."

https://www.latimes.com/politics/story/2022-12-15/long-left-out-of-job-market-people-with-disabilities-reap-benefits-of-covid-19s-teleworking-boom.

29. Disabilities relating to food are particularly acute. 6.2% of the adult population suffers from food allergies.

https://www.cdc.gov/nchs/pressroom/nchs_press_releases/2022/20220126.htm, 14.7% of the adult population has been diagnosed with diabetes, a condition that requires substantial food accommodations, https://www.cdc.gov/diabetes/php/data-research/index.html, and a relatively small, but growing, number of US adults have been diagnosed with celiac disease, a potentially life-threatening condition. https://www.ncbi.nlm.nih.gov/books/NBK441900/.

30. The underlying causes of food disabilities are varied.

31. 36% of the US adult population is lactose-intolerant, https://worldpopulationreview.com/country-rankings/lactose-intolerance-by-country, 11% of the global population suffers from irritable bowel syndrome, https://pmc.ncbi.nlm.nih.gov/articles/PMC3921083/ , and between 0.4-0.8% struggle with inflammatory bowel syndrome. https://www.cdc.gov/inflammatory-bowel-disease/php/facts-stats/index.html./

32. Plaintiffs believe that disability rates among Bryn Mawr students are higher than those in the general population because of Defendants' aggressive marketing of its access services, small class sizes, and understanding professors, which would be likely to attract students with special needs.

33. The experiences of the named Plaintiffs testify to the existence of a systemic problem at Bryn Mawr this lawsuit seeks to address.

## BRYN MAWR'S DISCRIMINATORY PRACTICES

### *Lauren De Camara*

34.    De Camara matriculated at Bryn Mawr in the fall of 2021. She suffered from ADHD, Dysautonomia, and Post-Concussive Syndrome. The recommended accommodations were priority schedule selection, access to air-conditioned housing, centrally placed housing, housing on the first floor, access to recorded lectures / professors' notes, and extended time on testing and assignments. Notwithstanding the college's promising rhetoric, she quickly found that Bryn Mawr was unable and/or unwilling to provide her with the accommodation needed.

35.    De Camara's first experience with the college's failure to meet her needs occurred in her first week of school, when, due to her disabilities, she submitted several homework assignments late. She had received neither the doctor's recommended accommodation, nor credit for the assignments. The stress of this inflexibility proved to be a burden on her health throughout the semester.

36.    In February of 2022, De Camara suffered a concussion that that seriously aggravated her existing and documented Post-Concussive Syndrome. De Camara asked for a priority registration accommodation, which the college rejected, on the pretext that a concussion was a "temporary" injury that would not permit priority registration, ignoring her diagnosed Post-Concussive-Syndrome and refusing to accept the established medical science that repeated concussions can have severe, long-lasting effects on the brain, emotional health and even personality.    *See*    https://www.cognitivefxusa.com/blog/multiple-concussions-effects-and-treatment.[1] In addition, De Camara required an additional accommodation to be allowed to attend

---

[1] *See also,* James L Spira , Corinna E Lathan, Joseph Bleiberg, Jack W Tsao*, The Impact of Multiple Concussions on Emotional Distress, Post-Concussive Symptoms, and Neurocognitive Functioning in Active Duty United States Marines Independent of Combat Exposure or Emotional Distress*, Journal of

lectures virtually. She sought this basic accommodation directly from her intensive Japanese instructors at Haverford, which offers classes to Bryn Mawr students under a joint program. The instructors were accommodating and allowed De Camara to attend classes remotely when necessary. She was able to maintain an A average in the class, but the Haverford administration refused to acknowledge the accommodation provided by the individual instructors, and insisted she be failed out unless she could obtain a formal accommodation through Bryn Mawr. When she sought to obtain the accommodation at Bryn Mawr, she was rejected. After an extensive and exhausting series of communications, her Bryn Mawr advisor worked with the Haverford administration, who switched her grade to a D instead of a flat-out failure in a transparently phony informal "accommodation."

37.     This further complication persisted throughout the following two semesters, fall of 2022 and spring of 2023. Because of her vocal advocacy for her rights, De Camara found herself unwelcome in many classrooms. In addition to not being given priority selection, she was asked to drop multiple classes in the first weeks of the semester by teachers who found the idea of opening a zoom recording too burdensome on their busy schedule. Some of the classes she was asked to leave were required for her declared psychology major, such as research methods, statistics, and the psychology seminar, as well as classes of personal interest, such as growth and spatial organization of cities. Those who did offer her a seat in the class varied on the delivery of their promise to accommodate, sometimes waiting numerous lectures before sending her any material at all. When she complained of the enormous stress she was under, because of the denial of basic accommodations, her advisor suggested that she seek therapeutic help, and/or transfer schools.

---

Neurotrama, November, 2014.

38.     De Camara attempted to engage in advocacy during her time at Bryn Mawr. Her advisor informed her the person she should speak with was Jennifer Walters, the undergraduate dean. Upon hearing De Camara's concerns that not allowing virtual access was discriminatory, Walters coldly suggested that she find a different school. Walters retired shortly thereafter. De Camara repeated her concerns to Cheryl Horsey, the acting dean, who has since become the equal opportunity officer, overseeing the Access Services department. Dean Horsey concurred with Walter's opinion, and equally coldly – and with blatant disregard for De Camara's legitimate need for an accommodation – suggested that De Camara seek education elsewhere.

