# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LAUREN DE CAMARA, ESÉNIA BAÑUELOS, HOPE RICHARDS CORDELL | : | CIVIL ACTION |
| | : | |
| | : | |
| | : | |
| v. | : | NO. 25-2287 |
| | : | |
| BRYN MAWR COLLEGE, THE BOARD OF TRUSTEES OF BRYN MAWR COLLEGE | : | |
| | : | |
| | : | |

## MEMORANDUM

**KEARNEY, J.** **April 9, 2026**

We today address a college's obligations to provide accommodations to students seeking a complete virtual education, modifications for their different dietary needs, transportation across campus, and academic assistance under federal disabilities law and to enforce promises in a college handbook. We find the college adduced undisputed evidence on the material issues and the students did not offer anything more than their say-so. We enter summary judgment for the college.

A liberal arts college decided to require its enrolled students to attend classes in person after the COVID-19 mitigation required virtual learning. The college established an Access Services Department to provide accommodations for students demonstrating they qualify for the accommodation without fundamentally altering the college's policies. One graduating senior and two former undergraduate students now challenge the college's accommodations through its Access Services Department. They claim the college deprived them of accommodations for virtual learning, dietary needs, transportation, and academic assistance. They ask us to order the college to do so even though two of the students no longer attend the college but one promises to return only if she can attend all classes virtually. They also seek damages claiming the college retaliated

against two of them for reporting their concerns and breached contractual obligations by not providing their identified accommodations.

We studied the record provided by the parties following an extended discovery period. The students chose to largely rely upon their own views and allegations and do not offer contrary evidence creating genuine issues of material fact on the dispositive issues. We disagree with the college's argument the students lack standing. But the students have not progressed beyond aspirational allegations of what they would like the college to provide and then conclude the absence of these accommodations breaches promises in the handbook. They need more than their allegations to defeat summary judgment based on record evidence. We grant the college's motion for summary judgment.

## I. Undisputed material facts[1]

Bryn Mawr College is a liberal arts college offering its students a "full-time, academic, residential community" for undergraduate study.[2] The College expects full-time students to complete at least three course units—or twelve credits—each semester.[3] The College also accepts part-time students who take at least two courses each semester.[4]

### *Students choose to attend the College knowing of its residential requirements.*

The College decided it would only offer its courses to students in a "residential" setting at the College.[5] The College requires its students to attend classes in-person at the College with limited short-term exceptions which a professor may allow on a case-by-case basis for some portion of the coursework.[6] The College stopped offering remote courses in the Fall 2021 semester following the COVID-19 pandemic.[7] It tells all students "it does not offer virtual learning."[8]

The College requires its resident students to participate in the College meal plan as part of its academic residential community.[9] The College gives students access to a dietitian who helps

them with their meal plan including by "establish[ing] accommodations for any student" with a nutrition need on campus."[10] Students seeking a dining accommodation usually complete a form and meet with the dietitian to discuss their needs.[11] If a student has a nutrition need requiring a "higher level of accommodation"—such as a nutrition need prompting the student to request to be off a meal plan—the dietitian will refer the student to the College's Access Services Department.[12]

The College's Access Services Department "provides reasonable accommodations for eligible students protected under the Americans with Disabilities Act due to documented learning, physical, medical, or psychological disabilities."[13] In addition to nutritional accommodations, students can request academic, residential, or other accommodations from the Department.[14] Students request accommodations in these areas by completing a form and meeting with the Director of Access Services.[15] The Department usually requires the student to provide supporting documents following her meeting with the Director to receive her accommodation.[16]

The College prohibits discrimination based on disabilities.[17] The College handbook provides the College cannot retaliate "against students who make a good-faith report of a violation of [the College's anti-harassment and discrimination] policy."[18] And the handbook instructs students to report violations of the anti-harassment and discrimination policy to "a dean, the Equal Opportunity Officer, or the Title IX Coordinator" or to "the President of the College, who will help the student find appropriate College officials with whom to discuss the concern."[19]

***Former-student De Camara requests virtual learning, academic, and dietary accommodations.***

Lauren De Camara chose the College with disclosed attention deficit hyperactivity disorder, multiple concussions, and dysautonomia.[20] She had a nut allergy but no other diagnosed food intolerances when choosing to attend the College.[21]

Ms. De Camera no longer attends the College.[22] Former-student De Camara contacted the

College's Access Services Department before her Fall 2021 Freshman year.[23] She spoke with the then-Director of Access Services Deborah Alder in June 2021 about receiving accommodations for her diagnoses.[24] She told Director Alder about the accommodations she received in high school, which included extended time for testing in a distraction-reduced environment and occasional access to virtual classes in response to concussion flares.[25] She did not request accommodations for her nut allergy from Director Alder.[26] She also met with the College's dietician during her first semester but did not make a request for accommodations for her nut allergy from her either.[27]

Ms. De Camara, her health care providers, or her social worker then submitted documents supporting three academic accommodations: (1) priority class scheduling, (2) alternate note taking methods, and (3) extra time for assignments and tests.[28] They did not submit documents supporting virtual attendance accommodations.[29] Director Alder allowed Ms. De Camara to record her lectures to assist with her note taking and allowed her extended time for tests.[30] Director Alder did not allow priority class registration or extra time on assignments accommodations.[31]

Ms. De Camara began her classes at the College in Fall 2021 knowing the College would provide her two of her requested accommodations.[32] She began classes being able to focus for about five hours each day or more.[33] But she began experiencing concussion systems in February 2022 and continuing in the Spring 2022 semester.[34] Her concussion symptoms reduced her capacity to concentrate from five hours per day to two or three hours per day.[35]

Ms. De Camara worked directly with her instructors to modify her courses in response to her concussion symptoms, including by receiving class recordings from her Japanese professors.[36] After giving her class recordings for about a month or a month and a half, Ms. De Camara's Japanese professors told her she needed to obtain an accommodation.[37] She then requested an accommodation from Director Alder on April 12, 2022.[38] Ms. De Camara supported her

accommodation request with a note from a physician recommending she complete the rest of her coursework for the semester from home.[39] Director Alder responded the doctor's note did not sufficiently show eligibility for a remote learning accommodation because the note did not include a diagnosis, list her current symptoms, or explain why her current symptoms led the doctor to conclude she needed to remain at home.[40] Director Alder also explained the College expects its students to attend classes on campus and noted the Dean of the Undergraduate College would need to approve an exception to the College's in-person requirements for Ms. De Camara.[41] Her Japanese professors independently agreed to give her recordings of their classes through the end of the semester.[42]

Ms. De Camara chose to return to the College for her second year. Director Alder again verified Ms. De Camara's accommodations allowing her extended time on tests and to record her lectures to assist with her note taking for her 2022–23 academic year.[43] She could only focus for two and a half to three hours each day.[44] Ms. De Camara met with the Vice President for Enrollment and 2022–23 Dean of the Undergraduate College Cheryl Horsey to ask for virtual access to her classes as an accommodation.[45] Dean Horsey noted "[t]here may be some situations where remote learning may be authorized as a partial and temporary accommodation" but reiterated the College "does not offer a remote/online degree."[46]

Ms. De Camara returned to in-person classes in Fall 2022 but had another symptom flare in November 2022.[47] She could then only focus an hour and a half each day.[48] Ms. De Camara also worked with a nutritionist in Fall 2022 to diagnose her food intolerances, "including an amine intolerance."[49]

Ms. De Camara reported concerns with accommodations at the College directly to the College's administrators.[50] She spoke with Dean Horsey about her request to attend classes

virtually in September 2022.[51] And she and student Esénia Bañuelos reported their concerns with the Access Services Department to then-President Kimberly Cassidy and Dean Horsey in the Spring 2023 semester.[52] Ms. De Camara claims the College then did not allow her to join certain classes after she advocated to be allowed to attend virtually, experiencing "hostility in . . . meetings" with administrators when they asked her why she did not consider attending another school, and shutting down a student news story about her lawsuit.[53]

Ms. De Camara's ability to focus returned to about two and a half to three hours per day at the start of the Spring 2023 semester but dropped to one to two hours per day after she experienced another flare.[54] She ultimately withdrew from the College on August 25, 2023.[55] Medical providers also diagnosed her with Central Sensitization Syndrome in August 2023.[56]

Former-student De Camara took a gap year and then began taking classes about a year later at Gwynedd Mercy University.[57] She took one class virtually and another class in person and received A grades in both classes at Gwynedd Mercy.[58] She took two classes in person for the Spring 2025 semester; she earned an A+ grade in one but failed the other.[59] Her health concerns persisted and she withdrew from Gwynedd Mercy in Spring 2025.[60] She could not sustain a "workload of just two classes even with the appropriate accommodations."[61] Former-student De Camara has not taken classes since she withdrew from Gwynedd Mercy last Spring.[62]

Former-student De Camara swears she will again enroll in the College if, and only if, we order the College provide her with a virtual experience.[63] And as of February 4, 2026, Ms. De Camara could still only focus two hours a day for activities which "are not triggering."[64] This two-hour capacity includes "all responsibilities and self-care requiring physical or cognitive exertion, including but not limited to activities of daily living such as meal preparation and personal errands."[65] Ms. De Camara would need a reduced course load—ideally one course and at

maximum two courses—and the ability to take virtual classes to return to the College.[66]

### *Former-student Richards-Cordell requests dietary accommodations.*

Former-student Hope Richards-Cordell also chose to enroll in the College beginning in Fall 2021.[67] They did not have a diagnosed food condition when they enrolled at the College and still do not have a diagnosis.[68] They instead assumed having Celiac's disease because their mother has it.[69]

Mx. Richards-Cordell asked the College's dietician for access to its gluten-free room before starting school in Fall 2021.[70] Access to the gluten-free room is the only accommodation former-student Richards-Cordell asked for before beginning school.[71] Former-student Richards-Cordell noticed the gluten-free room included snack food and microwaveable foot but no "hot food" during the Fall 2021 Semester.[72] Director Alder knew about student issues with the gluten-free room such as the room not having enough food options, not having hot food, and including contaminated food.[73]

Former-student Richards-Cordell took an academic leave for the calendar year 2022 and returned to the College during the Spring 2023 semester.[74] The gluten-free room had hot food during the weekdays when they returned in Spring 2023.[75] Mx. Richards-Cordell ultimately withdrew from the College after the Spring 2023 semester.[76] Former-student Richards-Cordell has not tried to return to the College since withdrawing because it would cost too much to live off-campus and purchase their own food.[77]