39.     De Camara finally joined her fellow advocate Bañuelos in securing a meeting with Kimberly Cassidy, president of Bryn Mawr, only to be met with defensiveness and indifference. Despite hearing De Camara's concern over the integrity of the Access Services Director, Cassidy stated that she would not continue the discussion without Alder's presence.

40.     In other joint meetings with Bañuelos, when De Camara requested virtual entry, she was denied access to multiple accessibility meetings, exacerbating the traumatic stress for both girls. When De Camara decided to try to gather her peers for this class-action lawsuit, the school newspaper took an interest in the project, but the article was never published.

41.     De Camara's health deteriorated vastly over her time at Bryn Mawr: she went from being able to spend five hours a day on productive activities, to barely managing 30 minutes a day while remaining practically bedridden. Her nervous system condition, which was diagnosed after her final semester at Bryn Mawr, reacts strongly to stress and requires careful psychiatric treatment and medication, neither of which were available on campus. In addition, De Camara suffers from a severe nut allergy and cannot tolerate food that has been prepared in contact with nuts in any form of any kind. The Bryn Mawr dining facilities failed to keep contaminated and un-contaminated

food separately, causing De Camara to skip meals on campus and lose weight, and increasing the physical, psychological and emotional toll Bryn Mawr conduct took on her.

42. Bryn Mawr's repeated refusal to offer De Camara needed accommodations – driven by a structural lack of resources, trained personnel, knowledge about disability and willingness to take seriously federal anti-discrimination legislation – caused her condition to deteriorate to the point that she required intensive treatment at the Mayo Clinic for nearly a month and continues to require weekly aftercare appointments for the entirety of the foreseeable future.

43. As a result of Bryn Mawr's deliberate indifference to her needs, De Camara has been forced to withdraw from Bryn Mawr. She is on indefinite leave until Bryn Mawr has taken the necessary steps to address the structural and specific issues set forth in this Complaint.

### *Hope Richards-Cordell*

44. Richards-Cordell matriculated at Bryn Mawr in the fall of 2021. She suffered from Celiac disease and notified the school. Her deposit for room and board guaranteed her three square meals a day, in addition to her dorm. She was told she would have access to a specialized "gluten-free room," opened with OneCard ID, for students with gluten intolerances or Celiac. On her very first day on campus, she found that her OneCard had not been granted access to the gluten-free room and was forced to rely on the main hot bar until the situation was remedied, which was rife with cross-contamination. Twenty-two days passed with an extensive, urgent, and exhausting series of emails with the dietician before her OneCard was granted access. Throughout those twenty-two days, she found very few foods that she could tolerate and often feared for where her next meal would come from, and whether it would make her sick.

45. When Richards-Cordell finally entered the gluten-free room for the first time, she was surprised to find that hot food was not kept there at all. She would have to continue relying on

the main hot bar as her food source. To mitigate the onset of food-related anxiety, Richards-Cordell attempted to plan her meals for the week using the available menu. However, she quickly found that this menu was rarely adhered to, and even that stability slipped away.

46. Richards-Cordell frequently vomited after eating or went hungry to avoid consuming food that was damaging to her health. She became unable to study and missed multiple classes. Richards-Cordell received two failing grades her very first semester and felt incredibly isolated for not being well enough to participate in almost anything. She then took medical leave.

47. She re-entered Bryn Mawr in the spring semester of 2023. She paid the required expense for room and board and was once again guaranteed three square meals a day. She spoke with Alder about acquiring the accommodations of a first-floor, single dorm, as well as the ability to have a car on campus. She was granted these accommodations, and was happy to find that, this semester, hot food was kept in the gluten-free room.

48. However, the apparent accommodation for her food disability – which had caused and continued to cause life-threatening consequences – was woefully inadequate. The gluten free room contained hot food only during weekday evening meals. This meant that students with gluten intolerances could not receive hot meals during the day or over the weekend.

49. Moreover, even though the gluten free room finally carried hot food, the selection of food was essentially limited to plain grilled chicken with rice and a vegetable, vastly inferior to the food provided to "normal" students. Richards-Cordell and others requested that the gluten-free room contain, at a minimum, gluten-free food available in the College's main hot bar, but that had not been properly protected from cross-contaminants, leading to severe, and in some cases, life-threatening reactions if students with gluten allergies ate food from outside the gluten-free room.

Defendants refused to provide for equal treatment of students requiring gluten-free accommodation and "normal" students without dietary restrictions.

50. In response to students' demands for dietary accommodations during the day and on weekends, the College administration responded that the kitchen was "short-staffed" and that the College did not have the resources to ensure that the gluten-free room adequately stocked at all times. The administration's attitude was that students should be happy with a partial accommodation, and that the costs of a full accommodation were too great for a college generating tens of millions of dollars in profits annually.

51. The short-staffing of the gluten-free room forced Richards-Cordell to eat from the regular hot bar, where items labeled "gluten free" had not been prepared to avoid cross-contamination. Richards-Corden fell ill and frequently vomited in response to food labeled as "gluten-free" but that had not been protected from cross-contamination.

52. Within the gluten-free room, the short staffing regularly created dangerous situations, such as when hot dishes explicitly labeled as containing wheat were made available, revealing the reckless disregard for proper isolation of gluten-free meals, or when the waffle machine would be uncleaned for weeks at a time.