### *Student Bañuelos requests academic accommodations.*

Current-student Esénia Bañuelos started at the College in Fall 2022.[78] Student Bañuelos had diagnoses for chronic post-traumatic stress disorder and attention deficit hyperactivity disorder when she started at the College.[79] Ms. Bañuelos has a 3.69 Grade Point Average and expects to

graduate in several weeks.[80] She then plans to attend graduate school.[81]

Ms. Bañuelos first requested accommodations from Director Alder and Access Services three months before beginning classes.[82] She requested test-taking accommodations including a separate room to take tests in, the ability to use headphones during tests, and extra time on tests.[83] Director Alder approved all her academic accommodation requests except extra time on tests.[84] Ms. Bañuelos did not request an accommodation for priority class registration.[85]

Ms. Bañuelos followed up with Director Alder about receiving extra time on tests again in August 2022 before beginning classes.[86] They discussed scheduling a meeting but Ms. Bañuelos did not respond to a follow-up email from Director Alder asking her to suggest a meeting time.[87] Ms. Bañuelos did not seek an accommodation for extended time on tests after her August 2022 emails with Director Alder.[88] And a physician removed Ms. Bañuelos's attention deficit hyperactivity disorder diagnosis in August 2024 after reviewing her strong grades at the College.[89]

Student Bañuelos also temporarily sprained her right ankle in March 2023.[90] She recovered within three to four weeks after the sprain but still experienced residual pain until mid or late 2023.[91] Current-student Bañuelos cannot remember requesting a transportation accommodation to help her with getting around campus after her injury.[92]

Ms. Bañuelos never reported the College violated its antidiscrimination policy to the College's Civil Rights and Title IX Office.[93] She met with Dean Richie Gebauer in November 2023 to discuss discrimination and retaliation she experienced.[94] She asserts the College retaliated against her before and after this meeting by (1) investigating her for slandering Director Alder in October or November 2022, (2) having Dean Tomiko Jenkins, Student Engagement Coordinator Mia Harvey-Alekson, and Dean Gebauer tell her she participated in "cancel culture" in October 2023 after she co-led a "History of Disability Justice" workshop and discussed Director Alder's

alleged misconduct, and (3) having Director Alder characterize her as an "adversarial person" during a February 2024 meeting.[95]

## II.     Analysis

The two former Students and one current Student sued the College in May 2025.[96] They presently claim the College violated their rights under the Americans with Disabilities Act and breached contracts with them.[97] We afforded the parties extended discovery and delayed summary judgment to give the Students more time to gather their evidence. The College timely moved for summary judgment on all the Students' claims.[98] The Students oppose summary judgment largely relying on their allegations.[99] We grant summary judgment for the College on all claims.

### A. We grant summary judgment dismissing former-student De Camara's Title III and breach of contract claims.

Former-student De Camara sues the College and its Trustees for (1) violating Title III of the Americans with Disabilities Act by failing to provide her with virtual attendance accommodations, (2) violating Title III of the Act by failing to provide her with testing and course assignment accommodations, (3) violating Title III of the Act by failing to permit priority registration, (4) breaching a contract with her by failing to provide her with dietary accommodations, (5) breaching a contract with her by failing to provide her with academic accommodations, and (6) breaching a contract with her by retaliating against her.[100] The College moves for summary judgment on her Title III and breach of contract claims.[101] We grant the College's motion.

#### 1. We grant summary judgment on former-student De Camara's Title III claim for virtual attendance accommodations because they would fundamentally alter the College's program.

The College moves for summary judgment on all of Ms. De Camara's Title III claims. It argues she does not have standing to sue for her Title III claims and is not qualified to attend school

at the College.[102] It further argues Ms. De Camara did not request reasonable accommodations.[103] Ms. De Camara responds she has standing to sue, she is qualified, and she requested reasonable accommodations.[104] Ms. De Camara requests accommodations including virtual attendance accommodations, extra time on tests and assignments, and priority course registration.[105] We grant summary judgment for the College on Ms. De Camara's Title III claims.

### a. There is a genuine dispute of material fact regarding Ms. De Camara's standing to pursue her Title III claims.

The College argues Ms. De Camara does not have standing to sue for any of her Title III claims because she cannot return to the College given she is arguably unable to meet requirements to be an undergraduate student.[106] Ms. De Camara responds she has standing because she swore she wants to return to the College with accommodations.[107]

We enjoy jurisdiction over actual cases and controversies.[108] There is no actual case or controversy—and we lack jurisdiction—when a person does not have standing to sue in federal court.[109] A person suing in federal court bears the burden to establish she has standing to sue.[110] A person has standing to sue for a particular type of relief if she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."[111] A person satisfies the injury in fact requirement if she has suffered a (1) concrete, (2) particularized, and (3) actual or imminent injury.[112] Where a person brings a claim for injunctive relief she must show she "is likely to suffer future injury from the defendant's illegal conduct" to establish the injury in fact requirement.[113] For example, a person seeking injunctive relief under Title III of the Americans with Disabilities Act must allege "facts giving rise to an inference that [they] will suffer future discrimination by the defendant."[114]

Ms. De Camara swore she would need a reduced course load—ideally one course and at maximum two courses—and the ability to take virtual classes to return to the College.[115] Viewing

this fact in a light favorable to Ms. De Camara as the non-moving party, a reasonable jury could use this fact to find Ms. De Camara intends to return to the College. We decline to grant summary judgment for the College on this basis because there is a genuine dispute of material fact regarding former-student De Camara's intent to return to the College and her standing to sue.

### b. Ms. De Camara adduced no evidence to overcome the College's defense her requested accommodations would fundamentally alter the College's in-person class policy.

The College first argues Ms. De Camara cannot sue for accommodations under Title III because she is not otherwise qualified to be an undergraduate student given she wants a reduced course load, admits she cannot concentrate for more than two hours a day, and cannot attend classes in-person.[116] Ms. De Camara responds she is qualified if the College allows her to attend part-time and virtually even though she offers no evidence the College would change its decided and disclosed policy of requiring students attend classes in person.[117] We appreciate Ms. De Camara hopes the College would change its policy for her. But she needs more than hope. She needs to adduce evidence and did not do so. We grant summary judgment for the College.

Congress requires a student suing for failure to accommodate under Title III to show (1) she "is disabled" and is otherwise qualified to participate in the program at issue (2) the college she is suing is a "public accommodation" under Title III, and (3) the college "unlawfully discriminated against [her] on the basis of [her] disability by (a) failing to make a reasonable modification that was (b) necessary to accommodate [her] disability."[118] A student is otherwise qualified to participate in her school's program if she "can meet all of a program's requirements in spite of a disability, with or without reasonable accommodation."[119] Where a student believes she can meet a program's requirements with reasonable accommodations she must show she is likely to be successful with those accommodations in place.[120] Once a student makes a prima facie

showing she is otherwise qualified, the burden shifts to her school to show her "requested accommodation would fundamentally alter the nature of the school's program."[121] We first address whether Ms. De Camara can meet the College's requirements with accommodations and then address whether the College has shown her requested accommodations will fundamentally alter the nature of its program.

The record confirms former-student De Camara only has capacity to focus for two hours each day.[122] But it also shows the College accepts part-time students who take at least two courses each semester.[123] And it also shows Ms. De Camara could successfully complete at least one semester of work at Gwynedd Mercy University with two courses, one of which was virtual.[124] If we assume the accommodations she requests are reasonable, we find there is a genuine dispute of material fact regarding whether Ms. De Camara is otherwise qualified to complete the College's program on a part-time basis.

But the College does not allow complete virtual attendance. The College has met its burden to show the virtual class accommodations Ms. De Camara requests would fundamentally alter the nature of its program. The College cites testimony from former Dean of the Undergraduate College Jennifer Walters, former Director of Access Services Deborah Alder, former Vice President for Enrollment and 2022–23 Dean of the Undergraduate College Cheryl Horsey, and Dean of Student Access Richie Gebauer all asserting the College's policy is to require students to attend class in-person.[125] The record includes statements from administrators acknowledging the College offered virtual classes during the COVID-19 pandemic and Ms. De Camara's testimony Gwynedd Mercy University allowed her to virtually attend classes.[126] But this evidence does not create a genuine dispute about the College's undisputed policy regarding in-person class attendance today.

Ms. De Camara is correct we require public accommodations like the College to make "an

individualized inquiry . . . to determine whether a specific modification for a particular person's disability would be reasonable" and necessary "under the circumstances . . . and yet at the same time not work a fundamental alteration."[127] But we do not require the College to "waive[] . . . an essential rule of" its program.[128]

The undisputed facts show the College has a policy requiring its students attend classes in-person. Requiring the College to allow former-student De Camara to attend her classes virtually would fundamentally alter its program. The College does not offer complete virtual enrollment. Ms. De Camara is asking we order the College to fundamentally alter its long-established program. We do not express an opinion on the wisdom of the College's policy as it may preclude some academically qualified students from paying tuition and benefitting from the College's courses. But Ms. De Camara cannot change the College's fundamental programming.

We grant summary judgment for the College on former-student De Camara's Title III claim for failure to provide virtual attendance accommodations because the evidence is undisputed virtual attendance accommodations would fundamentally alter the College's program.

Ms. De Camara swore she would need to receive a virtual class accommodation to return to the College.[129] The record shows she does not intend to return to the College without virtual class accommodations. Because we grant summary judgment on her Title III claim for failure to provide virtual attendance accommodations we grant summary judgment on her remaining Title III claims for prospective injunctive relief based on failure to provide extra time for tests and assignments and failure to provide priority registration as moot.[130]

### 2. We grant summary judgment on Ms. De Camara's breach of contract claims.

The College also moves for summary judgement on Ms. De Camara's breach of contract claims.[131] Ms. De Camara opposes.[132] We grant the College summary judgment on Ms. De

Camara's breach of contract claims.

**a. We grant summary judgment on Ms. De Camara's breach of contract claim based on failure to provide academic accommodations because she is not eligible for virtual accommodations.**

The College asks us to grant summary judgment on former-student De Camara's breach of contract claim for failure to provide academic accommodations.[133] It argues it did not promise to provide eligible students with accommodations and asserts even if it did the undisputed facts show she was not eligible for certain accommodations.[134] Ms. De Camara opposes the College's motion solely on its failure to provide her with virtual attendance accommodations.[135] We previously concluded the College's promise in its handbook to "provide[] reasonable accommodations for eligible students protected under the Americans with Disabilities Act" could be specific enough to give rise to a contract.[136] But we otherwise agree with the College: the undisputed facts show Ms. De Camara was not eligible for virtual attendance accommodations under the Act because they would fundamentally alter the College's program. We grant summary judgment for the College on Ms. De Camara's breach of contract claim based on failure to provide academic accommodations.