53. Richards-Cordell, along with many of her peers, decided it was safer to rely on her own financial assets to obtain safe food than continuing to fight an uncaring administration. She secured a job at a local Starbucks and determined that she needed to work a minimum of 15-20 hours a week to be able to afford the safe meals she should be given by right as a student. That semester, she made $2,439.09 and spent 48% of it ($1,165.79) on essential groceries.

54. Richards-Cordell's physical, mental, and social health were placed under immense stress once again. At the end of the semester, she withdrew from the college. To this day, she finds

herself healing from food insecurity, not caused by poverty, but by the deliberate indifference of the Bryn Mawr administration to her cries.

55. Richard-Cordell has affirmed that she would gladly return to Bryn Mawr if the dietary issues she encountered at the College were satisfactorily addressed.

***Bañuelos's Transportation and Accessibility Claims***

56. In addition to the ADHD, mental health, and retaliation claims described above, Bañuelos suffered a serious ankle injury that revealed the College's failure to provide transportation and accessibility accommodations for students with physical disabilities. As described in detail below, the physical layout of the campus near Bañuelos's dormitory included a flight of stairs that she could not navigate on crutches. The absence of any on-campus transportation service for injured students, combined with the inaccessibility of the campus infrastructure, left Bañuelos confined to her dormitory room for a full three-week period with no access to classes either in person or remotely.

57. The College's shuttle service is woefully inadequate, and the College has deliberately failed to provide an adequate transportation service for students with physical handicaps. Bryn Mawr's shuttle service does not operate on a regular schedule, is so poorly staffed and advertised that many students are unaware of its existence, and reserves the right to arrive half an hour or more late for any shuttle request. As a result, Bañuelos, like other physically handicapped students, could not plan her days on an equal footing with her non-disabled peers and was unable to attend class at all during her three-week incapacitation, resulting in academic discrimination. While friends provided Bañuelos with class notes during this period, receiving notes from classmates is not an adequate substitute for actual physical or remote attendance and instruction.

58.     Bañuelos's three weeks of missed classes caused her grades to decline sharply. Bañuelos is an excellent student with a cumulative GPA of 3.7 who is competing for admission to highly selective graduate programs at MIT and Princeton in the field of linguistics. Her GPA, while commendable by any ordinary standard, may be insufficient for admission to these programs, and the three weeks of missed classes attributable to the College's failure to provide reasonable accommodations contributed directly to the limitation of her academic achievement. Bañuelos experienced emotional harm and suffering as a result of the College's failure to accommodate her injury.

59.     Bañuelos continues to suffer from the lack of adequate transportation on campus. The College has never provided a functional, reliable transportation service for students with physical disabilities or injuries, and has never offered remote attendance as an accommodation for students unable to physically attend class due to temporary or permanent physical limitations. As student body president, Bañuelos has received complaints from dozens of students regarding the absence of adequate transportation and accessibility accommodations.

### *Esénia Bañuelos*

60.     Bañuelos matriculated at Bryn Mawr in the fall semester of 2022. She suffered from ADHD, C-PTSD (complex PTSD), major depression, and asthma. Her doctor recommended that she be provided with an accommodation of 50% extra time on exams/timed assignments. When she contacted the Access Services Director to discuss these accommodations, Alder peremptorily denied the requested accommodating, stating: "Extended time on testing does not exist at the collegiate level." Alder also stated that if she allowed her extended time, she was sure Bañuelos would "use it to cheat."

61. Separately, instead of providing any accommodation for Bañuelos' ADHD, Alder advised Bañuelos to use her own funds to purchase an iPad with an apple pencil and the Notability app installed on the iPad. These devices can cost thousands of dollars – a tiny rounding error in a day's interest on Bryn Mawr's endowment – but a genuine burden for students.

62. In her first weeks on campus, Bañuelos attempted to engage in advocacy. She conducted a survey about student perception of on-campus accessibility and posted it around the school. Days later, Bañuelos's advisor informed her that Alder had complained that Bañuelos' survey was "slanderous." Rather than attempting to address any of the structural problems in the treatment of students with disabilities, Alder had demanded Bañuelos's advisor and fellowship director investigate her. Bañuelos was cleared of any wrongdoing, and the incident demonstrates the backward-looking "blame the victim" mentality of the Bryn Mawr administration, and its unwillingness to spend even a tiny fraction of the interest of the College's stock portfolio.

63. Nearing the end of her first semester, Bañuelos requested a follow-up meeting with Alder regarding her needed accommodations, which Alder denied, stating that she was "too busy" to meet with Bañuelos. One of the most important accommodations for Bañuelos, as for many other students struggling with ADHD, was receiving extra time on tests and assignments.

64. In one course, Bañuelos was unable to finish any exam within the time limit and barely passed. In another, she was forced to take the class credit/no credit because the risk of failing without a test-taking accommodation was too high.

65. In addition, Bañuelos discovered the College's indifference even to physical disabilities after she twisted her ankle. The College shuttle service was so poorly staffed and advertised that Bañuelos was unaware of its existence. Bañuelos also discovered first-hand that numerous buildings on campus were not equipped for entrance by students unable to go up and

down stairs or unable to push open the large, heavy doors in many buildings. Specifically, while suffering from her ankle injury, Bañuelos was unable to push open the heavy doors at Merion dorm, Pembroke Hall, and Taylor Hall. As a result, Bañuelos was forced to miss several weeks of classes and her grades declined sharply.