**b. We grant summary judgment on Ms. De Camara's breach of contract claim based on failure to meet her nutritional needs because the undisputed facts show the College's nutritionist offered her access to an allergen-free menu.**

The College also asks us to grant summary judgment on former-student De Camara's breach of contract claim for failure to provide dietary accommodations.[137] It argues it did not contract with Ms. De Camara to provide dietary accommodations and, even if it did, it met its obligations.[138] Ms. De Camara responds the College promised her dietary accommodations but does not identify facts showing the College breached this alleged promise.[139] We agree with the College.

The College does not appear to dispute the authenticity of the handbook and website

provisions we previously determined could give rise to a contract to provide students required to purchase a meal plan with food meeting their nutritional needs.[140] Ms. De Camara began school at the College with a diagnosed nut allergy.[141] She did not have any other diagnosed food intolerances at the time.[142] She met with the College's nutritionist during her first semester to discuss her nut allergy.[143] The College's nutritionist discussed a "cross-contamination free and allergy controlled" menu with her.[144] But Ms. De Camara determined she could not eat items on the allergen-free menu the nutritionist offered.[145] The undisputed facts show the College's nutritionist discussed giving her access to food free from her only diagnosed food allergy or intolerance at the time Ms. De Camara met with her. We grant summary judgment for the College on Ms. De Camara's breach of contract claim based on failure to provide access to food meeting her nutritional needs.

### c. We grant summary judgment for the College on Ms. De Camara's breach of contract claim based on retaliation.

The College moves for summary judgment on former-student De Camara's claim for breach of contract based on retaliation and argues it did not promise to avoid retaliation and she has not adduced evidence showing she made a good-faith report of discrimination or experienced retaliation.[146] Ms. De Camara responds she did report discrimination and experienced retaliation.[147] We agree Ms. De Camara has not adduced evidence showing she experienced retaliation.

We previously determined the College's handbook includes a promise not to retaliate against students who make a good-faith report of a violation of the College's anti-harassment and discrimination policy.[148] The College argues Ms. De Camara needed to file a formal complaint to report the retaliation.[149] But the handbook instructs students to report violations to "a dean, the Equal Opportunity Officer, or the Title IX Coordinator" or to "the President of the College, who will help the student find appropriate College officials with whom to discuss the concern."[150] And

15

the College agrees Ms. De Camara spoke with Dean Horsey about her request to attend classes virtually in September 2022.[151] It also agrees Ms. De Camara swore she and current-student Bañuelos reported their concerns with the Access Services Department to then-President Kimberly Cassidy and Dean Horsey in the Spring 2023 semester.[152]

But even assuming these meetings qualify as good-faith reports of a violation of the College's anti-harassment and discrimination policy, Ms. De Camara has not adduced evidence showing she experienced retaliation because of them. Ms. De Camara claims the College retaliated against her for these reports by not allowing her to join certain classes after she advocated to be allowed to attend virtually, treating her with "hostility in . . . meetings" with administrators when they asked her why she did not consider attending another school, and shutting down a student news story about her lawsuit.[153] The College claims its handbook does not define retaliation and asks us to look to definitions for retaliation federal law provides.[154]

Retaliation under the Americans with Disabilities Act requires (1) a protected activity, (2) an adverse action "either after or contemporaneous with the" protected activity, and (3) "a causal connection between" the protected activity and the adverse action.[155] An action is adverse if it "might have 'dissuaded a reasonable [person] from making or supporting a charge of discrimination.'"[156] "[P]etty slights, minor annoyances, and simple lack of good manners" cannot be retaliation.[157] The handbook also provides a definition for retaliation when discussing sexual misconduct reports: "[a]ny intimidation, threats, coercion, or discrimination, for the purpose of interfering with any right or privilege secured by Title IX or its implementing regulations, constitutes retaliation."[158]

Ms. De Camara does not adduce facts a reasonable jury could use to find the College's decision to deny her virtual class accommodations is retaliation for reporting anti-harassment and

16

discrimination policy violations. The first possible good-faith report Ms. De Camara acknowledges is her September 2022 meeting with Dean Horsey where she discussed her existing attempts to attend classes virtually.[159] Ms. De Camara requested an accommodation for virtual classes from Director Alder on April 12, 2022.[160] Director Alder responded the same day and told Ms. De Camara her supporting doctor's note was insufficient to justify a virtual class accommodation.[161] This denial cannot be retaliation for reporting a policy violation because it occurred before Ms. De Camara met with Dean Horsey in September 2022. And she does not otherwise adduce evidence showing individual professors denied her remote access to classes because of a report she made in this meeting.

Her remaining claims of retaliation are administrators treating her with hostility during their meetings by asking her why she did not consider attending another school and shutting down a student news story about her lawsuit. Regardless of the definition of retaliation we have no evidentiary basis to find these incidents create questions of fact as to retaliation. She does not adduce evidence an administrator intimidated, threatened, coerced, or discriminated against her in response to their meetings. She also does not adduce facts suggesting her exchanges with administrators went further than petty slights, minor annoyances, or simple lack of good manners.

We grant summary judgment for the College on Ms. De Camara's breach of contract claim based on retaliation.

### B. We grant summary judgment on Mx. Richards-Cordell's Title III and breach of contract dietary accommodation claims.

Former-student Richards-Cordell sues the College for (1) violating Title III of the Americans with Disabilities Act by failing to provide them with dietary accommodations and (2) breaching a contract with them by failing to provide them with dietary accommodations.[162] The College moves for summary judgment on their Title III and breach of contract claims.[163] We grant

summary judgment for the College.

### 1. Mx. Richards-Cordell did not adduce evidence showing they are disabled under the Act.

The College moves for summary judgment on former-student Richards-Cordell's Title III claim arguing (1) they do not have standing to sue for injunctive relief, (2) they are not disabled, and (3) they did not request an accommodation beyond access to the College's gluten-free room.[164] Mx. Richards-Cordell responds they have standing, they are regarded as having a disability, and the College's gluten-free room did not accommodate their disability.[165] We agree Ms. Richards-Cordell has not adduced evidence showing they are disabled under the Act.

There is a genuine dispute of material fact regarding whether Mx. Richards-Cordell has standing to sue under Title III. The College argues Mx. Richards-Cordell does not have standing because they swore they might not return because they have financial concerns about reenrolling.[166] Mx. Richards-Cordell responds by citing their allegation they "would gladly return" to the College if the College addressed its dietary accommodation issues.[167] Mx. Richards-Cordell cannot rely on allegations alone to create a genuine dispute of material fact for summary judgment.[168] But we construe Mx. Richards-Cordell's testimony in a light most favorable to them as the non-moving party.[169] Former-student Richards-Cordell's testimony left open the possibility of them returning to the College if they receive accommodations and can live on-campus with the College's meal plan. There is a genuine dispute of material fact regarding whether Mx. Richards-Cordell has standing to sue for injunctive relief under Title III.

But Mx. Richards-Cordell's claim still cannot proceed because they have not adduced evidence showing they are disabled under Title III. We require students suing for failure to accommodate under Title III to show they are disabled.[170] Congress instructs a person has a disability under the Act if they (1) have "a physical or mental impairment that substantially limits

one or more" of their "major life activities[,]" (2) have "a record of such an impairment[,]" or (3) are "regarded as having such an impairment."[171] Mx. Richards-Cordell suggests they have a disability because they have a current impairment: Celiac disease.[172]

The College argues Mx. Richards-Cordell is not currently disabled because they admitted a physician has not diagnosed them with Celiac disease.[173] But medical evidence is "not always required to establish a disability" under the Act.[174] We instead consider whether "the alleged impairment is within the comprehension of a jury that does not possess a command of medical or otherwise scientific knowledge" to determine if medical testimony is needed to establish a disability on a "case-by-case basis."[175] "[A]ilments" like arm and neck pain, a knee injury, a back injury, or a missing arm do not require medical evidence because they are among "the least technical in nature and are the most amenable to comprehension by a lay jury."[176] But other conditions like a herniated disk spinal injury, avascular necrosis, fibromyalgia, and endometriosis require supporting medical evidence to establish impairment.[177] On the "spectrum" ranging from "missing limbs to rare medical infirmities," we find Celiac disease falls much closer to conditions like a herniated disk and requires medical evidence to confirm a diagnosis and explain its impact on a person's life.[178] Mx. Richards-Cordell did not adduce this evidence.

Still Mx. Richards-Cordell argues their Title III claim should survive because they are regarded as having a disability.[179] But even assuming this is true Congress instructs public accommodations do not need to "provide a reasonable accommodation or a reasonable modification to policies, practices, or procedures to an individual who meets the definition of disability . . . solely" because they are regarded as having a disability.[180] Because we conclude Mx. Richards-Cordell did not adduce evidence a reasonable jury could use to find they are disabled under the Act we do not address the College's argument it accommodated them.

We grant summary judgment for the College on Mx. Richards-Cordell's Title III claim because they did not adduce evidence suggesting they are disabled under the Act.

### 2. Mx. Richards-Cordell did not adduce evidence showing they have a nutritional need for gluten-free food to support their contract claim.

The College asks us to grant summary judgment on former-student Richards-Cordell's breach of contract claim because it did not contract with them to provide them with dietary accommodations.[181] Mx. Richards-Cordell responds the College did contract with them and their testimony creates a genuine dispute of material fact on whether the College breached its contract.[182] We grant summary judgment for the College.

The College does not appear to dispute the authenticity of the handbook and website provisions we previously determined could give rise to a contract to provide students required to purchase a meal plan with food meeting their nutritional needs.[183]

But Mx. Richards-Cordell did not have a diagnosed food condition at the time they enrolled at the College and still does not have a diagnosis.[184] Mx. Richards-Cordell has not adduced evidence showing they had a nutritional need for gluten-free food.[185] The disputed facts in the record regarding the adequacy of the College's gluten-free room are thus immaterial in this case.

We grant summary judgment for the College on Mx. Richards-Cordell's claim for breach of contract based on failure to meet their nutritional needs.

### C. We grant summary judgment on Ms. Bañuelos's Title III and breach of contract claims.

Student Bañuelos sues the College for (1) violating Title III of the Americans with Disabilities Act by failing to provide her with testing and course assignment accommodations, (2) violating Title III of the Act by failing to give her priority course registration, (3) violating Title III of the Act by failing to provide her with transportation accommodations, and (4) breaching a contract with her by retaliating against her.[186] The College moves for summary judgment on all of

20

her claims.[187] We grant summary judgment for the College on Ms. Bañuelos's claims.