66.     In February of 2023 Bañuelos worked with Alder to make a presentation educating students on the accommodations process. Barely 24 hours after distributing materials for this presentation, Horsey reached out and explained that Alder claimed that Bañuelos had not even mentioned the idea of a presentation, let alone sought Alder's review of the presentation materials. Horsey did not believe Bañuelos until she showed her the email of Alder confirming their meeting, with a subject line clearly indicating the presentation. Horsey ended the meeting immediately, claiming she would follow up with Alder. Bañuelos heard no more from this line of discussion.

67.     Bañuelos decided to take matters above Alder. She met with Nina Bisbee, the Director of Facilities, asking when they could expect fully accessible facilities, with adequate ramps and push plates to open doors. Bisbee informed her that it was not her job to think about accessibility and that Bañuelos concerns raised funding concerns she was unable to address. Bisbee suggested that Bañuelos raise her issues with Alder, which was obviously impossible given Alder's attacks on her for her advocacy work.

68.     Bañuelos then met with Kari Fazio, the CFO and a member of the board of trustees, asking why there wasn't enough funding for basic accessibility architecture. Like Bisbee, Fazio stated that it was not her job to think about accessibility, and that she should raise her concerns with Alder. Bañuelos even met with the President of the College, Kimberly Cassidy, who stated that there were no plans for widespread accessible entrances in the next 20 years.

69.     The ordeal Bañuelos endured in spring of 2023 – in which she was attacked, maligned, and ignored in attempting to advocate for others, all while attempting to address her own individual needs which the College was unwilling to address – resulted in the recurrence of chronic illnesses and several hospitalizations. Bañuelos fell into a major depression so severe she was frequently unable to attend class, and experienced suicidal ideation. That summer, Bañuelos' ankle condition had deteriorated, and she required several surgeries, the recovery from which was complicated by the psychological stress of contemplating returning to such an inhospitable and uncaring place as Bryn Mawr.

70.     When Bañuelos returned to school, she continued to struggle with entering buildings and could not open the heavy doors at Merion, Taylor and Pembroke without assistance. Bañuelos informed her fellow students of her advocacy activity, and the threats Alder had used to attempt to stifle her efforts to improve conditions for disabled students. When the Bryn Mawr administration learned of Bañuelos' comments, two members of the administration met with Bañuelos and attempted to silence her, falsely asserting that Bañuelos was practicing "cancel culture" that was "hurtful" to Alder's "feelings."

71.     Many of the students who had been following Bañuelos's work over the last two years wanted to meet with Alder themselves. With hesitation, Bañuelos organized a meeting with Alder and Dean Geubauer, who was then in charge of overseeing the department. At the meeting, Alder continued to defame Bañuelos, stating Bañuelos was an "adversarial person" who was trying to "take her job" as Access Services Director. The upshot of the meeting, characterized by complete denial and gaslighting, was that henceforth all information distributed by the students relating to accessibility issues – every video clip, every flier, every brochure, every pamphlet – would have to be reviewed and approved by Alder and Dean Gebauer.

24

72.     The particularity of ADA and disability claims at a college or University is that they are generally inscribed within a body of contractual promises made to students via promotional materials to induce students to attend the institutions and handbooks that formalize the contractual relationship between students and the institution. Bryn Mawr is no exception.

73.     The Bryn Mawr College Handbooks for the 2021, 2022, and 2023 academic years (collectively, the "Handbooks") together with the College website make very specific promises to students concerning the manner in which their actual or potential disabilities would be accommodated by the College.

74.     The College's promises thus provide a separate overlay to the underlying statutory regime, providing a contractual basis for students' disability claims.

75.     Bryn Mawr specifically promised its students that "Access Services provides reasonable accommodations for eligible students protected under the Americans with Disabilities Act." 2023–24 Handbook, Exhibit A, at 49; 2022–23 Handbook, Exhibit B, at 49; 2021–22 Handbook, Exhibit C at 40. To the extent the College failed to provide reasonable accommodations for eligible students, it violated not just its statutory obligations but its contractual promise and is liable for damages.

76.     The College expressed this contractual obligation in unmistakable terms. "The College will not tolerate, condone, or allow discrimination… including on the basis of physical ability." 2023–24 Handbook at 90. Such a promise was clearly not simply "aspirational" but was definite and concrete, such that a contract claim may properly be brought. *See Landau, et al. v. Corporation of Haverford College, et al.*, 789 F.Supp.3d 401,

430 (E.D. Penn. 2025) (finding that even anti-bias policy labeled as a "a draft" was sufficiently definite to support breach of contract claim at pleading stage). When the College denied Plaintiffs their needed accommodations, it breached the express contractual promise it had made to the students as set forth in the Handbooks.

77. Beyond its clear and definite promises to make access services available to all students and not engage in discrimination, the College undertook other specific contractual duties. In particular, the College expressly conditioned participation in Bryn Mawr's academic life on consumption of a College-imposed diet. "**<u>All resident students are required to participate in the College meal plan.</u>**" (2022–23 Handbook, p. 52).

78. In exchange, Defendants promised there would be "a registered dietitian on staff available to help you navigate our dining halls and menus." The College expressly promised that "Meatless, vegan and gluten-free meals are available at every meal. Allergens are handled with care and proper labeling. https://www.brynmawr.edu/inside/offices-services/dining-services/about-us/faqs.