### 1. We grant summary judgment on Ms. Bañuelos's Title III claims.

The College moves for summary judgment on all of Ms. Bañuelos's Title III claims.[188] Current-student Bañuelos opposes the motion.[189] We grant summary judgment for the College on all her Title III claims.

#### a. Ms. Bañuelos's Title III claim for failure to provide testing and course assignment accommodations is barred by the statute of limitations.

The College moves for summary judgment on Ms. Bañuelos's Title III claim for failure to provide extra time on tests because (1) she does not have standing to sue because she did not suffer an injury, (2) Title III's statute of limitations bars her claim, and (3) extra time on tests is not necessary to accommodate her disabilities.[190] Ms. Bañuelos responds the statute of limitations does not bar her claim because she needed accommodations throughout her education.[191] We agree with the College.

The College argues its decision to deny Ms. Bañuelos an accommodation for extra time on tests did not injure her solely because she is still on track to graduate in May 2026.[192] A person satisfies the injury in fact requirement for standing if she has suffered a (1) concrete, (2) particularized, and (3) actual or imminent injury.[193] Assuming the College denied current-student Bañuelos an accommodation she needed she satisfies the requirements for standing because she has not yet graduated.

Student Bañuelos's claim still fails because Title III's statute of limitations bars it. Congress did not define a statute of limitations in Title III.[194] We look to "the statute of limitations of the most analogous state law cause of action" to determine the Title III's statute of limitations because Congress enacted it before "the effective date of the default four-year statute of limitations for federal statutes."[195] Similar state law causes of action such as personal injury claims have a

two-year statute of limitations.[196] We thus "apply a two-year statute of limitations" to Title III claims.[197]

We then look to federal law to determine the date the statute of limitations begins to run.[198] And federal law instructs "a federal cause of action accrues 'when the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis for the claim'" unless Congress directs otherwise.[199] For example, a university student suing under Title II of the Act has "reason to know of her injury when [her university] allegedly failed to appropriately provide her reasonable accommodations."[200] The undisputed evidence before us confirms Student Bañuelos requested an accommodation for extended time on tests—and Director Alder denied the accommodation—in May 2022 but no later than in August 2022.[201] Ms. Bañuelos did not sue the College until almost three years later on May 5, 2025.[202] Title III's two-year statute of limitations bars her claim.

We grant summary judgment for the College on Student Bañuelos's Title III claim based on failure to provide extended time on tests. We need not address the College's argument her requested accommodation was not necessary.

> **b. We grant summary judgment on Student Bañuelos's Title III claim for failure to permit priority registration because she did not request this accommodation.**

The College moves for summary judgment on current-student Bañuelos's Title III claim for failure to permit priority registration because she swore she never requested a priority registration accommodation.[203] Ms. Bañuelos does not respond to this argument.[204] We agree with the College.

One of the elements for a Title III claim for failure to accommodate requires a person to show the private entity she is suing "unlawfully discriminated against [her] on the basis of [her]

disability by (a) failing to make a reasonable modification that was (b) necessary to accommodate [her] disability."[205] A private entity like the College cannot make a reasonable accommodation for a student unless the College knows about the student's disability or need for an accommodation.[206] The undisputed facts show Ms. Bañuelos did not alert the College of her need for a priority registration accommodation.[207] And she does not otherwise argue her need for a priority registration accommodation was obvious.[208] We grant summary judgment for the College on current-student Bañuelos's Title III claim based on failure to permit priority registration.

c. **We grant summary judgment on Ms. Bañuelos's Title III claim for failure to provide transportation accommodations because she does not have standing.**

The College moves for summary judgment on Student Bañuelos's Title III claim for failure to provide transportation accommodations following her ankle injury because (1) she does not have standing to sue and (2) she did not request a transportation accommodation.[209] Ms. Bañuelos's response focuses on arguing the College's second argument fails.[210] But we agree with the College: the undisputed facts confirm Ms. Bañuelos does not have standing to sue.

One of the components of the injury in fact required for standing to sue is an imminent injury.[211] A person requesting injunctive relief must show she "is likely to suffer future injury from the defendant's illegal conduct."[212] But the undisputed facts show current-student Bañuelos recovered from her temporary ankle injury.[213] She does not identify facts suggesting she will continue to require transportation accommodations. Student Bañuelos does not have standing to sue because the undisputed facts show she is not likely to suffer a future injury. We grant summary judgment for the College on Ms. Bañuelos's Title III claim based on failure to provide transportation accommodations. Because we conclude the undisputed facts show Ms. Bañuelos does not have standing to sue, we do not address the College's argument she did not request an

accommodation.

### 2. We grant summary judgment on Student Bañuelos's breach of contract claim based on retaliation.

The College also moves for summary judgment on Ms. Bañuelos's breach of contract claim based on retaliation.[214] It argues her claim fails because she did not report a violation of the College's anti-harassment and discrimination policy and did not experience retaliation.[215] She responds she did report a violation of the anti-harassment and discrimination policy and experienced retaliation.[216] We agree with the College.

We previously determined the College promised not to retaliate against students who make a good-faith report of a violation of the College's anti-harassment and discrimination policy.[217] Student Bañuelos states she experienced the following instances of retaliation: (1) an investigation into her for slandering Director Alder in October or November 2022, (2) Dean Tomiko Jenkins, Student Engagement Coordinator Mia Harvey-Alekson, and Dean Richie Gebauer telling her she participated in "cancel culture" in October 2023 after she co-led a "History of Disability Justice" workshop and discussed Director Alder's alleged misconduct, and (3) Director Alder characterizing her as an "adversarial person" during a February 2024 meeting.[218] But the only exchange Ms. Bañuelos identifies which could have included a report of a policy violation is a meeting she had with Dean Gebauer in November 2023 to discuss discrimination and retaliation she experienced.[219]

Even assuming her meeting with Dean Gebauer qualifies as a good-faith report of a violation of the College's anti-harassment and discrimination policy, Ms. Bañuelos has not adduced evidence showing she experienced retaliation because of this report. The November 2022 investigation and the October 2023 "cancel culture" allegations cannot be retaliation for her November 2023 report because they occurred before it.[220] And regardless of whether we apply the

Act's or the handbook's definition for retaliation, the February 2024 "adversarial person" comment is not retaliation. We grant summary judgment for the College on Ms. Bañuelos's breach of contract claim based on retaliation.

## III.     Conclusion

The former and current students did not adduce evidence of a genuinely disputed material fact on their disabilities accommodation or retaliation claims or breach of contract claims. We grant summary judgment for the College.

---

[1] Our Policies require parties moving for relief under Fed. R. Civ. P. 56 include a Statement of Undisputed Material Facts and an appendix in support of summary judgment. The College filed its Motion, Statement of Undisputed Material Facts, Memorandum in support of summary judgment, and Appendix. *See* ECF 63; ECF 70. The current and former students opposed the motion, responded to the College's Statement of Undisputed Material Facts, included an Additional Statement of Material Facts, and added a supplemental Appendix. *See* ECF 65; ECF 66; ECF 67; ECF 78; ECF 79. The College filed a reply brief. *See* ECF 69. All references to ECF 63, ECF 69, ECF 70, ECF 78, and ECF 79 are to the CM/ECF pagination.

We do not rely on allegations absent evidence in discovery when addressing a summary judgment motion. Summary judgment is referred to as "put up or shut up" time. *See Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) ("[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." (quoting *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109–10 (3d Cir. 1985))).

[2] *See* ECF 70-2 at 6, Appx. at BMCMSJ000621, Horsey Declaration at ¶ 3.

[3] *See* ECF 70-2 at 7, Appx. at BMCMSJ000622, Horsey Declaration at ¶ 4.

[4] *See* ECF 70-2 at 402, Appx. at BMCMSJ0001017, Curricular Rules at 3.

[5] *See* ECF 70-2 at 500–01, Appx. at BMCMSJ001115–16, N.T. Walters at 19:2–20:12.

[6] *See id.*; ECF 70-1 at 522, Appx. at BMCMSJ000518, N.T. Alder at 38:3–8.

[7] *See* ECF 70-2 at 500–05, Appx. at BMCMSJ001115–20, N.T. Walters at 19:2–24:14; ECF 70-1 at 589–90, Appx. at BMCMSJ000585–86, N.T. Horsey at 21:10–22:4; ECF 70-1 at 521–22, BMCMSJ000517–18, N.T. Alder at 34:13–38:13.

[8] *See* ECF 70-2 at 576–77, Appx. at BMCMSJ001191–92, N.T. Gebauer at 56:2–57:8.

[9] *See* ECF 70-4 at 228, Appx. at BMCMSJ001600, 2022–23 Student Handbook at 52; ECF 70-4 at 129, Appx. at BMCMSJ001501, 2023–24 Student Handbook at 61.

[10] *See* ECF 70-1 at 438, Appx. at BMCMSJ000434, N.T. Zaparzynski 30(b)(6) at 8:19–9:11.

[11] *See* ECF 70-1 at 441, Appx. at BMCMSJ000437, N.T. Zaparzynski 30(b)(6) at 18:21–21:18.

[12] *See* ECF 70-1 at 441, BMCMSJ000437, N.T. Zaparzynski 30(b)(6) at 20:25–21:12.

[13] *See* ECF 70-4 at 215, Appx. at BMCMSJ001587, 2022–23 Student Handbook at 39; ECF 70-4 at 117, Appx. at BMCMSJ001489, 2023–24 Student Handbook at 49.

[14] *See* ECF 70-1 at 515, Appx. at BMCMSJ000511, N.T. Alder at 12:11–25.

[15] *See* ECF 70-1 at 517, Appx. at BMCMSJ000513, N.T. Alder at 18:19–19:2.

[16] *See* ECF 70-1 at 517, Appx. at BMCMSJ000513, N.T. Alder at 19:3–6; ECF 70-1 at 404, Appx. at BMCMSJ000400, N.T. Timmerman at 14:14–23.

[17] *See* ECF 70-4 at 257–58, Appx. at BMCMSJ01629–30, 2022–23 Student Handbook at 81–82; ECF 70-4 at 158–59, Appx. at BMCMSJ001530–31, 2023–24 Student Handbook at 90–91.

[18] *See* ECF 70-4 at 258, Appx. at BMCMSJ001630, 2022–23 Student Handbook at 82; ECF 70-4 at 159, Appx. at BMCMSJ001531, 2023–24 Student Handbook at 91.