79. The College is absolutely unambiguous about its promise to each and every student that it would meet their nutritional needs:




Savor award-winning, delicious food *that meets every taste and nutritional need.*

https://www.brynmawr.edu/inside/offices-services/dining-services

80. As alleged above, Defendants denied Richards-Cordell access to the gluten-free room for 22 days, provided food that was "mold-ridden," failed to stock safe options, and created a risk of cross-contamination, forcing Plaintiff to spend her own money on groceries. Defendants also breached their promise to provide safe and nutritious food to Plaintiff De Camara who suffers from a severe nut allergy and was unable to consume the allergen-contaminated food at the Bryn Mawr dining hall

81. The imposition of an affirmative burden to participate in the College meal plan carries with it an implied promise that the food would be safely consumable by students with particular dietary needs. If this were not the case, the College could effectively force students to harm themselves, which would be absurd. *See, e.g.*, *Hickey v. University of Pittsburgh, 81 F.4th 301 (2023); SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 217 (3d Cir. 2022).

82. In a similar vein, the College plainly undertook implied contractual duties with its express statement of its obligation to the safety and welfare of students: "It is the

27

responsibility of Campus Safety to promote the safety and welfare of the Bryn Mawr College community." 2023–24 Handbook at 5. The Handbooks state explicitly that Transportation is a College "Service" on a par with Study Abroad, Athletics and other formal College programs and Departments.. The Bryn Mawr website underscores that students with temporary injuries, including issues such as sprained ankles, will be able to receive temporary assistance. As the website provides:

> Students who suffer a temporary injury (concussion, broken arm, sprained ankle, etc.) and who require assistance should reach out to the Department of Athletics (if appropriate), their Dean and their professors. Deans will collaborate with professors to provide support and develop a management plan that may include temporary modifications during the convalescent period.

https://www.brynmawr.edu/inside/offices-services/access-services/students/temporary-injuries.

83. Moreover, Defendants expressly stated that "Unlawful discrimination. . .will not be tolerated." *See* 2023-24 Handbook at 90-91. In connection with this commitment, Defendants made another equally important promise: "Bryn Mawr College strives to provide ***equal access to all College-sponsored activities and events***." 2023-2024 Handbook at 61. Defendants clearly breached their promise to arrange equal access to classes – the paradigmatic "College sponsored activity" – for Bañuelos, whose ankle injury was so severe that she was confined to her dormitory for three weeks without access to classes by failing to provide a functional, reliable, or adequately publicized shuttle service. The transportation service the College did provide was woefully inadequate and poorly staffed," vitiating Bryn Mawr's commitments and rendering the promised "accommodation" illusory. Likewise, the College breached its contractual duty to Bañuelos when it failed to ensure that she had accessible housing when she was suffering from a

serious ankle injury and its consequences. Bañuelos struggled with entrances to Merion, Pembroke and Taylor Halls with heavy doors that lacked push plates they could not open on an equal basis with students not suffering from physical disability or injury. On information and belief, earlier versions of the Bryn Mawr website that are not publicly available contain more explicit promises of transportation and access to students suffering from disabilities.

84. The also College made specific promises about the availability of academic accommodations and expressly promised students that they would be able to receive **reasonable accommodations** due to documented learning, physical, medical, or psychological disabilities." *See* 2022–23 Handbook at 39; 2023-2024 Handbook at 49. The College expressly promised that extended time on tests would be available to students in need of such an accommodation. The College did not make an exhaustive list of each and every accommodation that would be granted, knowing that the underlying promise was to make "reasonable" accommodations, every possible one of which could not be identified in advance. According to the College: "'Accessible'" means that every student is able to independently acquire the same information, engage in the same interactions, and enjoy the same services within the same timeframe, and with substantially equivalent ease of use."[2] The accessibility provisions provide explicitly for obtaining digital copies and recordings of classroom materials, and the College expressly promises "temporary modifications" of attendance for students in need. In this connection, the College also publicly promises that Deans will develop a "management plan that may include

---

[2] https://www.brynmawr.edu/inside/offices-services/access-services/faculty/accessibility-policy-classroom-instruction

**temporary modifications**" for students with injuries.[3]  The Handbooks explicitly state that the College Bryn Mawr College does not discriminate on the basis of . . .disability in the administration of its educational policies, scholarship and loan programs, athletic and other College-administered programs, or in its employment practices" 2023-2024 Handbook at 90; 2022-2023 Handbook at 81. Defendants breached this promise through the actions of their agent, the Director of Access Services, who, instead of advocating for students or ensuring equal access, arbitrarily denied standard academic accommodations, such as priority registration and additional test time. As set forth above, Director falsely claimed such accommodations "do not exist at the collegiate level," accused students of seeking to "cheat," and told students she was "not legally obligated" to help them succeed," thus clearly breaching the College's express promise of equal access to students with disabilities. On information and belief, earlier versions of the website that are not verifiable with current tools also specify that, as of 2023, the College expressly promised "temporary attendance" accommodations.