[19] *See* ECF 70-4 at 258, Appx. at BMCMSJ001630, 2022–23 Student Handbook at 82; ECF 70-4 at 159, Appx. at BMCMSJ001531, 2023–24 Student Handbook at 91.

[20] *See* ECF 70-1 at 17, Appx. at BMCMSJ000013, N.T. De Camara I at 46:1–16.

[21] *See* ECF 70-1 at 19, Appx. at BMCMSJ000015, N.T. De Camara I at 56:8–57:6; ECF 70-1 at 20–21, Appx. at BMCMSJ000016–17, N.T. De Camara I at 61:21–62:7.

[22] Ms. De Camera no longer attends the College. We may refer to her, along with her co-Plaintiff Hope Richards-Cordell, as "former students" to offer context in our analysis.

[23] *See* ECF 70-1 at 45, Appx. at BMCMSJ000041, N.T. De Camara II at 75:22–76:21.

[24] *See id.*; ECF 70-1 at 514, Appx. at BMCMSJ000510, N.T. Alder at 8:1–17.

[25] *See* ECF 70-1 at 46–47, Appx. at BMCMSJ000042–43, N.T. De Camara II at 81:21–83:13.

[26] *See* ECF 70-1 at 19, Appx. at BMCMSJ000015, N.T. De Camara I at 57:14–24.

[27] *See* ECF 70-1 at 20, Appx. at BMCMSJ000016, N.T. De Camara I at 59:20–60:24.

[28] *See* ECF 70-1 at 50–51, Appx. at BMCMSJ000046–47, N.T. De Camara II at 98:8–99:7.

[29] *See id.*

[30] *See* ECF 70-3 at 15, Appx. at BMCMSJ001324, 2021–22 Verification Letter.

[31] *See id.* Ms. De Camara swore Director Alder told her she would not give her an accommodation for extra time on assignments because she could "just ask the professors themselves" for an extension when she needed one. *See* ECF 70-1 at 52, Appx. at BMCMSJ000048, N.T. De Camara II at 105:20–106:16. Ms. De Camara swore her professors "[s]ometimes" denied her assignment extensions but did not "often" deny them. *See id.*

[32] *See* ECF 70-1 at 45, Appx. at BMCMSJ000041, N.T. De Camara II at 75:22–76:6; ECF 70-3 at 15, Appx. at BMCMSJ001324, 2021–22 Verification Letter.

[33] *See* ECF 70-1 at 53, Appx. at BMCMSJ000049, N.T. De Camara II at 109:12–15.

[34] *See* ECF 70-1 at 53–54, Appx. at BMCMSJ000049–50, N.T. De Camara II at 109:16–111:9.

[35] *See* ECF 70-1 at 57, Appx. at BMCMSJ000053, N.T. De Camara II at 124:25–125:8.

[36] *See* ECF 70-1 at 55–56, Appx. at BMCMSJ000051–52, N.T. De Camara II at 117:16–122:7.

[37] *See* ECF 70-1 at 55, Appx. at BMMSJ000051, N.T. De Camara II at 118:10–13.

[38] *See* ECF 70-1 at 56–57, Appx. at BMCMSJ000052–53, N.T. De Camara II at 122:8–123:10; ECF 70-3 at 12–13, Appx. at BMCMSJ001321–22, 4/12/2022 De Camara & Alder Emails.

[39] *See* ECF 70-1 at 57, Appx. at BMCMSJ000053, N.T. De Camara II at 124:14–23; ECF 70-3 at 12–13, Appx. at BMCMSJ001321–22, 4/12/2022 De Camara & Alder Emails.

[40] *See* ECF 70-3 at 8–13, Appx. at BMCMSJ001317–22, 4/12/2022–4/13/2022 De Camara & Alder Emails.

[41] *See id.*

[42] *See* ECF 70-1 at 60–61, Appx. at BMCMSJ000056–57, N.T. De Camara II at 138:12–139:1.

[43] *See* ECF 70-3 at 5, Appx. at BMCMSJ001314, 2022–23 Verification Letter.

[44] *See* ECF 70-1 at 90, Appx. at BMCMSJ000086, N.T. De Camara III at 18:16–19:11.

[45] *See* ECF 70-1 at 132, Appx. at BMCMSJ000128, N.T. De Camara IV at 10:2–12; ECF 70-1 at 591, Appx. at BMCMSJ000587, N.T. Horsey at 26:3–22; ECF 70-1 at 586–87, Appx. at

BMCMSJ000582–83, N.T. Horsey at 8:1–10:3. Dean Horsey also served as the College's equal opportunity officer. *See id.*

[46] *See* ECF 70-3 at 23–24, Appx. at BMCMSJ001332–33, 10/11/2022 & 10/13/2022 De Camara & Horsey Emails.

[47] *See* ECF 70-1 at 91–92, Appx. at BMCMSJ000087–88, N.T. De Camara III at 25:10–26:16; ECF 70-1 at 93–94, Appx. at BMCMSJ000089–90, N.T. De Camara III at 33:19–34:1.

[48] *See* ECF 70-1 at 91–92, Appx. at BMCMSJ000087–88, N.T. De Camara III at 25:10–26:16.

[49] *See* ECF 70-1 at 20–21, Appx. at BMCMSJ000016-17, N.T. De Camara I at 61:21-62:7.

[50] *See* ECF 70-1 at 177–78, Appx. at BMCMSJ000173–74, De Camara Deposition IV at 55:17–56:19.

[51] *See* ECF 70-1 at 591, Appx. at BMCMSJ000587, N.T. Horsey at 26:10–24.

[52] *See* ECF 70-1 at 154–55, Appx. at BMCMSJ000150–51, N.T. De Camara IV at 32:23–33:19; ECF 70-1 at 158–63, Appx. at BMCMSJ000154–59, N.T. De Camara IV at 36:8–41:16.

[53] *See* ECF 70-1 at 166–72, Appx. at BMCMSJ000162–68, N.T. De Camara IV at 44:18–50:17.

[54] *See* ECF 70-1 at 93, Appx. at BMCMSJ000089, N.T. De Camara III at 32:1–9; ECF 70-1 at 99, Appx. at BMCMSJ000095, N.T. De Camara III at 56:5–57:22.

[55] *See* ECF 70-3 at 25, Appx. at BMCMSJ001334, De Camara Transcript; ECF 70-1 at 100, Appx. at BMCMSJ000096, N.T. De Camara III at 59:23–60:1.

[56] *See* ECF 70-1 at 14–15, Appx. at BMCMSJ000010–11, N.T. De Camara I at 37:11–38:10.

[57] *See* ECF 70-1 at 15, Appx. at BMCMSJ000011, N.T. De Camara I at 38:23–39:5.

[58] *See* ECF 70-1 at 175, Appx. at BMCMSJ000171, N.T. De Camara IV at 53:2–8.

[59] *See* ECF 70-1 at 175–76, Appx. at BMCMSJ000171–72, N.T. De Camara IV at 53:8–54:19.

[60] *See* ECF 70-1 at 15, BMCMSJ000011, N.T. De Camara I at 40:9–41:18.

[61] *See* ECF 70-1 at 14, Appx. at BMCMSJ000010, N.T. De Camara I at 35:11–16.

[62] *See* ECF 70-1 at 15, BMCMSJ000011, N.T. De Camara I at 41:15–18.

[63] *See* ECF 70-1 at 179, Appx. at BMCMSJ000175, N.T. De Camara IV at 57:10–20. Ms. De Camara will only apply to the College again if she receives virtual classes. So it does not matter, at least for her, as to whether we order the College to provide the other requested accommodations

of "testing and course assignment accommodations" and "priority registration" for classes. *See* ECF 57 at 33–35 ¶¶ 93–109.

[64] *See* ECF 70-1 at 17, Appx. at BMCMSJ000013, N.T. De Camara I at 49:9–14.

[65] *See* ECF 47-3 at 1, De Camara Declaration at ¶ 3.

[66] *See* ECF 70-1 at 179, Appx. at BMCMSJ000175, N.T. De Camara IV at 57:10–20.

[67] *See* ECF 70-1 at 247, Appx. at BMCMSJ000243, N.T. Richards-Cordell at 18:3–5.

[68] *See* ECF 70-1 at 246, Appx. at BMCMSJ000242, N.T. Richards-Cordell at 15:15–23.

[69] *See id.*

[70] *See* ECF 70-1 at 246, Appx. at BMCMSJ000242, N.T. Richards-Cordell at 16:22–17:9.

[71] *See id.*

[72] *See* ECF 70-1 at 247, Appx. at BMCMSJ000243, N.T. Richards-Cordell at 20:19–21:5.

[73] *See* ECF 70-1 at 546, Appx. at BMCMSJ000542, N.T. Alder at 135:1–10. The College's dietician also agreed the gluten-free room only had carb-based food like "cereals, granola bars, crackers, [and] bread" when she first started working at the College. *See* ECF 70-1 at 447, Appx. at BMCMSJ000443, N.T. Zaparzynski 30(b)(6) at 44:20–23.

[74] *See* ECF 70-1 at 248, Appx. at BMCMSJ000244, N.T. Richards-Cordell at 22:17–19, 25:19–23; ECF 70-1 at 249, Appx. at BMCMSJ000245, N.T. Richards-Cordell at 28:9–29:23; ECF 70-1 at 259, Appx. at BMCMSJ000255, N.T. Richards-Cordell at 69:1–7.

[75] *See* ECF 70-1 at 249, Appx. at BMCMSJ000245, N.T. Richards-Cordell at 28:9–29:9; ECF 70-1 at 256–57, Appx. at BMCMSJ000252–53, N.T. Richards-Cordell at 57:22–58:7.

[76] *See* ECF 70-1 at 250, Appx. at BMCMSJ000246, N.T. Richards-Cordell at 32:16–33:10; ECF 70-1 at 260, Appx. at BMCMSJ000256, N.T. Richards-Cordell at 70:19–23.

[77] *See* ECF 70-1 at 251, Appx. at BMCMSJ000247, N.T. Richards-Cordell at 36:14–37:1.

[78] *See* ECF 70-1 at 308, Appx. at BMCMSJ000304, N.T. Bañuelos at 13:2–6.

[79] *See* ECF 70-1 at 310–11, Appx. at BMCMSJ000306–07, N.T. Bañuelos at 18:20–22:3.

[80] *See* ECF 70-1 at 308, Appx. at BMCMSJ000304, N.T. Bañuelos at 13:8–22.