85.     Finally, Defendants breached their binding contractual policies by engaging in retaliation, which was explicitly prohibited. The Bryn Mawr website promises formal process for disputes, not retaliation against students who lodge complaints.[4] Further, the Handbooks make a binding promise that "No retaliation against students who make a good-faith report of a violation of this policy will be tolerated." 2023-2024 Handbook, at 91; 2022-2023 Handbook at 82. Defendants breached these promises when, in response to

---

[3] https://www.brynmawr.edu/inside/offices-services/access-services/accommodations/temporary-injuries.
[4] *See also* https://www.brynmawr.edu/inside/offices-services/access-services/students/disclosure-confidentiality-appeals-complaints.

Bañuelos' and De Camara's advocacy, the College's agents subjected them to a hostile process, investigated them, defamed them as "slanderous" and "adversarial," and "coldly suggested that [De Camara] find a different school," constituting a direct and bad-faith breach of the College's own written rules.

**Class Action Allegations**

86.     The Class Members are so numerous that their individual joinder herein is impracticable. On information and belief, the Class Members number in the hundreds. Members of the class include Bryn Mawr students who attended the College at any time from February 14, 2022 to the present. The precise number of Class Members and their identities are unknown at this time, but may be determined through discovery. Class Members may be notified of the pendency of this action by mail and/or publication through the records of Defendants.

87.     Common questions of law and fact exist as to all Class Members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to, the extent to which the College and its representatives owed a contractual or other special common law duty to provide an academic environment free from prior restraint and retaliation; to provide adequate transportation and access to school facilities for students suffering from temporary or permanent physical disabilities; to make available gluten and allergen-free meals unharmed by cross-contamination and of comparable quality and variety to the food provided to students who are not subject to dietary restrictions; to provide students with special learning needs academic accommodations, including extended time on tests and priority registration; to ensure that kitchen facilities are in adequate working condition to cook and prepare food

31

safely; to make available prescribing psychiatrists on campus and counsellors and therapists trained with respect to "invisible" disabilities; to ensure students salubrious living conditions free from, among other things, infestations of rats; and to prevent discrimination of students who need special school equipment and supplies.

88. The claims of the named Plaintiffs are typical of the claims of the Class Members in that, to the extent that a contract exists with respect to the matters set forth above, the named Plaintiffs have suffered from the violation of the contractual obligations of Defendants.

89. The named Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class Members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously.

90. The interests of Class Members will be fairly and adequately protected by the named Plaintiffs and their counsel.

91. The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability, particularly against an entity such as Bryn Mawr, that generates tens of millions of dollars in annual profit. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents the potential for inconsistent or contradictory judgments.

92.     To the extent that any described Class herein does not meet the requirements of Rules 23(b)(2) or (b)(3), Plaintiffs seek the certification of issues that will drive the litigation toward resolution.

### <u>COUNT I</u>

**Violation of Title III of Americans with Disabilities Act**
**(Failure to Provide Virtual Attendance Accommodation)**
**<u>De Camara v. Defendants</u>**

93.     Plaintiffs incorporate the foregoing paragraphs as though set forth at length.

94.     De Camara suffered from Central Sensitization Syndrome and Post-Concussive Syndrome, both of which are disabilities, and had a federally protected right to accommodation for such disabilities.

95.     Defendants knew that, in the absence of an accommodation, there was a substantial likelihood of harm to a federally protected right.

96.     Notwithstanding their knowledge of the need to provide an accommodation to avoid a substantial likelihood of harm to a federally protected right, Defendants failed to provide the needed accommodations by declining to allow De Camara to attend classes virtually.

97.     As a result of Defendants' failures, De Camara has suffered physical, emotional, and mental harm and has been effectively barred from fully participating in the educational program to which she was admitted at Bryn Mawr College; thus, De Camara is entitled to an injunction ordering Defendant Bryn Mawr to permit De Camara to complete her studies at Bryn Mawr with the ability to attend classes remotely as needed in light of her disabilities.

### <u>COUNT II</u>
**Violation of Title III of Americans with Disabilities Act**
**(Failure to Provide Testing and Course Assignment Accommodations)**
**<u>De Camara and Bañuelos v. Defendants</u>**

98.     Plaintiffs incorporate the foregoing paragraphs as though set forth at length.

99. De Camara and Bañuelos each suffered from a disability, as defined under the ADA, requiring Bryn Mawr to provide them with additional time to complete tests and assignments and had a federally protected right to accommodation for such disability.

100. An accommodation request for additional time to complete tests and assignments is reasonable and is an accommodation frequently granted to students with similar disabilities as Plaintiffs DeCamara and Bañuelos.

101. Defendants knew that, in the absence of an accommodation, there was a substantial likelihood of harm to a federally protected right.

102. Notwithstanding their knowledge of the need to provide an accommodation to avoid a substantial likelihood of harm to a federally protected right to Plaintiffs, Defendants failed to provide the needed accommodations by refusing DeCamara and Bañuelo extra time allotment on assignments and tests.

103. As a result of Defendants' failures, De Camara and Bañuelos have suffered physical, emotional, and mental harm and are entitled to an injunction ordering Defendants to provide De Camara and Bañuelos up to 50% additional time to complete tests and assignments.

## COUNT III

**Violation of Americans with Disabilities Act
(Failure to Permit Priority Registration)
De Camara and Bañuelos v. Defendants**

104. Plaintiffs incorporate the foregoing paragraphs as though set forth at length.

105. De Camara and Bañuelos suffered from a disability requiring Bryn Mawr to provide them with priority registration for classes and had a federally protected right to accommodation for such disability, which Defendants chose to ignore, closing their eyes to established medical science and practice.