[81] *See* ECF 70-1 at 309, Appx. at BMCMSJ000305, N.T. Bañuelos at 14:3–8.

[82] *See* ECF 70-1 at 313, Appx. at BMCMSJ000309, N.T. Bañuelos at 32:12–33:2; ECF 70-1 at 314–15, Appx. at BMCMSJ000310–11, N.T. Bañuelos at 37:4–38:10.

[83] *See* ECF 70-1 at 313–14, Appx. at BMCMSJ000309–10, N.T. Bañuelos at 33:19–35:21.

[84] *See id.*; ECF 70-1 at 316–17, Appx. at BMCMSJ000312–13, N.T. Bañuelos at 45:20–46:5.

[85] *See* ECF 70-1 at 320, Appx. at BMCMSJ000316, N.T. Bañuelos at 59:24–60:7.

[86] *See* ECF 70-1 at 317, Appx. at BMCMSJ000313, N.T. Bañuelos at 48:20–49:17; ECF 70-3 at 103–07, Appx. at BMCMSJ001401–05, Bañuelos & Alder August & September 2022 Emails.

[87] *See* ECF 70-3 at 103–07, Appx. at BMCMSJ001401–05, Bañuelos & Alder August & September 2022 Emails.

[88] *See* ECF 70-1 at 317, Appx. at BMCMSJ000313, N.T. Bañuelos at 49:8–17.

[89] *See* ECF 70-1 at 310–11, Appx. at BMCMSJ000306–07, N.T. Bañuelos at 21:9–22:3.

[90] *See* ECF 70-1 at 310, Appx. at BMCMSJ000306, N.T. Bañuelos at 18:20–19:9; ECF 70-1 at 311, Appx. at BMCMSJ000307, N.T. Bañuelos at 23:4–24.

[91] *See* ECF 70-1 at 311, Appx. at BMCMSJ000307, N.T. Bañuelos at 24:14–25:25.

[92] *See* ECF 70-1 at 319–320, Appx. at BMCMSJ000315–16, N.T. Bañuelos at 57:22–58:24.

[93] *See* ECF 70-1 at 333, Appx. at BMCMSJ000329, N.T. Bañuelos at 110:7–23.

[94] *See* ECF 70-1 at 333, Appx. at BMCMSJ000329, N.T. Bañuelos at 110:24–111:21.

[95] *See* ECF 70-1 at 333, Appx. at BMCMSJ000329, N.T. Bañuelos at 110:1–5; ECF 70-5 at 44–45, Appx. at BMCMSJ001800–01, Bañuelos Declaration; ECF 70-1 at 322, Appx. at BMCMSJ000318, N.T. Bañuelos at 66:11–68:6; ECF 70-1 at 331, Appx. at BMCMSJ000327, N.T. Bañuelos at 103:24–105:18; ECF 70-1 at 320–21, Appx. at BMCMSJ00316–17, N.T. Bañuelos at 61:20–64:15.

[96] *See* ECF 1. Six current and former students originally sued the College but only three remain. *See id.*; ECF 57.

[97] *See* ECF 57.

[98] *See* ECF 63; ECF 69. Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is "genuine" if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526,

534 (3d Cir. 2017) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011)). The "mere existence of a scintilla of evidence" favoring the non-moving party does not prevent summary judgment. *See SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 204 (3d Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). When determining whether a disputed fact is genuine, we draw all inferences in favor of the non-moving party. *See id.* We do not weigh evidence or make credibility determinations. *See Spivack v. City of Phila.*, 109 F.4th 158, 166 (3d Cir. 2024) (citing *Peroza-Benitez v. Smith*, 994 F.3d 157, 164 (3d Cir. 2021)).The Supreme Court "outlined two closely related methods for a movant to succeed at summary judgment": (1) under the "standard approach," the moving party may produce material facts, genuinely undisputed, entitling it to judgment as a matter of law; and (2) under the "*Celotex* approach," the moving party "may instead demonstrate that the non-moving party has not made 'a showing sufficient to establish the existence of an element essential to that party's case . . . *on which that party will bear the burden of proof at trial.*" *See Mall Chevrolet, Inc. v. Gen. Motors LLC*, 99 F.4th 622, 630 (3d Cir. 2024) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Summary judgment is appropriate where the non-moving party does not make a showing sufficient to establish the existence of an element essential to its case and on which it bears the burden of proof at trial. *SodexoMAGIC*, 24 F.4th at 204 (citing *Celotex Corp.*, 477 U.S. at 322).

We "view the facts and draw reasonable inferences 'in the light most favorable to'" the Students as the parties opposing the College's summary judgment motion. *See Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted).

[99] *See* ECF 78.

[100] *See* ECF 57 at 33–35 ¶¶ 93–109, 37–39 ¶¶ 122–32.

[101] *See* ECF 63-2 at 9–22.

[102] *See id.* at 10–14.

[103] *See id.* at 14–16.

[104] *See* ECF 78 at 8–12.
[105] *See* ECF 57 at 33–35 ¶¶ 93–109.

[106] *See* ECF 63-2 at 10–14.

[107] *See* ECF 78 at 12.

[108] *See* U.S. Const. art. III § 2.

[109] *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 337–38 (2016); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) ("For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case—in other words, standing" (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997))).

[110] *See Spokeo*, 578 U.S. at 338 (noting "[t]he plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing" standing to sue).

[111] *See id.*

[112] *See id.* at 339 ("To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical'" (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992))).

[113] *See Doe v. Nat'l Bd. of Med. Exam'rs*, 210 F. App'x 157, 159–60 (3d Cir. 2006) (emphasis removed); *see also Anderson v. Macy's, Inc.*, 943 F. Supp. 2d 531, 538 (W.D. Pa. 2013) ("Because the remedy for a private [Title III] violation is injunctive relief, courts look beyond the alleged past violation and consider the possibility of future violations. Plaintiffs seeking prospective injunctive relief 'must demonstrate a "real and immediate threat" of injury in order to satisfy the "injury in fact" requirement'" (quotations omitted)).

[114] *See Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 561 (3d Cir. 2002) (quoting *Shotz v. Cates*, 256 F.3d 1077, 1081 (11th Cir. 2001)); *Anderson*, 943 F. Supp. 2d at 538.

[115] *See* ECF 70-1 at 179, Appx. at BMCMSJ000175, N.T. De Camara IV at 57:10–20.

[116] *See* ECF 63-2 at 10–14.

[117] *See* ECF 78 at 10–11.

[118] *See Matheis v. CSL Plasma, Inc.*, 936 F.3d 171, 175 (3d Cir. 2019) (citations omitted); *CG v. Pa. Dep't of Educ.*, 734 F.3d 229, 236 (3d Cir. 2013) ("To prove a claim under . . . the [Act] . . . Plaintiffs must show that (1) they are handicapped or disabled as defined under the statutes; (2) they are otherwise qualified to participate in the program at issue; and (3) they were precluded from participating in a program or receiving a service or benefit because of their disability."); *see also Hershman v. Muhlenberg Coll.*, 17 F. Supp. 3d 454, 457 (E.D. Pa. 2014) ("A student alleging that his college failed to accommodate his disability as required by Title III of the [Act] must establish '(1) that the plaintiff is disabled and otherwise qualified academically, (2) that the defendant is a private entity that owns, leases or operates a place of public accommodation (for [Act] purposes) . . . , and (3) that the defendant failed to make reasonable modifications that would accommodate the plaintiff's disability without fundamentally altering the nature of the public accommodation'" (quoting *Schneider v. Shah*, 507 F. App'x 132, 137 (3d Cir. 2012))).

[119] *See Millington v. Temple Univ. Sch. of Dentistry*, 261 F. App'x 363, 366 (3d. Cir. 2008) (citing *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 406 (1979); *McDonald v. Pennsylvania*, 62 F.3d 92, 96 (3d Cir. 1995)).

[120] *See Pahlavan v. Drexel Univ. Coll. of Med.*, 438 F. Supp. 3d 404, 423 (E.D. Pa. 2020) ("Where a plaintiff or his expert are unable to forecast the likelihood of success with an additional accommodation in place, the proposed accommodation is unreasonable and fails to support that a

student is otherwise qualified." (citing *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 466 (4th Cir. 2012)); *Chin v. Rutgers*, No. 14-1332, 2016 WL 2653908, at *6 (D.N.J. May 9, 2016) (explaining the student must show "she was capable of completing the School's requirements with reasonable accommodations at the time that she requested those accommodations rather than several years prior to or after she made" her requests); *Weiss v. Rutgers Univ.*, No. 12-6834, 2014 WL 2608201, at *4 (D.N.J. June 10, 2014) (explaining a student can be "otherwise qualified . . . with or without reasonable modifications" but "to the extent that [the student] alleges that she was unable to pass her courses because of a failure to provide reasonable accommodations, [the university defendants are] correct that [the student] bears 'the burden of proving that a reasonable accommodation existed that would enable her to meet the requirements' of the program" (first quoting 42 U.S.C. § 12131(2); and then quoting *Millington*, 261 F. App'x at 366)).

[121] *See Millington*, 261 F. App'x at 367 (finding dental school met its burden to show requested accommodations for dental student would fundamentally alter its program where the accommodations would (1) "have a negative impact on [the student's] schooling and the continuity of patient care[,]" (2) impact "patient comfort" or raise "safety issues[,]" and (3) violate a policy "requir[ing] students to complete assignments for one school year before the next one begins"); *Chin*, 2016 WL 2653908, at *7–8 (finding medical school met its burden by showing the accommodations would weaken its academic standards by waiving its "Step-2" policy limiting students to two attempts at passing exams, its six-year graduation policy, and its three-year clinical completion policies), *aff'd on other grounds*, 697 F. App'x 751 (3d Cir. 2017); *Reichert v. Elizabethtown Coll.*, No. 10-2248, 2012 WL 1205158, at *11 (E.D. Pa. Apr. 10, 2012) (finding an accommodation to "provide additional time" for a certain type of assignment would fundamentally alter a course where additional time would "deprive" the student of the opportunity to receive feedback on the assignment).

[122] *See* ECF 70-1 at 17, Appx. at BMCMSJ000013, N.T. De Camara I at 49:9–14.

[123] *See* ECF 70-2 at 402, Appx. at BMCMSJ0001017, Curricular Rules at 3.

[124] *See* ECF 70-1 at 175–76, Appx. at BMCMSJ000171–72, N.T. De Camara IV at 53:2–54:19.