106. An accommodation in the form of priority registration is necessary to ensure De Camara's and Bañuelos' full and meaningful participation in the College's educational programs, as it enables them to select class schedules that are appropriately spaced to account for the functional limitation imposed by her disability.

107. Defendants knew that, in the absence of an accommodation, there was a substantial likelihood of harm to a federally protected right.

108. Notwithstanding their knowledge of the need to provide accommodation to avoid a substantial likelihood of harm to a federally protected right to DeCamara and Bañuelos, Defendants failed to provide the needed accommodations by refusing to allow DeCamara and Bañuelos priority registration.

109. As a result of Defendants' failures, De Camara and Bañuelos have suffered physical, emotional, and mental harm and are entitled to an injunction ordering Defendants to authorize priority registration for them.

<u>**COUNT IV**</u>
**Violation of Title III of Americans with Disabilities Act**
**(Failure to Provide Transportation Accommodations)**
<u>**Bañuelos v. Defendants**</u>

110. Plaintiffs incorporate the foregoing paragraphs as though set forth at length.

111. Bañuelos suffered from a disability and injury requiring access to transportation services to accommodate mobility limitations. Her ankle injury left her completely incapacitated for approximately three weeks, during which the absence of on-campus transportation and remote attendance accommodations caused her to miss all classes.

112. Students, like Plaintiff, who cannot easily navigate stairs, were barred from fully and meaningfully participating in campus life.

113.    The transportation that Defendants advertised to their students was wholly inadequate for students who required reliable transportation to accommodate physical limitations imposed by their disability.

114.    Defendants knew that, in the absence of an accommodation, there was a substantial likelihood of harm to a federally protected right.

115.    Notwithstanding their knowledge of the need to provide accommodation to avoid a substantial likelihood of harm to a federally protected right, Defendants failed to provide the needed accommodation by failing to provide transportation and accessibility accommodations.

116.    As a result of Defendants' failures, Bañuelos has suffered physical, emotional, and mental harm and is entitled to an injunction ordering Defendants to provide students with physical disabilities and injuries access to a shuttle service operating at regular hours pursuant to a regular schedule, and to provide remote attendance accommodations for students unable to physically attend class due to temporary or permanent physical limitations.

## COUNT V

**Violation of Title III of Americans with Disabilities Act**
**(Failure to Provide Dietary Accommodations)**
**Richards-Cordell v. Defendants**

117.    Plaintiffs incorporate the foregoing paragraphs as though set forth at length.

118.    Richards-Cordell suffered from a disability requiring a dietary accommodation and limiting the foods that she could safely consume.

119.    Defendants knew that, in the absence of dietary accommodation, there was a substantial likelihood of harm to a federally protected right.

36

120. Notwithstanding their knowledge of the need to provide accommodation to avoid a substantial likelihood of harm to a federally protected right, Defendants failed to provide the needed accommodation by failing to provide reasonable food accommodations to students with dietary restrictions due to disability.

121. As a result of Defendants' failures, Richards-Cordell has suffered physical, emotional, and mental harm and is entitled to an injunction ordering Defendants:

    a. To provide gluten-free food alternatives in a safe, cross-contaminant free environment reasonably comparable to the food provided to students without gluten intolerances.

    b. To implement a training and oversight program to ensure that gluten-free food alternatives are prepared in a manner that avoids cross-contamination with gluten-containing foods.

    c. To implement a training and oversight program to ensure that allergenic and non-allergenic foods are prepared in a manner that avoids cross-contamination.

**COUNT VI**
**Breach of Contract**
**(Failure to Provide Dietary Accommodations)**
**Richard-Cordell and De Camara v. All Defendants**

122. Plaintiffs incorporate the foregoing paragraphs as though set forth at length.

123. As part of the bargained-for exchange of tuition and other payments by students in exchange for an education providing certain minimal, baseline services and benefits, such academic instruction, access to classes and professors, and a diet meeting students' basic nutritional and health requirements, Bryn Mawr promised its students with special dietary needs it would provide

them with "nutritious" food, which by definition must be consumable, as expressly set forth in the Handbooks.

124. Bryn Mawr breached its contract to provide students with safe, edible, "nutritious" and "gluten-free" food, by failing to provide gluten-free and allergen-free food to Richards-Cordell and De Camara and other similarly situated students.

125. As a result of the foregoing, Richards-Cordell, De Camara and all other similarly situated students have suffered harm as measured by the diminution in value of their academic experience, the loss of opportunity to attend other colleges that provide adequate nutrition, the waste of resources in paying for a Bryn Mawr education that failed to provide adequate nutrition, medical harm, including hospitalizations, doctor's bills,  pain and suffering, and are entitled to an award of damages, together with payment of attorneys' fees, in an amount to be determined at trial, and such other relief as set forth below.

**COUNT VII**
**Breach of Contract**
**(Failure to Provide Academic Accommodations)**
**DeCamara vs. All Defendants**

126. Plaintiffs incorporate the foregoing paragraphs as though set forth at length.

127. As part of the bargained-for exchange of tuition and other payments by students in exchange for an education providing certain minimal, baseline services and benefits, such academic instruction, access to classes and professors, buildings and facilities, Bryn-Maw promised its students with disabilities they would that they would be provided academic accommodations sufficient to receive an education comparable to that of students without such disabilities, including testing and priority registration accommodations, as discussed above.