[125] *See* ECF 70-2 at 500–01, Appx. at BMCMSJ001115–16, N.T. Walters at 19:2–20:12; ECF 70-1 at 522, Appx. at BMCMSJ000518, N.T. Alder at 38:3–8; ECF 70-1 at 589–90, Appx. at BMCMSJ000585–86, N.T. Horsey at 21:10–22:4; ECF 70-2 at 576–77, Appx. at BMCMSJ001191–92, N.T. Gebauer at 56:2–57:8.

[126] *See* ECF 78 at 10; ECF 70-1 at 521–22, BMCMSJ000517–18, N.T. Alder at 34:13–38:13; ECF 70-2 at 505–06, Appx. at BMCMSJ001118–20, N.T. Walters at 22:19–24:14; ECF 70-1 at 60, Appx. at BMCMSJ00056, N.T. De Camara II at 135:15–136:3; ECF 70-1 at 15, Appx. at BMCMSJ000011, N.T. De Camara I at 39:22–40:8.

[127] *See PGA Tour, Inc. v. Martin*¸ 532 U.S. 661, 688–89 (2001).

[128] *Cf. id.* at 689.

[129] *See* ECF 70-1 at 179, Appx. at BMCMSJ000175, N.T. De Camara IV at 57:10–20.

[130] *See Camesi v. Univ. of Pittsburgh Med. Ctr.*, 729 F.3d 239, 247 (3d Cir. 2013) ("An action is rendered moot when 'an intervening circumstance deprives the plaintiff of a "personal stake in the outcome of the lawsuit," at any point during the litigation.'" (quoting *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013))); *see also Klaassen v. Trs. of Ind. Univ.*, 24 F.4th 638, 639 (7th Cir. 2022) (changing mootness decision—where panel originally concluded student's claim against university was not moot despite student's withdrawal because student asserted she would attend the university again if she received her requested relief—because student now declared she had "no plans to return as a student"); *Harris v. Univ. of Mass. Lowell*, 43 F.4th 187, 192, 195 (1st Cir. 2022) (holding claim is moot because student had "withdrawn and transferred" from the university and "nothing in the record suggests that [the student] has any intent or plan to transfer back to [the university]"); *Rhodes v. S. Nazarene Univ.*, 554 F. App'x 685, 690 (10th Cir. 2014) (holding student's [Act] claim against university is moot because student had "no intention of returning to the school").

[131] *See* ECF 63-2 at 16–22.

[132] *See* ECF 78 at 19–23.

[133] *See* ECF 63-2 at 18–19.

[134] *See id.*

[135] *See* ECF 78 at 21–22.

[136] *See* ECF 40 at 11–12; ECF 70-4 at 215, Appx. at BMCMSJ001587, 2022–23 Handbook at 39; ECF 70-4 at 117, Appx. at BMCMSJ001489, 2023–24 Handbook at 49.

[137] *See* ECF 63-2 at 19–20.

[138] *See id.*; ECF 69 at 10–11.

[139] *See* ECF 78 at 19–21.

[140] *See* ECF 63-2 at 19–20, 23–24; ECF 40 at 10–11.

[141] *See* ECF 70-1 at 19, Appx. at BMCMSJ000015, N.T. De Camara I at 56:8–57:6; ECF 70-1 at 20–21, Appx. at BMCMSJ000016–17, N.T. De Camara I at 61:21–62:7.

[142] ECF 70-1 at 19, Appx. at BMCMSJ000015, N.T. De Camara I at 56:8–57:6; ECF 70-1 at 20–21, Appx. at BMCMSJ000016–17, N.T. De Camara I at 61:21–62:7.

[143] *See* ECF 70-1 at 20, Appx. at BMCMSJ000016, N.T. De Camara I at 59:20–60:24.

[144] *See id.*

[145] *See* ECF 70-1 at 20, Appx. at BMCMSJ000016, N.T. De Camara I at 59:20–61:20; ECF 70-1 at 21, BMCMSJ00017, N.T. De Camara I at 63:12–64:15.

[146] *See* ECF 63-2 at 20–22; ECF 69 at 12–13.

[147] *See* ECF 70 at 22–23.

[148] *See* ECF 40 at 12; *see also* ECF 70-4 at 258, Appx. at BMCMSJ001630, 2022–23 Student Handbook at 82; ECF 70-4 at 159, Appx. at BMCMSJ001531, 2023–24 Student Handbook at 91.

[149] ECF 63-2 at 20–21.

[150] *See* ECF 70-4 at 258, Appx. at BMCMSJ001630, 2022–23 Student Handbook at 82; ECF 70-4 at 159, Appx. at BMCMSJ001531, 2023–24 Student Handbook at 91.

[151] *See* ECF 70-1 at 591, Appx. at BMCMSJ000587, N.T. Horsey at 26:10–24.

[152] *See* ECF 70-1 at 154–55, Appx. at BMCMSJ000150–51, N.T. De Camara IV at 32:23–33:19; ECF 70-1 at 158, Appx. at BMCMSJ000154, N.T. De Camara IV at 36:8–41:16.

[153] *See* ECF 70-1 at 166–72, Appx. at BMCMSJ000162–68, N.T. De Camara IV at 44:18–50:17.

[154] *See* ECF 63-2 at 20–22.

[155] *See Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997).

[156] *See Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

[157] *See id.*

[158] *See* ECF 70-4 at 255, Appx. at BMCMSJ001627, 2022–23 Student Handbook at 79; ECF 70-4 at 156, Appx. at BMCMSJ001528, 2023–24 Student Handbook at 88.

[159] *See* ECF 79-1 at 3 ¶ 26. A review of former-student De Camara's surrounding testimony also suggests she met with Dean Walters sometime during the end of summer 2022. *See* ECF 70-1 at 131–32, Appx. at BMCMSJ000127–28, N.T. De Camara IV at 9:24–10:12. Even if former-student De Camara made a good-faith report in summer 2022 about her requests for virtual accommodations she does not adduce evidence this meeting resulted in her being denied virtual access to classes.

[160] *See* ECF 70-1 at 56–57, Appx. at BMCMSJ000052–53, N.T. De Camara II at 122:8–123:10; ECF 70-3 at 12–13, Appx. at BMCMSJ001321–22, 4/12/2022 De Camara & Alder Emails.

[161] *See* ECF 70-3 at 8–13, Appx. at BMCMSJ001317–22, 4/12/2022–4/13/2022 De Camara & Alder Emails.

[162] *See* ECF 57 at 36–38 ¶¶ 117–25.

[163] *See* ECF 63-2 at 22–24.

[164] *See id.* at 22–23.

[165] *See* ECF 78 at 17–19.

[166] *See* ECF 63-2 at 23; ECF 69 at 7–8; ECF 70-1 at 251, Appx. at BMCMSJ000247, N.T. Richards-Cordell at 36:14–37:1.

[167] *See* ECF 78 at 19.

[168] *See Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) ("[A] nonmoving party must adduce more than a mere scintilla of evidence in its favor . . . and cannot simply reassert factually unsupported allegations contained in its pleadings." (citations omitted)).

[169] *See SodexoMAGIC*, 24 F.4th at 204.

[170] *See Matheis*, 936 F.3d at 175 ; *CG*, 734 F.3d at 236; *see also Hershman*, 17 F. Supp. 3d at 457.

[171] *See* 42 U.S.C. § 12102(1).

[172] *See* ECF 57 at 17 ¶ 44, 36 ¶ 118.

[173] *See* ECF 63-2 at 22–23; ECF 69 at 7; ECF 70-1 at 246, Appx. at BMCMSJ000242, N.T. Richards-Cordell at 15:15–23.

[174] *See Morgan v. Allison Crane & Rigging LLC*, 114 F.4th 214, 225 & n.53 (3d Cir. 2024) ("[F]ailure to present medical evidence of [an] impairment, in and of itself, does not warrant judgment as a matter of law." (quoting *Marinelli v. City of Erie*, 216 F.3d 354, 361 (3d Cir. 2000))); *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 998 (10th Cir. 2019) (explaining there is "[n]o language in the [Act] or implementing regulations stat[ing] that medical testimony is required" and "[t]here is certainly no general rule that medical testimony is always necessary to establish disability" (first quoting *E.E.O.C. v. AutoZone, Inc.*, 630 F.3d 635, 643 (7th Cir. 2010); and then quoting *Katz v. City Metal Co., Inc.*, 87 F.3d 26, 32 (1st Cir. 1996))).

[175] *See Morgan*, 114 F.4th at 225 (first quoting *Marinelli*, 216 F.3d at 360; and then quoting *Tesone*, 942 F.3d at 996).

[176] *See id.* (quoting *Marinelli*, 216 F.3d at 361); *Tesone*, 942 F.3d at 997 (explaining medical evidence is not needed to establish a disability based on a knee injury because "a lay jury can fathom [a knee injury] without expert guidance" (quoting *Mancini v. City of Providence*, 909 F.3d

32, 42 (1st Cir. 2018))); *Tesone*, 942 F.3d at 997 (noting a back injury also did not require supporting medical evidence where the injured person "described in detail the limitations [he] faced in his ability to care for himself" (quoting *AutoZone*, 630 F.3d at 644)); *Katz*, 87 F.3d at 32 (noting an impairment like "a missing arm" is "obvious to a lay jury").

[177] *See Morgan*, 114 F.4th at 225 (affirming district court judge's decision to grant summary judgment on a claim for discrimination based on a herniated disk because the record only included the injured person's hearsay testimony a chiropractor had diagnosed him with one and noting it agrees the injured person "needed medical evidence to substantiate that he suffered from a bulged or herniated disc"); *Tesone*, 942 F.3d at 998 (noting a rare condition like avascular necrosis requires supporting evidence and citing an earlier case where it affirmed summary judgment because the person suing "offered no medical evidence to confirm her diagnosis" or its effects on her (citing *Felkins v. City of Lakewood*, 774 F.3d 647, 648, 651 (10th Cir. 2014))); *Brandon v. Klingensmith Healthcare, Inc.*, No. 03-1963, 2005 WL 3434141, at *4–5 (W.D. Pa. Dec. 13, 2005) (noting fibromyalgia and endometriosis are "not so commonplace that a jury could be expected to evaluate the extent of its impact on [the person's] life based upon its own analysis of her testimony").

[178] *Cf. Mancini*, 909 F.3d at 42 ("On a spectrum that ranges from missing limbs to rare medical infirmities, some conditions plainly fall within the universe of impairments that a lay jury can fathom without expert guidance. These conditions do not require medical evidence in an [Act] case.").

[179] *See* ECF 78 at 18.