128. Bryn Mawr breached its contract with De Camara and other similarly situated students by failing to provide additional time for testing and completing assignments despite the

documented need for such accommodations.

129. As a result of the foregoing, De Camara and all other similarly situated students have suffered harm as measured by the diminution in value of their academic experience, the loss of opportunity to attend other colleges that provide adequate transportation and facility access, the waste of resources in paying for a Bryn Mawr education that failed to provide adequate transportation and facility access, aggravation of their physical disabilities, medical harm, pain and suffering, and are entitled to an award of damages, together with payment of attorneys' fees, in an amount to be determined at trial, and such other relief as set forth below.

**COUNT VIII**
**Breach of Contract**
**(Violation of No-Retaliation Policy)**
**De Camara and Bañuelos v. All Defendants**

130. Plaintiffs incorporate the foregoing paragraphs as though set forth at length.

131. Defendants breached their contractual obligation not to engage in retaliation against students for engaging in advocacy activities by attacking, slandering and defaming Bañuelos and De Camara.

132. As a result of Defendants' breach, Plaintiffs Bañuelos and De Camara haves suffered a diminution in the value of their Bryn Mawr education, reputational and medical harm, pain and suffering, and are entitled to an award of damages, together with payment of attorneys' fees, in an amount to be determined at trial, and such other relief as set forth below

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the entry of judgment as follows:

(1) Under Count I, for an injunction ordering Defendants to permit De Camara to complete her studies at Bryn Mawr with the ability to attend classes remotely as needed in light of her disabilities, together with attorneys' fees and costs.

(2)     Under Count II, for an injunction ordering Defendants to provide De Camara and Bañuelos up to 50% additional time to complete tests and assignments, together with attorneys' fees and costs.

(3)     Under Count III, for an injunction ordering Defendants to authorize priority registration for De Camara, together with attorneys' fees and costs.

(4)     Under Count IV, for an injunction ordering Defendants to provide Bañuelos and all similarly situated students with access to a shuttle service operating at a regular time and on a regular schedule, and to provide remote attendance accommodations for students unable to physically attend class due to temporary or permanent physical limitations, together with attorneys' fees and costs.

(5)     Under Count V, for an injunction ordering Defendants to provide Richards-Cordell gluten-free and allergen-free food alternatives in a safe, cross-contaminant free environment reasonably comparable to the food provided to students without gluten intolerances, and to implement a training and oversight program to ensure that gluten-free and allergen-free food alternatives are prepared in a manner that avoids cross-contamination with gluten containing foods, together with attorneys' fees and costs.

(6)     Under Count VI, for damages resulting from Defendants' breach of contract in an amount to be determined at trial, together with attorneys' fees and costs.

(7)     Under Count VII, for damages resulting from Defendants' breach of contract in an amount to be determined at trial, together with attorneys' fees and costs.

(8)     Under Count VIII, for damages resulting from Defendants' breach of contract in an amount to be determined at trial, together with attorneys' fees and costs.

(9)     Certifying Counts I-VIII as a class action under Rule 23(b)(3) of the Federal Rules

of Civil Procedure Rule, with sub-classes as necessary, and appointing the Plaintiffs named in each individual claim as the class representative for the respective class or sub-class.

(10) Issuing an injunction ordering Defendants to:

(a) To provide extra time for tests and completion of assignments upon presentation of a doctor's note recommending this accommodation.

(b) To make available a virtual option for all classes, accessible to students who present a doctor's note or objective medical evidence of their disability.

(c) Provide gluten-free and allergen-free food alternatives in a safe, cross-contaminant free environment reasonably comparable to the food provided to students without gluten intolerances.

(d) Implement a training and oversight program to ensure that gluten-free and allergen-free food alternatives are prepared in a manner that avoids cross-contamination with gluten containing foods.

(e) Provide priority registration to students with a documented diagnosis.

(f) Provide a campus shuttle service with app access for disabled students, sufficient vehicles to respond to requests for service within fifteen minutes, and well-publicized guidelines for eligibility, use, and inquiries.

(11) Awarding Plaintiffs a reasonable fee as class representatives.

Such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury in this action of all issues so triable.

Respectfully submitted,

*/s/ Samantha F. Green*
Samantha F. Green, Esquire
**SIDKOFF, PINCUS & GREEN, P.C.**
1101 Market Street, Suite 2700
Philadelphia, PA 19107
(215) 574-0600
(215) 574-0310 (fax)
sgreen@sidkoffpincusgreen.com
*Attorneys for Plaintiffs*


*/s/ Eden P. Quainton*
EDEN P. QUAINTON** *PHV*
**QUAINTON LAW, PLLC**
2 Park Ave., 2nd Floor
New York, New York 10016
(212) 419-0575

Dated: December 10, 2025                    *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Samantha F. Green, Esquire, hereby certify that the foregoing *Amended Complaint* was

electronically filed and served today on all counsel of record, and is available for viewing and

downloading on the Court's ECF system.

                            */s/ Samantha F. Green*
                            Samantha F. Green


                            **SIDKOFF, PINCUS & GREEN, P.C.**
                            1101 Market Street, Suite 2700
                            Philadelphia, PA  19107
                            (215) 574-0600
                            (215) 574-0310 (fax)
Dated: December 10, 2025          sgreen@sidkoffpincusgreen.com