[180] *See* 42 U.S.C. § 12201(h) ("A covered entity under subchapter I, a public entity under subchapter II, and any person who owns, leases (or leases to), or operates a place of public accommodation under subchapter III, need not provide a reasonable accommodation or a reasonable modification to policies, practices, or procedures to an individual who meets the definition of disability in section 12102(1) of this title solely under subparagraph (C) of such section."); 42 U.S.C. § 12102(1)(C) (defining disability to include "being regarded as having . . . an impairment" which "substantially limits one or more major life activities").

[181] *See* ECF 63-2 at 23–24.

[182] *See* ECF 78 at 19–21.

[183] *See* ECF 40 at 10; ECF 63-2 at 19–20, 23–24.

[184] *See* ECF 70-1 at 246, Appx. at BMCMSJ000242, N.T. Richards-Cordell at 15:15–23.

[185] Mx. Richards-Cordell's "additional material facts" include claims they "vomited after eating" food at the College because the College did not meet their nutritional needs. *See* ECF 79-1 at 16 ¶¶ 203–05. But Mx. Richards-Cordell only cites to their third amended Complaint to support these statements. *See id.* They cannot rely on "factually unsupported allegations" from their pleadings. *See Williams*, 891 F.2d at 460.

[186] *See* ECF 57 at 33–36 ¶¶ 98–116, 39 ¶¶ 130–32.

[187] *See* ECF 63-2 at 24–31.

[188] *See id.* at 24–28.

[189] *See* ECF 78 at 13–17, 22–23.

[190] *See* ECF 63-2 at 24–26; ECF 69 at 8–9.

[191] *See* ECF 78 at 13–14.

[192] *See* ECF 63-2 at 26.

[193] *See Spokeo*, 578 U.S. at 339; *Giterman v. Pocono Med. Ctr.*, 361 F. Supp. 3d 392, 404 (M.D. Pa. 2019) ("[T]o have standing to bring a claim for injunctive relief under Title III of the [Act], [the person] must show that she faces real and immediate threat of future injury.").

[194] *See Burkhart v. Widener Univ., Inc.*, 70 F. App'x 52, 53 (3d Cir. 2003).

[195] *See Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*, 539 F.3d 199, 208 (3d Cir. 2008) (citing 28 U.S.C. § 1658; *N. Star Steel Co. v. Thomas*, 515 U.S. 29, 33–34 (1995)).

[196] *See Burkhart*, 70 F. App'x at 53 (citing 42 Pa. Cons. Stat. § 5524(2)).

[197] *See id.*; *Disabled in Action of Pa.*, 539 F.3d at 208 (applying a two-year statute of limitations to Title II claims (citing 42 Pa. Cons. Stat. § 5524)); *Katz v. Nat'l Bd. of Med. Exam'rs*, 751 F. App'x 231, 235 (3d Cir. 2018) (noting the "same statute of limitations applies to claims brought under Title II or Title III of the [Act]" (citing *Soignier v. Am. Bd. of Plastic Surgery*, 92 F.3d 547, 551 n.3 (7th Cir. 1996))).

[198] *See Disabled in Action of Pa.*, 539 F.3d at 209 ("For federal causes of action, the accrual date is a matter of federal law." (citing *Romero v. Allstate Corp.*, 404 F.3d 212, 221 (3d Cir. 2005))).

[199] *See id.* (quoting *Romero*, 404 F.3d at 222) (calling this the "federal discovery rule"); *see also Cohn v. Pa. State Univ.*, No. 19-2857, 2020 WL 738496, at *6 (E.D. Pa. Feb. 12, 2020) ("A federal discrimination claim accrues and the applicable statute of limitations begins to run when the plaintiff knows or has reason to know of the injury that is the basis of the action." (quoting *Saylor v. Ridge*, 989 F. Supp. 680, 686 (E.D. Pa. 1998))).

[200] *See Cohn*, 2020 WL 738496, at *6 (E.D. Pa. Feb. 12, 2020); *see also Katz*, 751 F. App'x at 235–36 (noting exam taker's cause of action accrued when the exam administrators denied his request for accommodations in March or "at the latest" when he took the exam without accommodations in September).

[201] *See* ECF 70-1 at 313, Appx. at BMCMSJ000309, N.T. Bañuelos at 32:12–33:2; ECF 70-1 at 314–15, Appx. at BMCMSJ000310–11, N.T. Bañuelos at 37:4–38:10; ECF 70-1 at 317, Appx. at BMCMSJ000313, N.T. Bañuelos at 48:20–49:17; ECF 70-3 at 103–07, Appx. at BMCMSJ001401–05, Bañuelos & Alder August & September 2022 Emails. In their opposition the Students claim current-student Bañuelos first contacted Director Alder in April 2022. *See* ECF 79-1 at 7 ¶ 77. But our review of current-student Bañuelos's testimony shows she agrees she first contacted Director Alder in May 2022. *See* ECF 70-1 at 314–15, Appx. at BMCMSJ000310–11, N.T. Bañuelos at 37:4–38:10.

[202] *See* ECF 1.

[203] *See* ECF 63-2 at 26.

[204] *See* ECF 78 at 13–17.

[205] *See Matheis*, 936 F.3d at 175.

[206] *Cf. Schneider*, 507 F. App'x at 137–38 (seeming to reject student's argument she could sue school for failure to provide reasonable accommodations during a period when she did not notify the school she had a disability and applying Title I's interactive process standard requiring knowledge of disability); *Lopez v. Pec*, No. 23-23012, 2025 WL 25560, at *16 (D.N.J. Jan. 3, 2025) (dismissing tenants' Title III failure to accommodate claim in part because the tenants did not "allege what disability or disabilities they have that entitle them to accommodations under the [Act], whether the [landlord] knew about their disabilities, nor how the [landlord] purportedly denied their requests for accommodations"); *Mullen v. DSW Dev. Corp.*, No, 23-518, 2024 WL 5166775, at *1–2 (W.D. Pa. Dec. 19, 2024) (denying motion to dismiss where defendant argued hotel patron failed to state a claim because he did "not allege [he] notified the hotel of his disability or need for an accommodation" because the hotel patron alleged "sufficient facts to raise a reasonable expectation that discovery will reveal evidence of the notice element of [his] Title III accommodation claim"); *Anderson v. First Premier Bank*, No. 25-5502, 2025 WL 3214776, at *3 (E.D. Pa. Nov. 17, 2025) (observing plaintiff failed to plead "whether and how she asked the Defendants to accommodate her disability"); *see also J.V. v. Albuquerque Pub. Schs.*, 813 F.3d 1289, 1299 (10th Cir. 2016) (noting in Title II context "[a] public entity must provide a reasonable accommodation under the [Act] when it knows that the individual is disabled and 'requires an accommodation of some kind to participate in or receive the benefits of its services'" and "[a] public entity is on notice that an individual needs an accommodation when it knows that an individual requires one, either because that need is obvious or because the individual requests an accommodation" (quoting *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1197–98 (10th Cir. 2007))); *Adams v. The Vanderbilt Univ.*, No. 23-00001, 2024 WL 1182861, at *19 (M.D. Tenn. Mar. 19, 2024) (citing *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862 (6th Cir. 2007) (stating "[a] plaintiff seeking to establish discrimination based on a failure-to-accommodate theory [under Title III] must show that he or she made a request for reasonable accommodation that the defendant denied" and acknowledging most of the caselaw requiring requests for accommodations "comes from Title II cases" but the requirement still "applies in Title III cases").

[207] *See* ECF 70-1 at 320, Appx. at BMCMSJ000316, N.T. Bañuelos at 59:24–60:7.

[208] *See* ECF 78 at 13–17.

[209] *See* ECF 63-2 at 27–28; ECF 69 at 9.

[210] *See* ECF 78 at 15–17.

[211] *See Spokeo*, 578 U.S. at 339.

[212] *See Doe*, 210 F. App'x at 159–60 (emphasis removed); *see also Anderson*, 943 F. Supp. 2d at 538; *Green v. DGG Props. Co., Inc.*, No. 11-01989, 2013 WL 395484, at *13 (D. Conn. Jan. 31, 2013) (finding person failed to plead facts showing a likelihood of future injury necessary for standing to sue for injunctive relief where he claimed he used a wheelchair only "at the time" he visited a public accommodation because he did not "allege a continuing disability such that it is reasonable to infer that the discriminatory treatment against him will continue").

[213] *See* ECF 70-1 at 310, Appx. at BMCMSJ000306, N.T. Bañuelos at 18:20–19:9; ECF 70-1 at 311, Appx. at BMCMSJ000307, N.T. Bañuelos at 23:4–25:25.

[214] *See* ECF 63-2 at 28–31.

[215] *See id.*; ECF 69 at 12–13.

[216] *See* ECF 78 at 22–23.

[217] *See* ECF 40 at 12; *see also* ECF 70-4 at 258, Appx. at BMCMSJ001630, 2022–23 Student Handbook at 82; ECF 70-4 at 159, Appx. at BMCMSJ001531, 2023–24 Student Handbook at 91.

[218] *See* ECF 70-1 at 333, Appx. at BMCMSJ000329, N.T. Bañuelos at 110:1–5; ECF 70-5 at 44–45, Appx. at BMCMSJ001800–01, Bañuelos Declaration; ECF 70-1 at 322, Appx. at BMCMSJ000318, N.T. Bañuelos at 66:11–68:6; ECF 70-1 at 331, Appx. at BMCMSJ000327, N.T. Bañuelos at 103:24–105:18; ECF 70-1 at 320–21, Appx. at BMCMSJ00316–17, N.T. Bañuelos at 61:20–64:15.

[219] *See* ECF 70-1 at 333, Appx. at BMCMSJ000329, N.T. Bañuelos at 110:24–111:21.

[220] The only report Ms. Bañuelos identified occurred in her November 2023 meeting with Dean Gebauer. *See* ECF 70-1 at 333, Appx. at BMCMSJ000329, N.T. Bañuelos at 110:24–111:21. But former-student De Camara's testimony includes references to meetings she says current-student Bañuelos had with administrators including a meeting with Dean Horsey and President Cassidy in the spring 2023 semester. *See* ECF 70-1 at 154–55, Appx. at BMCMSJ000150–51, N.T. De Camara IV at 32:23–33:19; ECF 70-1 at 158–63, Appx. at BMCMSJ000154–59, N.T. De Camara IV at 36:8–41:16. Even if Ms. Bañuelos made a good-faith report in this meeting the October 2023 "cancel culture" comment still is not retaliation.